67 U.S. 17 (____)
2 Black 17
THE UNITED STATES
v.
ANDRES CASTILLERO.
ANDRES CASTILLERO
v.
THE UNITED STATES.
Supreme Court of United States.

*84 Mr. Archibald C. Peachy, of California, Mr. Charles O'Conor, of New York, and Mr. Reverdy Johnson, of Maryland, for claimant.
Mr. Black, of Pennsylvania, and Mr. B.R. Curtis, of Massa chusetts, for the United States.
*144 Mr. Justice CLIFFORD.
These are appeals from a decree of the District Court of the United States for the Northern District of California, brought here under the Act of Congress of the 3d of March, 1851, entitled "an Act to ascertain and settle the private land claims" in that State.
*145 Provision was made by the first section of that act for the appointment of Commissioners to examine all such claims, and decide upon their validity; and it was provided by the 8th section of the act, that every person claiming land in that State by virtue of any right or title derived from the Spanish or Mexican Governments, should present the same to those Commissioners for their adjudication.
Pursuant to that requirement, Andres Castillero, on the 30th day of September, 1852, presented the claim in controversy for adjudication to the Board of Commissioners constituted under that act, and at the same time submitted certain documentary evidences of title, to show that the claim ought to be confirmed. Among other things, he represented in his petition to the effect, that, in the year 1845, he discovered a mine of cinnabar in the then jurisdiction of San José, which is now known as the County of Santa Clara, in the State of California; and that having formed a company for working the miné, he, on the 3d day of December of that year, received from the Magistrate of that jurisdiction, in due form, the juridical possession of the mine, and also of certain adjacent land, to the extent of three thousand varas in all directions, averring, in the same connection, that all the facts so alleged would appear by the duly authenticated papers issued from the office of that Magistrate, copies of which were submitted with the petition. He also represented, that soon after his discovery, the record of his mining possession, or a testimonio of the same, was submitted to the Junta de Fomento y Administrativa de Mineria, the highest mining tribunal of Mexico; and that the members of that tribunal, on the 14th day of May, 1846, after an examination of the laws relative thereto, and mature deliberation, declared that the juridical possession so given, although embracing an unusually large extent of land, was in conformity to law, and fully justified by the circumstances of the case, and recommended to the President through the Minister of Justice, not only that his mining possession should be confirmed, but that two square leagues of land should also be granted to him in fee for the benefit of his mining operations. Petitioner accordingly claimed the two *146 leagues of land in fee as well as the mining possession, and in support of the claim to the land, he alleged that the Minister of Justice, on the 20th day of the same month, informed the Junta de Fomento that the President had acceded to the recommendation and granted the land; that on the same day he also notified the Minister of Relations of the same fact, in order that the proper decree might be issued; and that the Minister of Relations, on the 23d day of May, 1846, issued his order to the Governor of the Department, directing him to put the petitioner in the possession of the same two square leagues of land. Referring to the last dispatch, and assuming it to be a grant, he also alleged in his petition, that on receiving the same, he started to go to that Department for the purpose of surveying the land and taking juridical possession of the same, but was interrupted in his journey and prevented from so doing by the operations of the war between the two countries.
Such is the substance of the representations of the petition so far as respects the title of the claimant, but he also alleged that he had ever since continued in possession both of the mine and the land, and that he and those claiming under him had made extensive and expensive improvements on the premises. Claimant presented certain documentary evidences of title before the Commissioners which it becomes important to notice, because it was upon those that he relied to show that the prayer of his petition ought to be granted. They consisted of certain proceedings alleged to have taken place before the Alcalde of San José Guadalupe in respect to the registry of the mine, and certain subsequent proceedings of the Junta de Fomento and other public authorities of the home government, which were introduced as showing a confirmation of the doings of the Alcalde in respect to the registry of the mine and an absolute grant of the two square leagues of land.
I. Petitioners in such cases are required by the act of Congress not only to present their claims to the Commissioners, but also the documentary evidences of title on which they rely to support the same; and in obedience to that requirement the *147 claimant presented the documents referred to in his petition, of which the following is a summary:
1. His petition, dated November 22d, 1845, addressed to the Alcalde of first nomination, representing that he had discovered a vein of silver with a ley of gold on the rancho of José Reyes Berreyesa, which he wished to work in company, and requesting the Alcalde, in conformity with the ordinance on mining, to fix up notices in public places of the jurisdiction, in order to make sure of his right when the time for the juridical possession should arrive, according to the laws upon that subject. Immediately following the petition is a certificate signed by Pedro Chabolla, certifying that the petition is a copy of the original to which he refers, and which certificate purports to have been executed on the 13th day of January, 1846, at the Pueblo of San José Guadalupe, and to have been signed in the presence of two assisting witnesses.
2. Claimant also introduced another document purporting to be a supplemental petition to the same Alcalde, dated the 3rd day of December, 1845, in which he represented that, in addition to silver with a ley of gold, he had, in the presence of several bystanders, taken out liquid quicksilver from the mine, and requested to add that statement to his previous representation in order to secure his right. Both of the petitions purport to have been executed at the Mission of Santa Clara, and to have been signed by the claimant. Appended to the supplemental petition, also, is a certificate signed by Pedro Chabolla, which is of the same date and in all respects similar to the one connected with the first petition.
3. Following the last named petition and certificate is the document filed before the Commissioners as the copy of an original then relied on by the claimant as the proper evidence to show that he made due registry of the mine, and that the juridical possession of the same was duly given to him by competent authority in accordance with the regulations of the mining ordinance. Considering the importance of the document it will be given in full. Unlike what is usual in title papers *148 executed by Mexican officials, it has no introductory caption whatever, but the translation reads as follows:
"There being no deputation on mining in the Department of California, and this being the only time since the settlement of Upper California that a mine has been worked in conformity with the laws, and there being no Juez de Letras, (Professional Judge,) in the Second District, I, the Alcalde of First Nomination, citizen Antonio Maria Pico, accompanied by two assisting witnesses, have resolved to act in virtue of my office for want of a notary public, there being none, for the purpose of giving juridical, possession of the mine known as Santa Clara, in this jurisdiction, situated on the rancho of the retired sergeant José Reyes Berreyesa, for the time having expired which is designated in the ordinance of mining, for citizen Don Andres Castillero to show his right, and also for others to allege a better right, between the time of denouncement and this date, and the mine being found with abundance of metals discovered, the shaft made according to the rules of art, and the working of the mine producing a large quantity of liquid quicksilver, as shown by the specimens which this Court has; and as the laws now in force so strongly recommend the protection of an article so necessary for the amalgamation of gold and silver in the Republic, I have granted three thousand varas of land in all directions, subject to what the general ordinance of mines may direct, it being worked in company, to which I certify, the witnesses signing with me; this act of possession being attached to the rest of the espediente, deposited in the archives under my charge. This not going on stamped paper, because there is none, as prescribed by law.
"Juzgado of San José Guadalupe, December 30, 1845.
 "ANTONIO MARIA PICO.
"Assisting witnesses:
 "Antonio Suñol,
 "José Noriega."
Annexed to this document, or immediately following it, is a receipt signed by the Alcalde, and purporting to have been executed at the same time and place as the principal document, in *149 which the signer certifies that he has received $25 on account of the fees for the possession of the quicksilver mine, named Santa Clara, which is in the jurisdiction under his charge.
4. Connected with the document, appertaining to the proceedings before the Alcalde, is another of considerable importance in the investigation, which is dated the 2d of November, 1845, and is denominated in the transcript as the writing of partnership.
Like the preceding petitions, it was executed at the Mission of Santa Clara, and by its terms it purports to be a partnership between the claimant and José Castro, Secundino Robles, and Teodoro Robles, and José Maria R.S. del Real, for the working "of a mine of silver, gold and quicksilver, in the rancho of José Reyes Berreyesa, in the jurisdiction of the pueblo of San José, Guadalupe." Article 1 provides to the effect that the claimant, "conforming in all respects to the ordinance of mining, forms a regular perpetual partnership" with the persons before named, adding that "the half of the mine, which is that of which he can dispose, will be divided into three parts"  that is, "four shares to José Castro, four shares to S. and T. Robles, and the other four shares" to the Padre Real, "as a perpetual donation." Parties were restrained by the instrument from alienating their shares; and the provision was, that the expenses should be borne in proportion to the shares. Stipulation was also made that the claimant should have charge of the operations when present, but in his absence they were to be conducted by the Padre Real, and it was also stipulated that the agreement should be authenticated by Manuel Castro, the Prefect of the Second District. His certificate is appended to the document, in which he certifies, under date of the 8th of December, 1845, that it is a copy of the original, and the certificate purports to have been executed at Santa Clara, in the presence of the Alcalde, to whom the petitions were addressed. Congress recognized the existence of war between Mexico and the United States, on the 13th of May, 1846, and it is not denied that the official functions of the Mexican officers in that Department entirely ceased as early as the 7th of July in that year. Reference to these dates becomes necessary. *150 especially to the latter, because after that time the civil officers in that Department during the war were such as were appointed by our military commanders.
5. He also introduced another certificate, which applies to each and all of the foregoing documents. It is signed by James W. Weekes, Alcalde of San José Guadalupe, and reads as follows:
"I certify in due form, that the foregoing is a faithful copy, made to the letter from its original, the `espediente' of the mine of Santa Clara, or New Almaden, which exists in the archives under my charge, to which I refer. And in testimony thereof I have signed it this 20th day of January, 1848."
Four additional certificates are also appended to this espediente, as it has been called in argument at the bar. Of these, the first was executed at San Francisco, and is signed by James Alexander Forbes, British Vice-Consul, in which he certifies under date of the 21st of January, 1848, that the signature of the last named Alcalde is the true and proper handwriting of the person it represents. None of the other three were executed in California, but respectively bear date at Tepic, in the Department of Jalisco. One is signed by Jesus Vejar, a notary public, in which he certifies under date of the 15th of March, 1850, to the effect that the signature of the British Vice-Consul is genuine. Another is, the signature of the first Alcalde at that place, in which he certifies under the same date that the mark and signature of the notary are those he is accustomed to use, and the last is the certificate of the Consul of the United States at that place, in which he certifies, under date of the 1st of December, 1850, that "the signatures attached to the foregoing document are in the true handwriting of the subscribers."
II. Other documents were also introduced by the claimant as showing a confirmation of the doings of the Alcalde in respect to the registry of the mine, and which it is insisted by his counsel establish his right to the two square leagues of land. They do not purport to be originals, but were admitted in evidence as sworn copies of originals, alleged to be on file in the archives of the Junta de Fomento and other Departments of the Supreme *151 Government at the capital of the Republic. Briefly described, the documents of this class, introduced before the commissioners, are as follows:
1. Copy of a letter from the claimant, dated at the Mission of Santa Clara on the 19th of February, 1846, and addressed to Tomas Ramon del Moral, in which he states in effect that he has discovered an abundant deposit of cinnabar, and that he sends with the communication some of the ore and a little quicksilver, that it may be assayed.
2. He also introduced a copy of a letter from J.J. de Herrera, which was addressed to the same person as the preceding letter, in which the writer, under date of the 13th of April, 1846, professes to give certain extracts from two letters received by him at the City of Mexico from the claimant, while the latter was at the Mission of Santa Clara. These letters, as described in the copy of the communication given in evidence, were dated on the 19th and 22d of February, in the same year, and the extracts represent the claimant as saying that at the distance of five leagues from the Mission to the west he had discovered and denounced a very abundant mine of quicksilver, and that he had sent to his correspondent some of the ore procured from the top of the vein to confirm his statement, together with a little quicksilver which was taken out with the greatest facility.
3. Copies of two communications, showing that the specimens of ore so sent were submitted to the Junta Facultativa, and that an assay founded on a mean of the different specimens, gave a "ley" of twenty-five and a half per cent.
4. Copy of a letter or report from the President of the Junta to the Minister of Justice, under date of the 5th of May, 1846, communicating the fact of the reception of the specimens of ore and of the successful result of the assay.
5. Copy of the reply of the Minister of Justice, dated four days afterwards, in which he states that the President ad interim of the Republic learns with satisfaction that the claimant has discovered a deposit of quicksilver of excellent quality.
6. Claimant also introduced a copy of a communication signed by him under date of the 12th of May, 1846, addressed to the *152 Junta for the encouragement and administration of mining, as fully set forth in the transcript.
Referring to his discovery as a mine of quicksilver in the Mission of Santa Clara, he states that he has denounced and taken possession, not only of said mine named Santa Clara, but also of an extent of three thousand varas in all directions; that he has formed a company to work it, constructed the pit, and complied with all the conditions prescribed by the ordinance. Intimation is there given that he could easily have secured aid from foreign houses, but that he preferred that the establishment should be entirely national, and for that reason had not hesitated to apply to the Junta for such assistance as he at present needed. His representation was that he only wanted a small advance of $5,000, on account of the scarcity of coin in that Department, and an immediate remittance to the mine of retorts, cylinders, and other small distilling apparatus, and also iron flasks for bottling up the quicksilver. He suggested that he would have proposed a contract of partnership to the Junta as an avio, or some other agreement, if there had been time to furnish the proofs and details which would be required for such an arrangement, but being obliged to leave the capital within a few days, he found it necessary to restrict himself to "that which appears to present no difficulty and which may open a way to a future agreement." What he desired of the Junta was not only that they should accede to his requests as far as they had the power, but that they should send such as they could not grant to the Supreme Government, recommending their adoption, and with that view he submitted nine propositions, which were as follows:
"First. The Junta, in the act of approving the agreement, will give me a draft for $5,000 on some mercantile house in Mazatlan.
"Second. On my part, I bind myself to place in said port, within six months after leaving it, fifty quintals of quicksilver, at the rate of $100 each, which I will send from the first taken out, with absolute preference over every other engagement.
"Third. The Junta will order that there be placed at my disposition *153 before leaving the capital, the eight iron retorts which it has in its office, and all the quicksilver flasks which can be found in the negociacion of Tasco, which are fit for use; and, lastly, it will deliver to Señor Don Tomas Ramon del Moral, my attorney, the sums to pay for the retorts, cylinders, and other kinds of small apparatus, which may be ordered to be made for the negociacion, to the amount of $1000.
"Fourth. I will receive the retorts of the Junta at cost price, and the flasks which I may select at $2 a piece, agreeably with their valuation.
"Fifth. The ascertained value of said retorts and flasks, and that of the sums which may be delivered to Senor Moral, I will return in the term of one year from this agreement, and also the premium on the draft on Mazatlan, in quicksilver, placed in said port at the price of $100 the quintal; but if the Junta should wish to take one or more `acciones' in the mine, it shall be left as a part payment of the sum corresponding to one or more `barras.'
"Sixth. While the company is being formed, during the period of one year, counted from the date on which this agreement shall be approved, and the $5,000 spoken of in the first proposition being paid, I will give the preference to the Junta in the sale of quicksilver placed in Mazatlan, at the rate of $100 the quintal.
"Seventh. The Junta shall represent to the Supreme Government the necessity of approving the possession which has been given me of the mine by the local authorities of California, in the same terms as those in which I now hold it.
"Eighth. It shall also represent the advantage of there being granted to me, as a colonist, two square leagues upon the land of my mining possession, with the object of being able to use the wood for my business.
"Ninth. For the compliance of this contract I pledge the nine itself and all its appurtenances."
7. On the 14th of the same month the President of the Junta communicated the letter of the claimant, or petition as he calls it, to the Minister of Justice, and in that communication the mine is described as the quicksilver mine in the Mission of Santa *154 Clara in the Department of California. Claimant also introduced a copy of that communication. Among other things, the writer states that the Junta "has no hesitation in recommending the petition" to the favorable consideration of the Government; that they, the Junta, are of the opinion that the sum of $5,000 should be advanced to the applicant on the terms proposed, and that they should be authorized to furnish him with such iron retorts and flasks as they had on hand, and to advance him the other $1,000 asked, which, as they stated, could be employed in the construction of retorts, cylinders, and other small apparatus for the use of the mine.
They also refer to the reasons assigned by the claimant for deferring the formation of a contract of partnership, or avio, and state, in effect, that they, the Junta, regard it as satisfactory. Reference is also made to that part of the claimant's petition in which he represents that he has denounced and taken possession not only of the mine, but also of an extent of three thousand varas in all directions, and their views upon that subject were, that the possession given by the local authorities was "not in conformity with the ordinance," because it embraced an extent greater than the ordinance allowed, but, notwithstanding that fact, they presented various arguments for the consideration of the Department to show, that, under the circumstances of the cases, it might be sustained. In respect to the two square leagues of land solicited by the claimant as a colonist, the Junta declined to express any opinion for or against the application for the reason, as stated, that they had no information upon the subject, and therefore left that matter to be decided by the President as he might think proper.
8. Both the petition of the claimant and the recommendation of the Junta were, by the Minister of Justice, laid before the President, and the former on the 20th of May, 1846, sent a dispatch to the Junta, informing them that the President had been pleased to approve, in all its parts, the agreement made with the claimant, "in order to commence the working of said mine," and that the corresponding communication was made to the Minister of Relations to issue the proper orders respecting that *155 which was contained in the eighth proposition for the grant of lands in that Department. Under the same date a decree, so called, was entered by the Minister of Justice in the margin of the communication received by him from the Junta, in the following terms: "Granted in the terms which are proposed, and with respect to the land; let the corresponding order issue to the Minister of Relations for the proper measures of his office, with the understanding that the Government accedes to the petition." Copies of the dispatch of the Minister of Justice and of the last named document were also introduced by the claimant.
9. On the same day, the Minister of Justice sent a dispatch to the Minister of Relations, informing him of what had been done; in which it is also stated, that the President had acceded to the petition of the claimant, and that the dispatch was transmitted to the end that there might be granted to the claimant, as a colonist, two square leagues upon the land of his mining possession. Copy of that dispatch was also introduced by the claimant:
10. Finally, the claimant introduced a copy of a dispatch from the Minister of Relations to the Governor of California, dated on the 23d day of May, 1846, in which the former, after transcribing the dispatch to him from the Minister of Justice, and incorporating a copy of the same into his own dispatch, as an explanation of the transaction, adds as follows: "And I transcribe it to your Excellency, that in conformity with the provisions of the laws and decrees relative to colonization, you may give Señor Castillero possession of the two square leagues above mentioned."
Remark should be made, that in all of the documents introduced as copies of originals on file in the Department of the Supreme Government, the mine is described as one discovered by the claimant in the Mission of Santa Clara; and in no one of them is any allusion made to the fact that it was situated on the rancho of José Reyes Berreyesa, as represented in the first petition of the claimant, and repeated in the act of juridical possession alleged to have been executed by the Alcalde.
*156 11. Parol testimony was also introduced by the claimant in support of his claim, both to the mine and to the two square leagues of land, to which some brief reference will be made. He proved by Charles S. Lyman, that he, the witness, made a survey of the land around the mine in the month of February, 1848, at the request of James Alexander Forbes, of California, and Alexander Forbes, of Tepic, in Mexico, who was at the mine at the time of the survey. His orders were to lay out two square leagues; and he states that he was shown a grant, or a copy of a grant, for that quantity from the Mexican Government. They requested him to locate the grant so as to cover certain mining rights called "pertenencia," extending three thousand varas in every direction from the mouth of the mine; and he states that it was so surveyed as to have the mouth of the mine as nearly in the centre as could be without covering land of the neighboring ranchos claimed by individual owners. Field notes of that survey were exhibited, and Fernando Alden, who was also examined by the claimant, testifies that he assisted in making a part of it, and he confirms the testimony of the first witness as to the location of the alleged grant. By his testimony it also appears that he heard of the grant in 1846, when he was in Mexico, and that he was employed by Alexander Forbes, the agent and partner of the claimant, to go to California for the purpose of working the mine, erecting buildings, and occupying the land so granted; and he testifies that he first went to live on the land about the 1st of April, 1847, and continued to reside there until about a year before he gave his testimony, acting as the agent and overseer of the company holding under the claimant. Witnesses were also examined by the claimant to prove that the copy of the act of possession executed by the Alcalde, and the other papers included in that espediente, were true copies of the originals, and that the originals were genuine documents. To prove these facts, he called and examined Frank Lewis, Deputy Recorder for the County of Santa Clara, who, upon being shown a certain paper entitled "Posesion de la mina de Sta Clara de Año 1845," stated that he obtained it from the office of the Recorder of that county. Having made that statement, *157 the witness was then requested to compare the copies filed in the case with the corresponding parts of that paper; and after naving done so, he testified that they were true and exact copies. Two witnesses, Antonio Suñol and José Noriega, who, it will be remembered, were the assisting witnesses to the act of possession executed by the Alcalde, were also called and examined by the claimant in respect to the authenticity of the supposed original document. They were accordingly requested to examine the same, and having complied with that request, respectively testified that all the signatures, including their own, were genuine. Claimant also called and examined José Maria La Fragua in respect to the class of documents introduced as copies of originals on file in the archives of the Supreme Government, and his testimony was to the effect that he had compared all those documents with the originals in the City of Mexico, and found them to be correct.
Commissioners, or a majority of them, adjudged that the claim to the mine was valid, and confirmed the mining right or privilege of the claimant, as pertenencia, to the extent of three thousand varas in all directions from the mouth of the mine; but they unanimously adjudged the claim to the two square leagues of land to be invalid, and rejected that part of the claim.
Appeal was taken both by the claimant and by the United States to the District Court of the United States for the Northern District of California.
Much additional documentary evidence was introduced in the District Court, and more than one hundred additional witnesses were examined in respect to the matters involved, or supposed to be involved, in the controversy. Parties were fully heard, and on the 18th day of January, 1861, the District Court entered a decree confirming the claim to the mine, but diminishing the mining right, or privilege, as compared with the decree of the Commissioners, and adjudging the claim to the two square leagues of land to be invalid and rejecting the same. By the terms of the decree, the mining right, or privilege, of the claimant is described and defined as "a piece of land embracing a superficial area, measured on a horizontal plane, equivalent to *158 seven pertenencias," regarding each pertenencia as a solid of a rectangular base two hundred varas long, of the width established by the ordinance, and in depth extending from and, including the surface, to the centre of the earth.
Whereupon both parties appealed to this Court. No. 123 is the appeal of the claimant, and No. 133 is a cross-appeal of the United States.
Power to decide upon the validity of any claim presented to land in California, by virtue of any right or title derived from the Spanish or Mexican Government, as matter of original jurisdiction, is, by the Act of the 3d of March, 1851, exclusively conferred upon the Commissioners appointed under the first section of that Act. Appellate jurisdiction, however, is conferred upon the respective District Courts of the United States for the Northern and Southern Districts of California, and finally upon this Court. In deciding upon any such claim, the rule of decision is, as prescribed by the eleventh section of the Act, that the Court or tribunal making the decision shall be governed by the treaty under which the lands were acquired, the law of nations, the laws, usages, and customs of the government ceding the same, the principles of equity, and the decisions of this Court, so far as they are applicable.
III. Enough has already been remarked, in view of those provisions, to show that there are three principal questions involved in the record of very considerable importance.
First. Whether the claim of the petitioner to the two square leagues of land, under the rules of decision already mentioned, is shown by the documentary and other evidence to be a valid one within the meaning of the eighth section of the Act providing for the adjudication.
Secondly. Whether the Commissioners had jurisdiction to decide upon the validity of the claim to the mine and mining right, or privilege, as described in the petition, or in other words whether the claim to the mine, together with the pertenencias to the same, as recognized in the Mining Ordinance, is a claim to land within the meaning of the provisions of the 8th section of that Act.
*159 Thirdly. Whether the claim to the mine, including the mining right, or privilege, as set forth in the petition, is shown by the documentary and other evidence to be a valid one under the rules of decision already described.
1. Title to the two square leagues of land, it is insisted, became vested in the claimant by virtue of the documents on file in the Department of the Supreme Government, as evidenced by the copies filed in the case at the time the petition was presented to the Commissioners. They consist, it will be remembered, so far as that part of the claim is concerned, of the communications from the claimant to the Junta de Fomento, their report or recommendation to the Minister of Justice, his reply to the same, together with the decree made by him in the margin of their communication, and his dispatch to the Minister of Relations and the dispatch of the Minister of Relations of the 23d of May, 1846, to the Governor of the Department where the land was situated. Forty witnesses or more, mostly from the City of Mexico, were examined by the claimant to prove the authenticity of those documents, or of the corresponding originals, on file in the archives of the Supreme Government, and various other proofs, in the form of exhibits, were also introduced for the same purpose, filling a large space in the transcript which contains more than three thousand five hundred pages of closely printed matter.
Such testimony and proofs were regarded as essential, because it was and is insisted by the United States that the documents were fabricated, but in the view we have taken of the case it will not be necessary to decide or consider that question, and consequently neither the testimony of the witnesses or the exhibits on that point will be reproduced. According to the evidence introduced by the claimant, Mariano Parades y Arrillaga, assumed the functions of President ad interim of the Republic on the 15th day of December, 1845, and the same proofs show that he continued in authority as such until the 29th day of July of the following year, when he surrendered his power, and for a time took command of the army.
Counsel for claimants assume that during that period the *160 President was in the exercise of extraordinary powers, and it must be conceded that the evidence is full to that effect, although it may well be doubted whether such of his official acts as were in violation of law have ever been ratified by the Mexican Government. Assuming that the President was in the exercise of extraordinary powers on the 23d day of May, 1846, the claimant insists that the dispatch of that date from the Minister of Relations to the Governor of the Department of California, especially when it is considered in connection with the marginal decree and dispatch of the Minister of Justice of the 20th of the same month, is of itself an absolute grant of the two square leagues of land described in his petition.
Conceding the power of the acting President of the Republic to make such a grant of the public domain, the question then is one of construction, and in that view of the case it becomes necessary to examine with care so much of the several documents as relate to the claim for the two square leagues of land. Petitioner's representation to the Junta de Fomento was that he desired such a grant in order that he might be able to procure sufficient fire-wood for his mining works, and the effect of his request, as stated in his eighth proposition, was that they, the Junta, should recommend to the Supreme Government that there be granted to him, "as a colonist," two square leagues upon the land of his mining possession. When he made that request for a grant as a colonist he evidently referred to the colonization laws as containing the authority to comply with his request and make the grant. Those laws had then been in operation for more than twenty years, and consequently he must have expected, even if the Government acceded to his petition, that the grant would be issued in conformity to those laws, and of course must be executed by the Governor, subject to the approval of the Departmental Assembly.
Such also was the view taken of the matter by the Junta in their communication to the Minister of Justice, as plainly appears from the language employed by them in describing his eighth proposition. They refer to it as a petition in which the claimant solicits as a colonist two square leagues of land "upon *161 the surface of his mining property for the purpose of supplying himself with the fire-wood necessary for the reduction of the ores," evidently showing that they regarded it as an application under the colonization laws. Nothing is expressed in the decree or memorandum made by the Minister of Justice in the margin of the communication from the Junta which, if rightfully understood, affords any countenance whatever to the views of the claimant. Reliance is placed upon the introductory words, to wit: "Granted on the terms proposed," but it is so obvious from what follows in the same connection, that those words refer to the terms proposed as an arrangement for exploring and operating the mine, that it is difficult to see how any one can be misled in regard to their import. Justification for that remark will be found in the directions immediately given "with respect to the land," which are that the corresponding order be issued to the Minister of Relations for the proper measures of his office, with the understanding that the Supreme Government accedes to the petition. Strong doubts are entertained whether the order, "with respect to the land," was intended as anything more than the usual office direction to the corresponding clerk in the Department to prepare and put in form a dispatch upon the subject which should express the views embraced in the marginal directions.
Support to that view is certainly derived from the fact that a dispatch was prepared and sent on the same day, which, in its concluding sentence, contains substantially the same language, in the form of a request that the "orders corresponding" may be issued. Other matters, however, are stated in the dispatch which ought not to be overlooked. After stating the fact that he had laid the communication of the Junta before the President, he proceeds to say that "His Excellency had been pleased to approve, in all respects, the agreement made with the claimant in order to commence the working of said mine," adding that he communicates the information that there may be granted to the claimant, as a colonist, the two square leagues of land, and requesting the Minister of Relations "to issue orders corresponding." Additional orders, therefore, were assumed to be necessary, and *162 the concluding sentence of the dispatch to the Minister of Relations written on the same day, and already referred to, shows what kind of orders were contemplated at the time the marginal decree was made. Prepared as those documents were on the same day, they must be considered together, and when so considered, it is clear and beyond doubt, that the marginal decree with respect to the land was not drafted or intended as a grant or any evidence of a grant; for if it had been, the officer who drafted it never would have asked for any order upon the subject from a co-ordinate Department of the Government.
Request was made by the claimant, in the first place, that a grant might be made to him as a colonist, and it conclusively appears, we think, from an examination of those dispatches, that the Mexican officials who wrote them never for a moment contemplated that the claimant was to have a grant of land in any other mode than by the usual proceedings under the colonization laws. Abundant confirmation of that proposition, if any be needed, is to be found in the dispatch from the Minister of Relations to the Governor of the Department, which is the document that the claimant professes to regard as an absolute grant of the land described in his petition. Mexican officials, in their correspondence upon official matters of domestic concern, usually transcribe and incorporate into their own dispatches such communications as they have previously received upon the same subject from other official sources. Such was the course pursued by the Minister of Relations in his dispatch to the Governor of the Department. He accordingly transcribed into his dispatch a copy of the one sent to him from the Minister of Justice, in which is also contained a copy of the before mentioned communication to the Junta, and referring to the entire dispatch, he states in effect, that he transcribed it to the Governor in order that he, the Governor, in conformity with what is prescribed by the laws and dispositions upon colonization, may put the claimant in possession of the two square leagues of land which are mentioned in the communication. Conformity to the laws and regulations upon the subject of colonization grants is plainly contemplated and required by the directions of that *163 dispatch, and consequently it is clear that the Governor could not put the claimant into the possession of the described tract in any other mode than by the usual proceedings under those laws.
2. Claimant calls this a grant, and it is his privilege to do so if he sees fit; but it is vain for him to expect that this Court can give its sanction to any such manifest error. Vacant lands in California belonged to the Supreme Government, and the laws for the disposition of the same emanated from that source. U.S. vs. Knight, (1 Black, 242.)
General rules and regulations upon the subject were accordingly ordained, authorizing the Governors of Territories, under certain specific conditions, to grant such lands to such of the persons therein described as might ask for the same for the purpose of settlement and cultivation. Persons soliciting such lands were required by those rules and regulations to address a petition to the Governor, setting forth their names, country, profession and religion, and also to describe the land asked for as distinctly as possible, by means of a diseño or map annexed to the petition. He was not required to prove his representations, but it was made the duty of the Governor to obtain the necessary information to enable him to determine whether the case fell within the conditions specified in the regulations, both as regarded the applicant and the land. None of these conditions, of course, were ever complied with, because the proofs show, and it is conceded, that the dispatch was never transmitted to the Governor, and that the claimant never returned to that Department. Application for a grant was never made under that dispatch, and so far as appears, the Governor of the Department was never informed that it had been issued. Unless the lands were vacant, such an application would have been fruitless, as the Governor had no power to grant any other than vacant lands. Suppose it to be true that the mine is on the rancho of José Reyes Berreyesa, or that of Justos Larios, then the power of the Governor to make he grant was entirely wanting; and it would not benefit the claimant if it were now shown that the mine was and is on public land; because, if his representations are to be credited he, and all those associated with *164 him, fully believed that it was not a part of the public domain. Contrary to this view, it is insisted by the claimant that inasmuch as the President, by whose direction the dispatch was issued and delivered to the party, was in the exercise of all the powers of Government, the non-delivery of the dispatch to the Governor of the Department is wholly immaterial, that the dispatch itself was a decree of concession, and the placing it in the hands of the grantee was a sufficient delivery to vest an equitable title at least in the claimant.
3. Power in the President to make such a grant is not denied by the United States; but the question is, whether he exercised or attempted to exercise any such power, which under the circumstances must depend upon the construction to be given to the dispatch of the Minister of Relations addressed to the Governor of the Department. Explanations already given show to a demonstration, we think, that such is not the true construction of the dispatch, and consequently the proposition of the claimant cannot be sustained, and in rejecting the proposition as untenable, we place our conclusion upon the ground that the proposition assumes an erroneous construction of the dispatch under consideration, and is based entirely on that assumption.
4. Attempt is made to support the proposition by some of the remarks of this Court in the case of U.S. v. Castillero, (23 How., 468,) but it is evident that the construction given to the opinion of the Court in that case is quite as erroneous as that given to the dispatch of the Minister of Relations. Title to the island of Santa Cruz, near the coast of that Department, was claimed in that case by virtue of a regular grant from the Governor. Such grant it is true had been issued by the Governor, under a special dispatch from the Minister of the Interior, but the statement is nevertheless correct that the claimant held the island under a formal grant which was in the list of grants included in the Jimeno index. Lands of the islands prior to the 20th day of July, 1838, had never been granted by the Governor of that Department, and the better opinion is that the colonization laws did not confer the power to make such grants. Authority upon that subject was on that day conferred upon the Governor in *165 connection with the Departmental Assembly by a general order, as is more fully explained in that opinion. Direction was given to the Governor on the same day by a special dispatch that one of the islands, such as the claimant in that case might select, should be assigned to him before they proceeded under the general order. He accordingly selected the island mentioned, and the Governor issued title papers to the donee. Objection was made here to the confirmation upon the ground that the grant had never been approved by the Departmental Assembly, but the Court overruled the objection. Absolute directions were given in that case in respect to lands not authorized to be granted under the colonization laws, and the power so conferred had been exercised and the doings of the Governor in making the grant acquiesced in for a period of eight years before the jurisdiction of the territory was acquired by the United States. Compare that statement, which is undeniable, with the facts of this case and it is obvious that the supposed analogy utterly fails.
By the terms of the dispatch under consideration the proceedings in this case were directed to be "in conformity with what is prescribed by the laws and dispositions upon colonization," and of course the discretion of the Governor and that of the Departmental Assembly were to be exercised in the performance of their respective duties under the obligations imposed by law. Something also remained to be done by the claimant in order to call forth the exercise of that discretion. He must prepare and present his petition describing the land, and he must also prepare and present, if required, a diseño or map of the land in order that the Governor might have the means of ascertaining whether the tract solicited was vacant and so situated that it might properly be granted to the applicant. No such petition was ever presented, and no action of any kind ever took place upon the subject. But we forbear to pursue the comparison, as it must be obvious, we think, to every unprejudiced mind, that the two cases are in no substantial respect alike. For these reasons we are of the opinion that the claim to the two square leagues of land cannot be sustained.
*166 IV. Before entering upon the examination of the questions involving the validity of the title of the claimant to the mine and mining right or privilege claimed by him, it becomes necessary to consider and decide the question whether the Commissioners under the Act of the 3rd of March, 1851, had jurisdiction over such a claim. Counsel for the claimant maintain the affirmative of that question, but the jurisdiction of the Commissioners is denied by the counsel of the United States upon several grounds:
1. They insist, in the first place, that the ownership of a mine under the Mexican law was not the ownership of the land in which the mine was situated; that it was simply the ownership of the right to take from the soil the minerals therein to be found, and was recognized as a right, severed from all public and private land which was vested in the sovereign and which did not pass by a grant of the land, and was capable of being acquired only by a title from the sovereign power, wholly distinct from the title to the land.
2. Several of those propositions, if properly restricted and rightly applied, may well be admitted, because when so restricted and applied they are undoubtedly correct. Mines under the Mexican law may be the subject of rightful ownership, distinct from the land as such for agricultural or other ordinary uses. Ownership of a mine, however, as secured under the mining ordinance by registry and juridical possession, does not consist alone in the right to take from the soil the minerals therein to be found, but it also embraces, if necessary to the working of the mine, a right to the exclusive possession and use of the surface of the land for an indefinite period within the boundaries of the pertenencias appertaining to the mining right or privilege. Such rights are by law regarded as severed from private land and also from public land when granted by the usual forms of conveyance for agricultural or other ordinary purposes. Gamboa by Heathfield, p. 132, sec. 5. Rights to a mine not registered can only be acquired from the sovereign power, and it is true, as contended by the United States, that the forms of such a conveyance are wholly distinct from those employed in the ordinary *167 process of granting lands. Another branch of the same proposition, not yet reproduced, may also be admitted in the same qualified sense. Mining rights under Mexican laws undoubtedly are usually held upon conditions not affecting the title to the land as derived under the ordinary conveyances, and it is also true that such rights may be acquired and held by others besides the owner of the land under the ordinary grants, and that such rights are terminable when by their use the minerals contained in the soil are wholly removed. Granting all this, still the question arises whether a mine, together with the mining right or privilege appertaining to the same, is not land within the meaning of the Act of Congress under which the Commissioners were appointed. Persons claiming lands in California by virtue of any right or title derived from the Spanish or Mexican Governments are required to present the same to the Commissioners for adjudication, and of course the Commissioners have jurisdiction to decide upon the validity of all such claims. 9 Stat. at Large, 632.
3. Questions concerning mines and mining rights in Mexico depend in a great measure upon the provisions of the Ordinance of the 22d of May, 1783, which, although ordained long before her independence, by the sovereign of the parent country, is still in force and constitutes the principal code of the Republic upon that subject. Omitting unimportant words, article 1, of the 5th title, reads as follows: Mines are the property of my royal crown as well by their nature and origin as by their re-union declared by law. Article 2 contains the following provision: Without separating them from the royal patrimony I grant them to my subjects in property and possession in such manner that they may sell them, rent them, pass them by will either in the way of inheritance or legacy, or in any other manner alienate the right which in the mines belongs to them, on the same terms in which they themselves possess it, and to persons capable of acquiring it. Rockw. on Mines, p. 49; Halleck Coll. 222.
Discoverers of a new mine in which no pit or shaft had beer opened might acquire three pertenencias, and if worked in company *168 a certain additional number not exceeding seven in all. Writers do not exactly agree as to what is a pertenencia, but the better opinion is that it is a square of two hundred varas, or five hundred and fifty feet. Prima facie, the owner of freehold lands, says Bainbridge, is entitled to all the minerals on and underneath the surface with the exception of royal mines, but he admits that the rule just stated is only a presumption of law, and that a mine may form a distinct possession and inheritance by the production of a title distinct from that to the surface. Bainb., p. 4. He also admits that when mines form a distinct inheritance and are not attached to the ownership of the lands in which they are situate, or form a part of a demesne of a manor, a title to them may be acquired or lost in the same manner as to a common estate of freehold. Bainb., p. 31. Property in minerals unsevered from the land, says Collyer, whether held together with or separately from the property in the land, is what the law terms a corporeal hereditament, as distinguished from the mere right to work for them, which is an incorporeal hereditament; and he also says that an estate in minerals is considered an estate in land, and is transferable only under the same restrictions, whether conveyed with or without a conveyance of the adjacent soil. P. 1.
4. Courts of justice also have had occasion to assert the same general principles. Plaintiff in ejectment was allowed, in Turner vs. Reynolds, (23 Penn. R., p. 199,) to recover a coal mine which he had described in his writ as land, although his title was under a conveyance to him, not of the tract of land, but of the coal which was unsevered. Coal and minerals in place are land, say the Court in Caldwell vs. Fulton, (31 Penn. R., 483,) adding in the same connection that it is no longer to be doubted that they are subject to conveyance as such. Minerals beneath the surface of the land, it is held in the same case, may be conveyed by deed, distinct from the right to the surface, and in enforcing that view the Court remark that nothing is more common in that State than that the surface right should be in one and the mineral in another, and we have no doubt that the rule there laid down is correct. Comyn vs. Wheatley, (Cro. Jac., 150.)
*169 Regarding the claim to be fully proved as set forth in the petition, which is the proper view to take of the case in determining the question under consideration, we are of the opinion that the objection to the jurisdiction of the Commissioners cannot be sustained, and it is accordingly overruled. Rockw., chap. 11, p. 519-529; 530-532.
V. Having come to that conclusion, it becomes the duty of this Court to examine the third question presented for decision, which, is, whether the claim to the mine, including the mining right or privilege as set forth in the petition, is shown by the evidence to be a valid one within the rules of decision already described.
1. Property in mines not discovered, and registered according to law, whether the mine was on public or private lands, was vested, as has already appeared, exclusively in the Supreme Government, so that private persons could not acquire it or any interest in it in any other mode than that prescribed in the provisions of the mining ordinance. Reference therefore must be made to those provisions to ascertain what they are and what the discoverer is required to do in order to acquire such a property. Persons discovering one or more mineral hills absolutely new, in which there is no mine or trial pit open, may, under article 1, title 6, of the ordinance, acquire, in the principal vein which they may select, three pertenencias, continuous or interrupted, according to certain prescribed measurements, and if they have discovered more than one vein they may have one pertenencia for each, to be determined and marked out within the term of ten days. Halleck Coll., p. 223, title 6, art. 1.
Discoverer of a new vein in a hill known and worked in other parts may have in it two pertenencias, provided he specifies them within ten days, as mentioned in the preceding article; p. 223, art. 2. Article 3 provides that he who asks for a new mine in a vein known and worked in other places shall not be a discoverer. Such persons as are described in the preceding articles who desire to secure the benefit of those provisions are required by article 4 of the same title to present themselves with a written statement before the Mining Deputation of that *170 Territory or the nearest one, should there be none there, stating in it their names and those of their partners, if they have any, the place of their birth, their residence, profession and employment, and the most particular and distinguishing feature of the place, hill or vein, of which they ask adjudication; all of which circumstances and the hour in which the discoverer presents himself shall be noted in a book of registry, which the Mining Deputation and Notary, if there be one, shall keep, and this being done, his written statement shall be returned to him attested for his due security. Notices are then to be affixed to the doors of the church, the Government houses, and other public places of the town for due information, and the command is that the discoverer within ninety days shall make or cause to be made in the vein or veins of his registry a pit or well (pozo) of one and a half varas in diameter at its mouth and ten varas deep, and that as soon as this shall be done, one of the deputies shall personally go, accompanied by the Notary, if there be one, and if there be none, by two assisting witnesses, and by the professional mining expert of that Department, to inspect the course and direction of the vein, its width, its dip or inclination to the horizon, called lay or slope, its hardness or softness, the greater or lesser solidity of its sides, and the kind or principal indications of the mineral, taking an exact account of all this in order that it may be added to the corresponding part of his registry, with the evidence of possession, which shall immediately be given to him in the name of the sovereign measuring to the party his pertenencias, and causing him, as required in the subsequent directions of the ordinance, to fix stakes in his boundaries. Following these regulations, and as the conclusion of the article in which they are contained, it is ordained to the effect that when all this is done "there will be delivered to him an attested copy of the proceedings as a corresponding title."
Contestants appearing during the ninety days may prefer a counter claim, and in that event it becomes the duty of the tribunal to adjudge the right to him who shall make the better proof, but no one shall have any right to be heard unless he *171 shall appear within that time. Halleck Coll., p. 224, arts. 4 and 5.
Strict compliance with the law is required, as appears by all the writers upon the subject, and the 13th article, of title 19, provides in effect that the regulations shall be executed with the greatest exactness, precisely as they are written and intended. Halleck Coll., p. 307; Rockw., p. 110; Thompson on Mines, 183.
Properly speaking, says Gamboa, the register is the book in which deeds and grants are entered for perpetual remembrance thereof, so that if they be lost, torn or defaced, or if any question be raised as to their identity or authenticity, recourse may be had to such book. Registry, says the same author, is the basis of a title to a mine, and the attributive cause of the subject's right of property in it; the Crown having subjected the proprietor to this obligation when he made the mines common, so that "no mine can be lawfully worked until registry is made, without which it is liable to be registered by any other person; the form of the ordinance not having been complied with." Although that commentary was written before the date of the ordinance which must furnish the guide in this case, still the views of the writer have an important bearing upon the questions presented, as showing the universality of the rule, that not even the discoverer can acquire any title to a mine without registry. Gamboa, pp. 143, 145.
2. Petition in this case was presented to the Commissioners on the 30th day of September, 1852, and on the 8th day of January, 1856, their decree was made, confirming the claim to the mine and to the entire mining right or privilege as therein set forth. When the petition was filed, the claimant, as required by law, also presented the documentary evidences of title on which he relied to show that the claim ought to be confirmed Throughout the whole period that the case was pending before the Commissioners, those documents appear to have remained on file as the foundation of the claim, and were finally urged upon the consideration of that tribunal as true copies of originals existing in the office of the magistrate before whom they *172 purported to have been executed. Final adjudication was made by the Commissioners and the claim confirmed upon that ground, and so far as appears, without the slightest suspicion that the copies filed in the case as documentary evidence under the Act of Congress were not true copies of originals on file as alleged, or that the originals did not import absolute verity. They of course regarded the documents as authentic, and considering how fully they are attested by official certificates, and that all of the signatures were thoroughly proved by the positive testimony of two witnesses, it is difficult to see how they could have come to any different conclusion, especially as there was no opposing evidence in the case. Additional testimony, however, of a very important character was taken upon the subject in the District Court while the case was pending there, and it now becomes the duty of this Court to decide the question upon a very different state of facts. Other parties it seems, besides the petitioner, are interested in this claim, and in order that the evidence may be understood, and the testimony of the witnesses properly appreciated, it becomes necessary to advert to the circumstances under which some of these parties acquired their supposed title.
According to the testimony, the mine is within the county of Santa Clara, and is situated in a spur of the Sierra Azul or Blue Mountain, some sixteen or seventeen hundred feet above the level of the sea, and fifteen miles southwardly from the city of San José. Discovery of mineral there was first made by the Indians at a very early period, and they were accustomed to obtain the mineral and use it for paint. Civilized men also had knowledge of the mineral and of the location of the mine more than twenty years before the discovery made by the claimant, but it no where appears that any one had discovered that the mineral contained quicksilver. Two persons, Antonio Suñol and Louis Chaboya erected a mill on a stream in that neighborhood some time during the year 1824, and tried to get silver out of the mineral. People generally knew that there was a mine there, but they did not know what kind of a mineral it contained. By authority of the Government the claimant, in the *173 autumn of 1845, made a journey to the fort of John A. Sutter, to negotiate with the proprietor for its purchase. Proceeding from Monterey, he and his party, consisting of José Castro and four others, besides a guard of some twenty soldiers, travelled on the route leading through Santa Clara, and his testimony shows that when near that place this mine was mentioned by his principal companion. While there, some of the specimens of the ore were shown to him, and one of the witnesses testified that he visited the mine. Some examination of the mineral was made by him at that time, but he presently left and pursued his journey to Sutter's fort, where he arrived on the 11th day of November, 1845. Remaining there but a short time, he then returned to Santa Clara, where he pursued his investigations by certain rude experiments, and discovered that the mineral contained quicksilver. His first step, as alleged, was to form a partnership for working the mine. Such an instrument bearing date the 2d day of November, 1845, is one of the documents which was filed with the petition. Original interests in mines are usually acquired under a division of the mine into twenty-four parts, called barras or shares, and by reference to the instrument of partnership it will be seen that it was framed upon that principle. Four shares were assigned to José Castro, four shares to S. and T. Robles, four shares to the Padre Real and twelve shares were retained by the claimant. They commenced working the mine in a small way, and the claimant remained there until some time in the month of March or April following, when he left for the City of Mexico and never returned to that Department. Affairs of the mine were left, at least for a time, in hands of the Padre Real.
On the 13th day of January, 1846, James Alexander Forbes, British Vice Consul for California, wrote to Eustace Barron, of the firm of Barron, Forbes & Co., at Tepic, that the claimant was working a quicksilver mine near the Mission of Santa Clara Alexander Forbes of the same firm and British Vice Consul a Tepic, on the 15th day of April, 1846, wrote to J.A. Forbes requesting the former to furnish him as correct information as possible respecting the quicksilver mine mentioned in his preceding *174 letter. Possession of the mine was, prior to the 22d day of September, 1846, delivered to James Alexander Forbes by the Padre Real, the agent of the claimant, as appears by the fact that on that day he wrote to Alexander Forbes, of Tepic, that he was in charge of the mine and was about making a bargain for four shares. Two shares were purchased by James A. Forbes of S. & T. Robles about the time he took possession of the mine. Arrangements were made with equal activity by Alexander Forbes to get control of the same property. On the 24th day of November of the same year he instructed his agent in the City of Mexico to purchase shares for him of the claimant, and on the 28th day of the same month he concluded with the agent of José Castro a contract for a lease or avio of the mine for the term of sixteen years, which term is not yet expired. His agent purchased five shares for him in the City of Mexico, and other shares were also purchased by James A. Forbes. Shares were also purchased by Robert Walkinshaw and other parties in the City of Mexico and elsewhere. Most or all of the deeds of conveyance, whether executed by the claimant, Castro, the Messrs. Robles, or the Padre Real, refer to the writing of partnership as the foundation of the title, and none of them make any reference whatever for any purpose to the supposed act of registry, or to the act of juridical possession supposed to have been executed by the Alcalde of San Josê Guadalupe.
3. Appeal was taken by the United States to the District Court on the 15th of April, 1856, and from that time to the date of the final decree the case was pending in that Court. Reasons for the appeal, as assigned by the United States, are that the claim is invalid, and that is the principal question that remains to be considered. Written notice was served upon the claimant by the District Attorney of the United States on the 18th day of August, 1856, to produce the original paper of which Exhibit A is a copy, to be used in the examination of witnesses. Exhibit A comprises the documents filed with the petition as copies of originals on file in the proper office of the Alcalde Claimant accordingly produced the document which is the one denominated Exhibit R. No. 2, in the record. Recurring to the *175 document it will be seen that while it has all the certificates appended to it which are described in the copies filed with the petition, still it shows to a demonstration that the copies were neither faithful nor to the letter, as was well said by the District Judge when his attention was first called to the subject. Certificate of James W. Weekes is one of the number of certificates appended to the document. When produced it was shown to him while he was under examination as a witness, and upon being asked whether he had ever seen the paper before, he answered that he had, and that the signature to the certificate was his signature. At first he seemed to suppose that it was a copy of what remained in the archives at that time, but immediately stated that he himself recorded it in the book of registry, and that he received the document which he so recorded from James Alexander Forbes. He was appointed Alcalde in 1848, and he expressly states that the person before named brought the paper to him and requested him to record it, and that he did so while he was Alcalde. Original document was presented to the witness, as he states, by J.A. Forbes, and the copy was also made by him, showing that the witness not only made the record without any other knowledge of the paper than what he received from his employer, but that he also signed the certificate certifying that it was "a faithful copy made to the letter from its original," without ever having compared it with the paper presented, and when in point of fact it was not a true copy. Examination of James W. Weekes took place on the 18th of August, 1857, and on the 14th of December, in the same year, James Alexander Forbes was also examined by the United States upon the same subject. His testimony fully confirmed the statements of James W. Weekes that the copy was made on the 20th day of January, 1848, and that the certificate of the Alcalde, as well as the body of the instrument, were in his own handwriting, showing that all the Alcalde had to do in the matter was to affix his signature to a paper already prepared. Witness last named thinks he prepared the copy at the mine; and he states positively that he obtained the paper which he used as the original from Alexander Forbes who was then at *176 the mine. Pressed to explain where he got certain words appearing on the first page of the document, he frankly admitted that he did not know, and finally stated that he copied the paper that was handed to him by his namesake and associate in that business. Attempts were made to impeach this witness, but his material statements are so fully confirmed that it is unnecessary to reproduce the evidence in that behalf. Unmistakable proof therefore is exhibited that the adjudication of the Commissioners was based upon documents which were fabricated, and it follows as a necessary consequence that the claimant, when he filed his petition, did not comply with the provision of law which required him to present to the Commissioners the documentary evidences relied on by him in support of his claim. Those papers, strictly speaking, are denominated the registry, the act of juridical possession and the writing of partnership, but the counsel at the bar have treated the entire document as an espediente, and as that is a convenient designation, it will be adopted in this investigation.
4. Espediente No. 1, called by the Attorney-General the Weekes' espediente, must be rejected as invalid. Certain characteristics of the paper, however, should be noted in addition to those already mentioned, in order that the other documents subsequently introduced may be compared with it as a test of their verity. Caption and indorsement as translated are "year 1845. Espediente of the denouncement, possession, and partnership of the quicksilver mine called Santa Clara, jurisdiction San José Gaudalupe, in upper California." Contents are: 1. Petition of claimant announcing the discovery of a silver mine with ley of gold. 2. Supplementary petition stating that besides silver and gold he had taken out liquid quicksilver. 3. Act of possession signed by Antonio Ma. Pico. 4. Receipt of same for fees amounting to $25. 5. Writing of partnership. Date of act of possession is Juzgado of San José Gaudalupe, December 30, 1845. Articles of partnership are for a mine of silver, gold and quicksilver, and are dated on the 2d day of November, 1845, some twenty-five days before quicksilver was discovered.
Noting these characteristics as proper to be considered in *177 connection with those previously mentioned, we dismiss the document as wholly unworthy of credit.
5. Second espediente, called the Fernandez espediente by the Attorney-General, is the one introduced by the claimant on the 6th day of November, 1857, when José Fernandez was examined a second time as a witness. His first examination was on the 28th day of March, 1855, while the case was pending before the Commissioners. No such espediente was exhibited then, and no inquiries were made of the witness upon the subject. Request was made of the witness on this last occasion to look at the document shown him by the claimant and say whether he knew in whose handwriting it was, and whether the signatures of Pedro Chabolla or Chaboya appearing thereon were genuine. Answer of witness was, that the document was in the hand writing of Salvio Pacheco, and that the respective signatures of Chabolla were genuine. Other documents were then shown to the witness, and upon being asked whether the signatures were genuine, his answer was in the affirmative. Those documents are as follows: 1. Petition of José Castro, dated the 27th day of June, 1846, addressed to the Alcalde of first nomination of the Pueblo of San José de Gaudalupe, in which, among other things, he solicits three pertenencias for himself and associates in addition to those previously conceded, and requests that the petition may be attached to the former espediente. Margin of that paper contains an order signed Pacheco, and dated Pueblo of San José Gaudalupe, June 29th, 1846, as follows: Let this be included and archived as the party requests. 2. Claimant's two petitions in respect to the registry of the mine. 3. Alcalde's act of possession, which is dated Juzgado de San José Gaudalupe, December, ____, 1845. Signatures to the act of possession are Antonio Ma. Pico with Antonio Suñol and José Noriega as assisting witnesses. Separate certificates of Pedro Chaboya are appended to each of those papers. Three of the certificates are without date, but the one appended to the act of possession is dated on the 13th day of August, 1846. Writing of partnership, so called, is wanting in the espediente, which came from the hands of the claimant. Although Pedro Chabolla was *178 examined as a witness by the claimant, still no questions were asked him respecting this document. Testimony of Salvio Pacheco shows that the whole body of the instrument is in his handwriting, but he omits to state from what he copied it, and fails to give any explanation upon that subject. He says he is acquainted with the signature of Pedro Chaboya, and that his signatures to his certificates are genuine, but he did not see him sign his name, and does not state how he became acquainted with his handwriting. Signer of the certificate testifies that he could not write, that he could only "paint his name," and that it was with great difficulty that he could read any kind of writing. Caption of the document is No. 1, and it is endorsed "Diligencias en el Registro," which signify that it should be promptly registered. Receipt of Antonio Ma. Pico, as shown on espediente No. 1, is wholly wanting in this document. Considering that the signer of the certificates could not write or read writing, and has not been called as a witness to verify the document, it is entitled to very little consideration. Circumstances, however will render it necessary to recur to this paper again after referring to certain other documents introduced by the claimant.
6. Espediente No. 3, called by the Attorney-General the Halleck espediente, is endorsed as filed in the case, on the 30th day of January, 1858, but it is certain that testimony respecting it was introduced at an earlier date. Deputy Recorder of Santa Clara County was examined by the United States in respect to a similar paper on the 18th day of August, 1857, but insisting upon his right to retain the document, a traced copy of it was made, and on the twenty-ninth day of the same month, the copy was filed in the case by the United States. On the 23d day of October following, another Deputy Recorder of that County was examined by the claimant in respect to the same or a similar document. Exhibiting a document, entitled "Posesion de la mina Sta. Clara, año de 1845," he stated that he obtained it from the office of the Recorder. Enquiry was made of him when he went into that office, and whether he did not, in 1852, see there the document produced. His answers were that he had the entire charge of *179 the office from the fall of 1852 to the summer of 1853, but that he had no recollection of seeing the document there during the first year. Explanations were then given by the witness, in which he stated that the first recollection he had of the document was a few days before the date of the filing on the back of the paper, which is as follows: "Filed February 25th, A.D. 1853, at 12 o'clock. A.M.  J.M. Murphy, Recorder, by S.C. Houghton, Deputy," who is the witness; and he goes on to say that just previous to that time, James A. Forbes called at the office of the Recorder, and after describing the paper, desired to see the record of it. Search was accordingly made by the witness, but he could find none such there, although he says that he and the applicant searched for it more than a day. What the party was looking for, says the witness, was the record of the paper and not the paper itself, but they could find nothing of the kind, although the search was thorough and faithful.
Unsuccessful though they were at that time, still the desired document, in the course of a few days, was found there without any further search; for the witness states that some days after that, he found the paper in the office, either in the top of his desk or one of its pigeon-holes, and he says that he was surprised that it should be there without his knowing it, but having found it, he kept it safely until the party who inquired for it came, and it was then filed at his request. Attention is called by the claimant to the fact that there was written in pencil on the back of the paper, as follows, "Filed 3 o'clock, P.M., 18 January, 1851  J.T. Richardson, Recorder, S.C.C.," but in view of the circumstances which surround the paper the fact referred to cannot have much weight. Pencil marks could be added to the filing quite as easily as the paper itself could be foisted into the pigeon-holes in the desk of the Recorder. Interrogatories were also propounded to H.W. Halleck in respect to that document, and the time when it was deposited in the office of the Recorder of Santa Clara County.
Speaking of the document, the witness said he thought it to be the one taken by the Mayor, "in my presence," from his office, and transferred to the office of the County Recorder in the *180 winter of 1851, during the session of the Legislature, and he thought in the month of January of that year.
Recollection of witness is that he first went to the office of the Recorder for a copy of the papers connected with the mine, but was told that the greater portion of the old Alcalde papers were in the office of the Mayor. Learning that fact, he went to the latter office, where, on overhauling certain old papers in an old desk, he found this one among them. Witness, as he states, only remembers the papers he found there from the general subject-matter of its contents, as purporting to be an original paper, containing the denouncement and juridical possession of the mine. Document embracing a copy of espediente, number one, was shown to the witness, and he was asked whether it was not a copy of the one he found in the office of the Mayor; to which he answered, that he could not remember whether it contained the same papers as that, more or less. Obviously the recollections of the witness upon the subject are very imperfect and indistinct, and consequently his statements are so qualified and so far short of positive declarations that they can hardly be regarded as evidence. Indistinct, however, as the recollections of the witness are, still it is evident that he regards the paper as the original denouncement and juridical possession of the mine, because he says so in answer to the direct interrogatory put to him by the United States, but his opinion in that behalf cannot be regarded as satisfactory proof of the fact, especially when considered in connection with his previous answers as to his means of knowledge and the state of his recollections.
7. Those interested in the mine could not have believed on the 13th day of December, 1850, that any such original document, or duly authenticated copy thereof, was in the State of California, as is evident from the affidavit of their counsel, signed and sworn to on that day. Suit had been commenced in the County Court, by the widow and heirs of José Reyes Berreyesa, against all of the persons in possession of the mine, to recover possession of a certain tract of land, including that in which the mine was situated. Defendants were Isidoro de la Torre, of Mazatlan; Alexander Forbes, William Barron, and Eustacho Barron, of Tepic, *181 John Parrot, of San Francisco; and James A. Forbes, and Robert Walkinshaw of the County of Santa Clara. Court granted a rule on the 13th of September, 1850, requiring defendants to produce "certain papers or copies thereof," to be used in the trial of that cause. Among those specified in the motion were certain papers of a pretended denouncement of the mine in 1845. Papers were not produced, and the affidavit of the counsel was filed to support a motion for a continuance. Affidavit stated to the effect that the original denouncement of the mine of New Almaden, and the act of juridical possession given of the same in the year 1845, were held by parties in Mexico, which had not then been received, although the defendants had exercised all due diligence to procure and produce them.
Referring to the contents of this espediente, it will be seen that it contains: 1. Petition of José Castro, already described. 2. Petitions of claimant. 3. Alcalde's act of possession.
None of the certificates exhibited in the other espedientes are to be found in this document. Testimony was adduced to show that the several papers were genuine, and the witnesses most relied on for that purpose were José Castro, Antonio Ma. Pico, together with Antonio Suñol and José Noriega, the two assisting witnesses to the act of possession. Full proof was exhibited that no one of the papers was written by the person or persons who signed it, and it was satisfactorily shown that each paper was in a handwriting different from all the rest. Satisfactory proof also was exhibited that the petition of José Castro was in the handwriting of Benito Diaz, and he testified that he wrote it five or six months after our conquest of that Department. Writing of partnership, and the receipt of Pico for his fees are both wanting in this document. Caption of the document is: "Posesion de la Mina de Sta. Clara, año de 1845," and the act of possession is dated Juzgado de San José Guadalupe, December __, 1845.
8. Two inventories, purporting to contain a list of documents in the Juzgado of San José, were also introduced. Included in the schedule of the first one, which is dated on the 2d day of January, 1846 is the following: posesion de la Mina de Sta. *182 Clara, a D. Andres Castillero; but the second, which is dated on the 10th day of November of the same year, shows no trace of any such paper. Testimony of H.C. Melone should also be noticed in this connection, as he was the first clerk of the Alcalde's Court, under our military occupation. His statement is, that he never saw the document or heard it spoken of, although he had occasion to examine the papers there, one by one, in order to select such as should go to the office of the Recorder from such as he was required to keep as county clerk.
9. Fourth espediente is the one called the Walkinshaw espediente by the Attorney-General, and is the last of the series introduced by the claimant, as the documentary evidences of his title, to the mine and mining right, or privilege described in his petition. Contents of the espediente are as follows: 1. Petitions of the claimant, as in the first espediente. Appended to each is also a certificate of Pedro Chabolla, dated the 13th of January, 1846, certifying that the petitions respectively were copies of originals, and each certificate purports to have been signed in the presence of P. Sansevan and Jose Suñol, as assisting witnesses. 3. Pico's receipt for twenty-five dollars as fees. Introductory part of the receipt corresponds to that in the first espediente, but he also describes the mine as one "in lands pertaining to Don José Reyes Berreyesa." Castro's petition and the writing of partnership are both wanting, and there is no certificate of Pedro Chabolla appended to the act of possession or any certificate of any kind. Another peculiarity of this document consists in its caption, and as that part of the paper is of considerable importance in the investigation, it will be given without abbreviation. It is as follows:

"YEAR 1845.
"Espediente of the Denouncement, Possession, and Partnership of the Quicksilver Mine called Santa Clara  Jurisdiction of San José Guadalupe, in Upper California.
"November 22, 1845.  Don Andres Castillero makes the denouncement of the aforesaid, in the Pueblo of San José Guadalupe, for want of Deputation of Mining and of Judge de letras.
*183 "December 3, 1845.  Writing which the said Castillero presented, testifying to have taken out quicksilver and other metals asking that it be annexed to the espediente.
"December 30, 1845.  Act of possession, which, with the assisting witnesses, the Alcalde of the Pueblo of San Jose gave to Don Andres Castillero, of the mine of Santa Clara, because of the time of the notices being completed.
"December 30, 1845.  Receipt for the fees of the possession, signed by the Judge of San José.
"December 8, 1845.  Writing of partnership for the works of the mine, authorized by the Prefect of the 2d District."
Partnership of the quicksilver mine is one of the matters enumerated in the title of the caption, and the writing of partnership is one of the documents circumstantially described in the last article of the same. Espediente produced, contains no such paper, and the inference is a very strong one that it has been spoliated by some one having an interest to suppress the missing paper. Description of the paper, as exhibited in the last article of the caption, gives the date as of the 8th day of December, 1845, which is a very material variation from the other copies presented in this record. Discovery that the mineral contained quicksilver, notwithstanding what is stated in the articles of partnership, was not made until late in November, 1845, after the claimant returned from Sutter's Fort. Articles of partnership, as exhibited in the first espediente, were dated before the quicksilver was discovered, and yet the discovery, as set forth in that document, was described as of a mine of silver, gold, and quicksilver, which inconsistency tended strongly to impair confidence in the entire espediente. Petition had been pending nearly eight years when this espediente found its way into this case. First espediente was filed on the 30th day of September, 1852, and this one was filed on the 17th day of July, 1860. Time enough, certainly, had elapsed to enable a party to examine and ascertain what, if any, contradictions or inconsistencies appeared in his proofs, and to give him an opportunity to employ all proper means to obviate any such difficulty. Produced, as this document was, at so late a stage of the litigation, *184 it must be held that the burden of proof is upon the party producing it, not only to establish the authenticity of the paper, but to do so by clear and satisfactory evidence. On the 27th of July, 1860, Pedro Chabolla was examined in respect to this espediente. Inquiry was made of him, whether his signature and those of the assisting witnesses were genuine, and upon looking at the document, he answered both questions in the affirmative, although he admitted, in the same deposition, that he never learned to write, and that it was with difficulty that he could "paint his name." His account of the matter was that the papers were brought to him from the mine; and he says he signed them because he was requested to do so; and when asked how he knew the papers were correct, his answer was that he did not examine them, adding that "it was not for me to do that." One of the assisting witnesses, José Suñol, is dead; but the other, Pedro Sansevan, was examined, and confirms the statements of the preceding witness as to the genuineness of the signatures; but two witnesses examined by the United States, testified, without qualification, that the witness had previously stated to them that he signed the documents in the year 1848, and that they were copies.
Theory of claimant now is, that espediente No. 3 is the original filed in office, and that the espediente under consideration was a duplicate executed at the same time and delivered to the party. Three witnesses, Antonio Ma. Pico, Antonio Suñol, and José Noriega, were recalled and examined to prove that the document was executed in duplicate. They stated nothing of the kind in their first examination, nor did they do so in their second depositions. When called for the third time, after the fourth espediente had been discovered and introduced, the witness first named said that the document was signed on the day of its date, and he had no doubt he delivered it to the claimant; but the other two witnesses were less positive, and were only able to say that they supposed the document was signed at its date. Learned counsel admit that the theory in this behalf was started at rather a late stage in the investigation, but endeavor to excuse the claimant upon the ground that *185 the fact was unknown to his attornies, and that his witnesses did not remember it. Attorneys are certainly without fault, and so are the witnesses, unless they have finally attempted to remember what never occurred, which, from all the circumstances, there is too much reason to fear.
Parties holding large and valuable interests in real estate are generally careful to secure title papers which are supposed to be correct in form, and their solicitude and vigilance in preserving them are more or less active, according to their importance and the magnitude of the interest involved. Contrary to what might have been expected, as shown by experience, the claimant in this case, and those holding under him lost all the original title papers to the mine, although the espediente, as they allege, had been executed in duplicate, and the mine and mining right or privilege were of incalculable value and importance. Fortuitous circumstances artistically described in the testimony, led, it seems, according to the theory of the claimant, to the discovery of the third espediente, called by his counsel the original, in the depository where it belonged, and where every one who made any enquiries upon the subject must have known that the papers of the Alcalde's office had been deposited.
10. Impressions still prevailed, as the claimant represents, in the minds of those interested in the mine that there was somewhere in existence a duplicate original, but all enquiries and search for it had proved ineffectual until the time when the fourth espediente was discovered under the extraordinary circumstances detailed in the record. Those circumstances are well described by the witness, Thomas Bell; and inasmuch as they were even more fortuitous than those under which the third espediente was discovered, it may be well to allow the witness to state them in his own language He was examined on the 17th of July, 1860, the day this last espediente was filed. Witness says:
Some time, about three weeks ago, at the request of Mr. Billings, I was looking for the documents relating to the barras in the mine of New Almaden, which at one time had belonged to Padre Real; not finding one of the documents which I was in search *186 of among the papers of the mine, I asked Mr. Young to get the box containing the papers relating to the estate of Walkinshaw to see if it could not be found there. He produced the box, and then we proceeded to overhaul the papers. I saw a bundle marked  "Papers relating to the disputed barra," which I opened, and in looking over these papers I found one endorsed "Titles of Mines." I was struck with the antique appearance of the paper, and knowing that it was suspected that Walkinshaw had had documents relating to the Almaden mine in his possession, after glancing over the papers, I took them to the office of Messrs. Peachy and Billings, to ascertain more particularly their nature. It was then discovered that it was an espediente which they had been anxious to obtain for a long time.
Explanation of the transaction as given by the claimant is, that Robert Walkinshaw, the undisputed owner of two shares in the mine, brought suit against Bolton, Barron & Co., to establish his right to a third share claimed by him on which the defendants refused to pay him dividends. He employed counsel and gave him certain papers which the counsel, who is now one of the counsel in the case, retained in his possession from January, 1853, when he was employed to bring the suit, until May, 1858, when he returned them to his client who gave him a receipt for the papers. Receipt is dated on the 14th of May, 1858, and the first paper named in it is a document in Spanish, headed "Ano de 1845, Espediente de denuncio posesion y compañia de la Mina de Azogue nombrado Santa Clara, jurisdicion de St. José Guadalupe, en la Alta California." Five pages writing and certificate, endorsed "Titles of Mine."
Day after the date of that receipt the party signing it sailed for Scotland, where, in the following August, he died. Document remained among the effects of the deceased in the care of his son-in-law and the executor of his estate until it was brought to notice in the manner already described.
Deposition of the son-in-law, who was the executor of the estate, was also taken by the claimant. He confirmed the statement of the preceding witness, but adds that he had previously *187 examined the papers of the deceased in search of documents relating to the title of the Almaden mine without any such success. Where the box had been kept, and whether so situated as to be accessible to other persons or not, the witness does not state; but he does state that the decedent before he left the country handed him the documents found in the bundle, and that he enveloped them "in a piece of paper" and labelled the envelope.
His search on the former occasion, as the witness admits, was especially directed to find the testimonio of the act of juridical possession, but he made no such discovery at that time. First search, as in the matter of the third espediente, was unsuccessful but the second was attended with no difficulty. Such a discovery at that stage of the controversy was doubtless thought to be an acquisition as valuable as it was unexpected, and if the document could be regarded as an authentic paper, free from suspicion, the claimant and those holding under him, in one aspect of the case, might well be of the opinion that its importance could hardly be over estimated.
Assuming the other espedientes to be genuine, still the evidence in regard to them, even if viewed according to the theory of the claimant, showed conclusively that article 4, title 6, of the Mining Ordinance had not been complied with, because it was conceded that no attested copy of the proceedings had been delivered to the acquirer of the mine as "a corresponding title." When he filed his petition before the Commissioners, he also filed copies of the first espediente. Both the copies and the original, subsequently produced, represented that the act of juridical possession contained the day of the month on which it was executed, and besides the document embraced the receipt of the Alcalde for his fees and two certificates of Pedro Chabolla dated on the 13th of January, 1846, appended to the two petitions of the claimant. Those particulars were all wanting in the respective documents subsequently introduced. Favorable adjudication under such a state of facts could not rationally be expected, unless these glaring inconsistencies could be explained, because their effect was not only to impair all confidence in those documents, *188 but also to discredit all the witnesses who, under oath, had verified the first espediente and the several papers of which it was composed.
Mention is made of these circumstances as showing the urgent necessity there was for additional proof and the corresponding inducement to commit fraud by fabrication and forgery. Counsel of the claimant admit in their brief that from the time James A. Forbes was examined as a witness in relation to the first espediente, until May or June, 1860, it remained inexplicable, whence came the word thirty in the date of the first copy of the act of juridical possession, whence came the copy of the receipt of the Alcalde for his fees, and whence came the copy of the two certificates of Pedro Chabolla which follow the respective petitions of the claimant. All these were found in the copy produced and filed as the first espediente, and up to that time had been treated by the claimant as parts of a genuine document. "Whence they came," say the counsel, "was the mystery," but their theory is, that the mystery was solved by what they now call the duplicate copy of the act of juridical possession, and in support of the theory they suggest, that it had long been supposed that such a copy must have been delivered by the Alcalde to the claimant. Suggestions were also made as to the mode in which Robert Walkinshaw might have become possessed of the supposed original document; but it is a sufficient answer to all these suggestions to say that they are founded on mere conjecture, are not supported by the evidence, and have little or no foundation in the probabilities of the case. Production of that espediente, say the counsel, "furnished the means of bringing in the testimony of all the witnesses concerned in (its) preparation who were yet living." Accordingly those witnesses who were called for the third time and re-examined, and although in their former depositions they had uniformly spoken of the espediente supposed to have been executed before the Alcalde in the singular number, without any intimation in respect to a duplicate, yet at last, after the petition had been pending nearly eight years, they were, as they state, able to recollect that a duplicate was executed at the same time *189 and delivered to the claimant, but their recollections upon the subject are by no means as distinct as they were on a former occasion they testified to the effect that the first espediente was a genuine document. Such testimony under the circumstances, is not entitled to credit, and such theories as those set up in respect to the supposed existence, loss and discovery of the third and fourth espedientes as genuine original documents are too speculative, sound too much in fiction, and are too thoroughly saturated with improbability to receive credence in a Court of Justice.
11. Frequent reference is made by the claimant in this connection to the evidence adduced as to the proceedings of the Junta de Fomento and other Departments of the Supreme Government, as tending to confirm the testimony introduced to prove the genuineness of these documents, and it may be conceded that the evidence referred to has some indirect bearing in that direction, but it must be borne in mind that no one of those documents, nor any part thereof, was ever submitted to those Departments, or to any one of them, and it is by no means certain that the officers of those Departments, or any one of them, ever heard that any such documents had been executed. They had doubtless heard what the claimant had stated in his communication to the Junta de Fomento, but there is no evidence to show that they had ever heard any thing more than that in respect to any of the supposed proceedings of the local authorities upon that subject. None of the documents were presented to them by the claimant, and of course there could have been no action in respect to their genuineness, which is the question now under consideration. Arguments which confound the question as to the genuineness of the documents, supposed to have been executed before the Alcalde, with the question of confirmation by the Home Government, afford very little aid in the decision of the case, and, in point of fact, are entitled to no weight, because their effect, if any, is to mislead.
Strong, however, as our impressions are that the evidence fails to show that any one of the four espedientes, introduced by the claimant, is entitled to credit, still we are disinclined, in view *190 of the great complication of the evidence upon the subject, to rest the decision of the case upon that ground.
VI. Two other principal objections are made to the confirmation of the claim:
First. It is insisted by the United States, that it is not shown by competent evidence, that a public tribunal, empowered by law to take jurisdiction over the subject-matter of the acquisition of a mine, or mining right, or privilege, has ever acted in this case, and adjudicated to the claimant the title to the mine, as alleged by him in the petition.
Secondly. That if such a tribunal is shown by competent evidence to have taken any action in the case, still it does not exercise its special and limited jurisdiction in a manner required by law so as to constitute or evidence any title to the mine claimed by the petitioner.
1. Mines under Mexican laws, as before explained, whether situated in public or private lands, belong to the Supreme Government, and private persons can only acquire a title in one not previously discovered and made individual property according to law, by conforming substantially to the conditions ordained in the provisions of the 4th article of the mining ordinance as herein previously recited. Applicant must resort to the proper tribunal and present his written statement, specifying in it his name and the names of his partners, if he has any, the place of their birth, their residence, profession and employment, and the most particular and distinguishing features of the place, hill or vein, of which he asks adjudication. The title to such properties are acquired by the citizen or subject wherever Spanish law prevails by the adjudication of the proper tribunal having jurisdiction of the subject-matter. Contrary to what is supposed by the claimant is the adjudication, or decree, of the proper tribunal in a case duly presented for decision, and the registry of the adjudication together with the proceedings on which it is founded, which vest the title in the applicant, and not the mere fact of discovery as was supposed at the argument. Without proof of discovery by the applicant, there can be no adjudication in his favor, but the discovery of a mine, by a party in whose favor there has been *191 no adjudition by a tribunal having jurisdiction of the subject-matter, secures no right or title to the discoverer. Boundaries also must be fixed to carry the adjudication into effect or rather to complete it, else the title or claim, like other indefinite and uncertain interests in lands, will be void for uncertainty. Marking of boundaries also is essential under all circumstances, whether the mine is situated in public or private lands, for if the location is in public lands, compliance with the requirement is essential to show what extent of the public domain has been segregated from the mass of such lands and has passed into private ownership.
2. Public convenience, therefore, in such a case requires that the boundaries should be fixed, and, besides, unless the limits of the pertenencia were fixed and staked, or monuments set, other tribunals, whose duty it is to adjudicate lands to applicants for agricultural purposes, would be subjected to embarrassment and be led into error. Definite limits also to mining rights or privileges are equally necessary and important, where the same happen to be located upon the lands of private individuals, in order that the land owner, as contradistinguished from the owner of the mine, may have the means of knowing and be judicially notified, as to what portion of his land has been condemned and appropriated to the use of another.
3. Registry, also, is expressly required by the very article of the mining ordinance under which the party in this case claims title to the mine, and it is a great error to suppose that a compliance with that provision is shown by proving that sheets of paper, not executed at the same time, but assumed to constitute an espediente, were at some time placed in the office of the Alcalde and remained there for a time in one of the pigeon-holes of his desk. Such a suggestion is destitute of any foundation. On the contrary, the requirement is in express terms that the statement of the discoverer, together with the time when he presented himself, "shall be noted in a book of registry, which the deputation and notary, if there be one, shall keep, and in respect to the action of the tribunal on the application, the provision is that an exact account shall be taken" in order that it may be *192 added to the corresponding part of the registry with the evidence of possession, which shall immediately be given. Act of possession, therefore, is to be added to the registry, together with the action of the tribunal on making the adjudication; and they are both required to be noted in a book (Libro) of registry.
4. Strict compliance with that provision is required as matter of public policy, because the mines of a country like Mexico are a great sources of revenue to the Government, and because it tends to prevent disputes and litigation; prevent fraud and false swearing; secure such rights of property, and promote order and a good understanding among miners holding and working contiguous pertenencias. 1 Gamboa per H., pp. 143, 144.
The tribunal empowered by the mining ordinance to exercise this jurisdiction was "the Deputation of Mining" for the territory or district where the mine was situated, or the nearest one thereto, should there be none there. Halleck Coll. 224. Former ordinances, especially that of 1584, on which Gamboa wrote, conferred the power of adjudicating such titles exclusively on the Mining Court within whose jurisdiction the mine was situated. Ord. 1584, art. 17, Gamboa per H., 139. Section 17th of that Ordinance also provided "that in case such registry be not made in the manner, and within the prescribed time, any person may register such mine, and shall thereby have and acquire the right which such discoverer or other person who might have required the registry, would have had if he had caused the registry to be made." Gamboa, p. 141.
5. Cases occurred under that Ordinance where mines were discovered in districts having no Mining Court and in that state of the case there was no tribunal in the parent country which had jurisdiction of the subject-matter, and of course the matter had to be referred to the sovereign power, and to remedy the embarrassment arising under such circumstances from the want of a court to adjudicate such titles, it was provided, in the mining Ordinance of 1783, that the court "nearest thereto" should have jurisdiction of such a case. Parties concede that the ordinance last named was in force at the date of these proceedings, and unless it can be shown, (and the burden is upon him who avers *193 it,) that the provision referred to has been modified or repealed, it is clearly applicable to this case. Constitution of Mexico vested all the judicial powers of the Republic in one Supreme Court of Justice, and other courts and tribunals to be constituted in conformity to the instrument. Coll. Mexican Constitution; tomo 1, titulo 5, art. 123. Pursuant to that provision the Tribunal-General of Mining, on the 20th of May, 1826, was deprived of its powers. New regulations were then adopted, which were from time to time amended, but it is not important to notice those decrees, because on the 2d day of December, 1842, a new system, carefully digested, was put in force, the 4th article of which constituted and regulated the tribunals of mining. Halleck Coll., pp. 409, 424, 434, 441.
Among other things it provides for the creation of "Courts of the First Instance" in each Department, and for the mode of their election, and also provides that those courts, within their respective districts, shall exercise the executive, judicial, and economical powers given by the old ordinance. Halleck Coll. p. 441 title 4, art. 26.
6. Courts of the First Instance were never organized in the Department of California, and the argument of the claimant is, that in consequence of that fact the ordinary tribunals, as for example, an Alcalde could take jurisdiction over such a subject-matter, and on the application of the discoverer, could adjudicate the title. But the position cannot be sustained, because by the express law of the Republic, as evidence in the special decree of the 14th of January, 1843, it is provided that territorial deputations may continue to exercise their functions "until the Courts of First Instance * * are established." Halleck Coll., p. 443. Support to the position cannot be derived, as is supposed, from the fact that the law was so in some of the dependencies of Spain prior to 1783, because it is from the express terms of the Ordinance of that year that the Mining Deputation derived their exclusive jurisdiction over the subject, and inasmuch as the supposed analogy on which the position was based fails, the position must fall with it.
7. Mexican policy also, and administration in regard to that *194 Department, afford strong ground to conclude that no such power was intended to be conferred upon any of the officers of the Local Government. Those officers were a Governor, appointed by the Supreme Government, a Departmental Assembly, consisting or seven members, who were chosen by electors, but their election was subject to the approval of the Home Government.
Most of the important functions of the Local Government were performed by the Governor and the Departmental Assembly; but the law also made provision for the appointment of Prefects, who were to be nominated by the Governor and confirmed by the General Government; also, Sub-Prefects, who were to be nominated by the Prefects and approved by the Governor. Provision was also made for Ayuntamientos or Municipal Councils, whose ordinary members were elective; and also for the appointment of Alcaldes and Juaces de Paz or Justices of the Peace, whose numbers were to be fixed "by the Departmental Assembly, in concurrence with the Governor." Arrillaga, Recop., pp. 202, 214, 223, 230. Judicial functions were exercised by the Prefect as well as the Alcalde, and no reason is perceived for holding that the latter could adjudicate a mining title which might not be adduced with equal and even greater force to show that the same important duty might be performed by the Prefect; but the truth is, there was no law which gave either the one or the other any pretence of jurisdiction in any such matter Theory of claimant is, and so is the argument, that the jurisdiction must have been confided to some of the officers of the Department, and that the presumption is, that the Alcalde had jurisdiction, inasmuch as it is not shown that Courts of First Instance had been constituted and organized.
Giving the argument, however, its utmost force, it only shows that a law conferring upon an Alcalde such a jurisdiction would have been a convenience to the inhabitants, and especially to the claimant; but it has no tendency to show there was any such law, which is the question to be decided. Opinion is expressed by two or three of claimant's witnesses that an Alcalde might make such an adjudication, but they exhibit no law to that effect, nor do they attempt to prove there was any such general *195 usage; and inasmuch as their opinions are not competent evidence, their testimony may be dismissed without further remark. Authorities of Mexico had long dreaded the influence of foreigners in that Department, and although the policy of the Home Government was to promote the settlement and growth of the Department, still they had always manifested an unwillingness to confer any more power upon the Local Government than was necessary to accomplish those objects.
Mineral wealth, if discovered, would furnish a motive to attempt the conquest of the Department, and it may well be inferred that the authorities of the Home Government had determined to reserve the adjudication of titles to such important public interests to the Federal tribunals. Strong support to that view of the case is derived from the course pursued by those authorities when the land system of the Department was devised and put into operation.
8. Power to grant vacant lands was as early as the 18th of August, 1824, vested in the Governor, in concurrence with the Departmental Assembly. Additional regulations upon the subject were adopted on the 21st of November, 1828, which exhibit a system as complete and perfect as is to be found anywhere. Granting vacant lands for agricultural purposes was by no means regarded as a matter of so much public importance as the adjudication of titles to newly discovered mines. Those provisions and regulations confer very ample power upon the Governor to grant vacant lands in concurrence with the Departmental Assembly, but they confer no power upon them or upon any of the local authorities to adjudicate titles to mines. Grants of land made under those laws did not convey to the grantee the unsevered minerals in the soil or any interest in them, and there is no ground whatever to hold that the Supreme Government ever conferred upon any of the local tribunals any jurisdiction upon the subject under consideration. Authority of the Alcalde therefore, cannot be inferred from the fact of its exercise, or from the fact that no other tribunal of the Department was authorized to exercise such a jurisdiction.
VII. But if the Alcalde had power to take jurisdiction of the *196 subject-matter, still it is insisted by the United States in the second place that he had only a special and limited authority, and that he did not exercise it in the manner required by law. 1. His proceedings were based upon the written statement of the claimant, and that was upon its face exceedingly imperfect if not absolutely insufficient. Some of the provisions of the mining ordinance are doubtless merely directory, others may be regarded as conditions subsequent, but those appertaining to the registry of the mine, together with the action of the tribunal thereon, and in respect to the juridical possession of the same are evidently conditions precedent; so that it is necessary, in order to support a title to such a right or privilege as a discoverer, to show that the party substantially performed those conditions. Unless a claimant shows a substantial compliance with those requirements the conclusion is inevitable, not that he has forfeited his right to the mine, but that he never acquired any such title. Forfeiture is of that which a party hath, but he cannot be said to have forfeited what he never had acquired, as the title to that which he had never acquired, must always have been in the State or in another person.
2. Nothing like forfeiture is pretended by the United States, and no such question arises in the case; but the proposition is, that the claimant never acquired any right or privilege in the mine even if he was the discoverer, because he did not, as required by law, pursue the necessary steps to give vitality to the inchoate privilege or pre-emption accorded to the discoverer to proceed according to law, and ripen such privilege or pre-emption into a perfect or complete right by a registry of that which he had discovered before the proper tribunal, and by securing the juridical possession of the same under a legal adjudication of the title. His discovery, and its registration, as is well said by the counsel of the United States, gave him a right, within ninety days to make an opening into the vein, and the further right to apply to the proper public authority and have that which he claimed to have discovered defined and set out to him and its boundaries marked, and a record made of his title to the defined pertenencias. When all this is done according to law, *197 the inchoate privilege or pre-emption of a discoverer so to proceed is then ripened into a perfect or complete right, and his title to the mine comes into existence.
3. Returning to the written statement which in this case is the petition of the claimant addressed to the Alcalde, and noting the representations it contains, it is clear that it is not a compliance with the requirements of the ordinance in many respects. Ordinance, for example, requires a written statement of the most particular and distinguishing features of the place, hill, or vein of which adjudication is asked, or of which he asks the grant, as the phrase is rendered in some of the translations. Representation in the statement or petition is, that he, the claimant, has discovered a vein of silver with a ley of gold "on the rancho of José Reyes Berreyesa, which was a hacienda of a league square, mostly table land, with disputed boundaries." Another requirement of the ordinance is, that the applicant shall give "the names of his partners, if he has any, and the place of their birth, their residence, profession, and employment;" and by article 6, of title 7, the discoverer is expressly forbidden to denounce a mine for himself having entered into a contract of partnership, and yet the claimant's petition which shows that there was a partnership, fails to disclose the names of his partners or any of the required particulars, and it also shows that he denounced the mine to himself alone.
4. Strong doubts are entertained whether the Alcalde, even if he had jurisdiction of the subject-matter, was authorized to proceed and adjudicate the title upon the basis of such a statement; but it is not necessary to decide that question, as there are two other defects in the proceedings which are fatal to the pretensions of the claimant. No such registry of the particulars concerning the mine, or of the action of the Alcalde upon the allegations of the petition, or of his proceedings in respect to the juridical possession of the mine was ever made, as is required by the provisions of the ordinance, nor were the pertenencias measured or definitely located, or the boundaries fixed, or the stakes set, as is therein required. Registry has been required as the basis of the title to a mine wherever Spanish law has prevailed *198 for more than three centuries, and probably no case ever occurred within that period which more fully showed the absolute necessity for such a rule or more fully exemplified its wisdom than the case under consideration.
When the Alcalde was first called and examined in another suit concerning the proceedings before him, in respect to the registry of this mine, and the supposed juridical possession given of the same, he testified that the claimant applied to him to go and give him possession of the mine, according to the Mexican custom. Taking the account of the matter, as he then gave it, to be true, he went there with the claimant and others, and pointed out such boundaries as he thought the claimant ought to have; but he expressly stated, on that occasion, "that no fixed possession was given to him," for the reason that there was a dispute between him and José Reyes Berreyesa, on whose rancho the mine was situated.
Berreyesa, as the witness stated, would not consent that possession should be given unless the claimant would admit that he, Berreyesa, should have an interest in the mine, and as the claimant would not do that, he, the witness, did not give any fixed possession of the mine. Witness was three times examined in this case, and on two of the occasions, he was interrogated upon this subject. His statements are to the effect that he, with the claimant and others, went to the mine; that after they arrived there, he sent for José Reyes Berreyesa, the proprietor of the Rancho, and that he accordingly came to the mine; that he, the witness, made known to Berreyesa what it was that was proposed to be done; that at first he objected, but finally consented, and that he, the witness, delivered the possession to the claimant. They made no survey, fixed no boundaries, and set no stakes, and the witness expressly states that he had no idea whether the three thousand varas in all directions were to be laid out in a square or round; that a part of the tract only was to be located around the mine, and the residue on the public domain in that neighborhood.
6. Nothing was done on the land; and if the witness is to be believed, very little was said, except that he stated that he *199 delivered the three thousand varas in all directions to the claim ant. During the examination he was reminded of his former statements upon that subject, and was requested to explain the differences, but his answer was that, according to his understanding, there was no contradiction between his testimony then given and the statement in the act of possession. Alcalde Antonio Ma. Pico had a secretary by the name of José Fernandez, who was a witness in this case, and who was also the escribano of the Court, but the Padre Real expressed a wish that these documents, whatever they were, should be prepared by one Gutierrez, a teacher at the Mission of Santa Clara, which was a league or two from the Juzgado of San José Guadalupe. They were not, therefore, prepared by the Secretary of the Court, and all he knows upon the subject is, that two or three days after the party returned from the mine, the schoolmaster, Gutierrez, brought him the document, and said, "there, now, it is all finished, and here is your fee," giving him three dollars and a half, and "so," in the language of the witness, "the document remained in the Court," but he expressly states that he never read it, or examined it and when asked by the United States what he did with it, he answered: "It remained there in Court. I did nothing else with it."
Other witnesses were examined upon these topics, but the statement given contains the substance of the evidence on both; and all the witnesses agree that there was no survey, no stakes set, and no boundaries marked in any manner. On this state of the case, it is insisted by the United States, that the acts of the Alcalde were absolutely void, but the claimant insists that even conceding the irregularities to have been such as represented, still that the acts of the Alcalde were not absolutely void, but at most only voidable, and that they were afterwards ratified and confirmed by the Supreme Government.
7. Reliance, it is proper to remark, is placed by the claimant upon the evidence of ratification, as affording a sufficient and complete answer to all the objections taken to the claim made by him to the mine. Examination of that evidence, as exhibited in the copies of documents, introduced as true copies of originals *200 on file in the Departments of the Supreme Government, has already been so fully made that a brief reference to it in this stage of the investigation will be sufficient.
Statement of the claimant in his communication to the Junta de Fomento is, that he had discovered a mine of quicksilver in the Mission of Santa Clara; that he had denounced and taken possession, not only of the mine, but also of an extent of three thousand varas in all directions, that he had formed a company to work it, had constructed the pit, and had complied with all the conditions prescribed by the ordinance. Required, as he was, to make the representation in writing, it was of course prepared with deliberation; and yet he falsely states that the mine is situated "in the Mission of Santa Clara," and suppresses altogether the fact stated in his petition, and repeated in the act of possession, that the mine was situated on the rancho of José Reyes Berreyesa.
He refers to none of the documents, and none were produced, and this remark applies as well to his seventh proposition as to his representations in the preliminary part of his communication to the Junta. They adopted his seventh proposition, and recommended to the President, through the Minister of Justice, that the possession given to the claimant by the local authorities, as he represented, should be confirmed. Two accounts are given, as to what was the action of the President on the occasion. First, in the dispatch of the Minister of Justice, and secondly, in that of the Minister of Relations.
In the first, the language is, that the President "has been pleased to approve in all its parts the agreement made with (the claimant) in order to commence the working of said mine;" and in the second, the language is the same, except that the purpose of the agreement, as described, was "to commence the exploration of that mine." Neither the one or the other contains a word which, by any proper construction, can be held to confirm the acts of the local authorities, or any of them, or to vest in the claimant any right, title, or interest in the mine. None of the documents, executed by the Alcalde were before the President, and it does not appear that he ever heard of them in any other *201 manner than by those vague representations, or others of a similar character. Action of the President evinces caution and circumspection, and the several communications, taken together clearly show that he did not act at all upon the seventh proposition of the claimant, or upon his representations in respect to the juridical possession of the mine; and there is nothing in the marginal order in any respect inconsistent with this view of the case, as it is evident that the purpose and intent of that order was accomplished in the contemporaneous dispatch of the Minister of Justice. Credence was evidently given to the representations that a mine had been discovered, and the President was willing that an advance of $5,000 or $6,000 should be made to the claimant to enable him to commence its exploration. Directions were accordingly given to approve the agreement to that extent, and to make the advance and furnish the retorts and other apparatus therein mentioned.
8. Second grants of land in the Department of California were seldom made by the Governors, and as the claimant already had one, he could hardly expect to obtain another without the special approbation of the Supreme Government. Hence his eighth proposition that a grant should be made to him, "as a colonist," which was approved by the President so far as appears in the dispatch of the Minister of Relations already explained. Grants of that description conveyed no interest in the minerals, as was well known to the claimant; and in respect to the eighth proposition, the President was silent, evidently reserving that matter for further information and a more deliberate consideration. Irrespective, therefore, of the question of fraud, we are of the opinion that, by the true construction of the several communications, the claimant fails to show that the acts of the Alcalde have in any manner been ratified or confirmed by the Supreme Government.
It is clear, therefore, that the respective documents executed before the Alcalde must stand or fall, by what appears in the instruments, when considered in connection with the evidence, showing what was lone at the time of their execution. Conceding full credit to the witnesses, and giving the utmost scope to their *202 testimony consistent with the language employed, still it is obvious from the claimant's own showing that he never made any registry of the mine, within the meaning of the provision requiring it to be made. Such a document cannot be said to have been registered, merely because it was handed to the Secretary of the Alcalde, before whom it was executed, and was for a time somewhere in the courthouse, especially when it appears that it was subsequently abstracted from the depository, if such it may be called, and was not returned to it for years afterwards, and then clandestinely and under circumstances of the greatest suspicion. Constrained as we are to regard the facts in point of view, the conclusion is inevitable that there was no legal registry of the mine, and the evidence is all one way to show that there was no survey of the nine hundred pertenencias granted, and no boundaries were fixed, and no stakes were set as required in the ordinance. Assuming, therefore, that the Alcalde had jurisdiction over the subject-matter, still, as it was but a special and limited authority, in order to give any validity to his acts he must exercise it in the manner required by law, and not having done so, his acts are void. U.S. vs. Osio, 23 How., p. 283; U.S. vs. Castillero, 23 How., p. 466.
VIII. Conduct of claimant throughout shows that he knew that he had no title as is plainly to be inferred from the fact that in the several conveyances made by him he never referred to the registry of the mine or to the acts of juridical possession supposed to have been executed before the Alcalde as the source or foundation of his title.
1. Whenever he referred to the source of his title he uniformly pointed to the writing of partnership. Sale of five barras or shares of the mine was on the 17th day of December, 1846 made by the claimant to Alexander Forbes, of Tepic.
2. Negotiations for the purchase and sale commenced on the 5th of the same month between the claimant and Francisco M. Negrete, the agent of the purchaser. Several interviews took place, but the negotiations were suspended to await the arrival of the Padre Ugenio McNamara, the agent of José Castro. He arrived from Tepic a short time before the contract of sale was *203 completed, and Negrete testifies that up to that time he had seen no other document than the writing of partnership, and no other had been mentioned. Padre McNamara brought with him the contract of lease or avio, which had been concluded between him, as the agent of José Castro, and Alexander Forbes.
3. Claimant approved the contract of avio, voluntarily putting into it his claim to the two square leagues of land. At the same time, also, he executed the conveyance of the five shares to the purchaser, but in none of these transactions was any mention made of the registry of the mine or of the act of juridical possession, leaving it to be inferred that the writing of partnership was the only document ever executed before the Alcalde, or certainly that there was no other, that the claimant thought proper to exhibit to a purchaser.
IX. Much stronger evidence, however, is exhibited in the record to show that the parties most interested in the mine, and who were engaged in working it, knew full well that the supposed title was invalid, as is fully shown by the correspondence between James A. Forbes and Alexander Forbes, or between the former and Barron Forbes & Company. More than forty letters between these parties are exhibited in the record.
Brief references will be made to such as have the most direct bearing upon the question under consideration, omitting all such parts as are not material to the inquiry, but preserving the substance. 1. Under date of the 5th May, 1847, James A. Forbes suggests to William Forbes, but evidently in reply to letters received from Alexander Forbes, that it is of the most vital importance to obtain from Mexico a positive, formal and unconditional grant of the two sitios of land conceded to thè claimant according to the decree appended to the contract, and also an unqualified ratification of the juridical possession which was given of the mine by the local authorities, including, if possible, the three thousand varas of land given in that possession as a gratification to the discoverer. He also suggests in the same letter that the documents should be made out in the name of the claimant and his partners.
2 No letter is produced which is a direct reply to that communication. *204 Record shows that Alexander Forbes visited California early in October, 1847, and it appears that he remained there until near the close of March, 1848, engaged, at least for a part of the time, in exploring the mine and in overseeing the prudential affairs of the Company. During that period other persons acquired an interest in the mine, and among the number were Barron, Forbes & Company, and they accordingly wrote to James A. Forbes, under date of the 11th of April, 1849, informing him that hereafter he might expect that the mine would be worked to the utmost of its capabilities of production. On the 20th of May, 1849, they wrote another letter to the same individual, saying in effect that from certain circumstances that he had mentioned it might be necessary to purchase some lands in the vicinity of the mine and hacienda of New Almaden, and authorized him to make such purchases, not to exceed in price the sum of $5000, as might be necessary to the secure possession of the mine and hacienda, or to effect such other arrangements as he might deem necessary for that purpose.
3. Seven days after the date of that letter, and before it was received, James A. Forbes arrived at Tepic, and while there left with Alexander Forbes the following memorandum to be delivered to the claimant: "Very private." Memorandum of the documents which Don Andres Castillero will have to procure in Mexico.
"1st. The full approbation and ratification by the Supreme Government of all the acts of the Alcalde of the District of San Jose, in Upper California  in the possession given by the said officers of the quicksilver mine situated in his jurisdiction, to Don Andres Castillero, in December, 1845.
"2d. An absolute and unconditional title of two leagues of land to Don Andres Castillero, specifying the following boundaries:  On the north by the lands of the Rancho of San Vicente and Los Capitancillos; on the east, south, and west by vacant lands or vacant highlands.
"3d. The dates of these documents will have to be arranged by Don Andres, the testimony of them taken in due form, and *205 besides, certified to by the American Minister in Mexico, and transmitted to California as soon as possible.
"Tepic, May 27, 1849."
Proofs in the case show that the author of that memorandum returned to San Francisco, and on the 28th day of October following, in a letter to William Forbes, he again called his attention to the importance of his former suggestions as to the necessity of perfecting the title to the mine. In that letter he also referred to verbal explanations previously given by him to his correspondent and Alexander Forbes, and then proceeds to impress upon the mind of his correspondent the vast importance of securing from Mexico the documents comprised in the memorandum left with Alexander Forbes, when he was in Tepic, for the claimant. Two days afterwards he wrote again to Alexander Forbes, in which letter, among other things, he says to his correspondent, you will now readily perceive the great importance of my advice to you to purchase a part both of the lands of Cook and of the Berreyesas. You were of the opinion that this measure would not be necessary in view of the supposed facility of getting the title to the mine perfected in Mexico, and he complains that more than five months have elapsed since it was decided that the claimant should procure the necessary documents in that city, and that they have not been sent to him.
4. His description of his situation shows plainly that he was in great want of the documents, because he says that on the one side he depended upon the precarious and illegal possession of the mine granted by the Alcalde of the District to the claimant, who was himself in reality the judge of the quantity of land given by the Alcalde; and on the other side, he says he was attacked by the purchasers of the same land declared by the claimant himself to comprise the mine. Evidently that letter was regarded as one of importance, for it called forth two replies, one from Barron, Forbes & Co., and one from Alexander Forbes. By the one first mentioned, he was informed by his correspondent that on the 13th of the same month they had enclosed to him a notarial copy of the grant of land made by the Mexican Government to the claimant.
*206 They acknowledged therein the receipt of his letters, thanked him for his able conduct, expressed satisfaction in view of the document sent, that he had not been obliged to purchase the land of Berreyesa, but submitted the matter to his best judgment, requesting him, however, to keep in view, "that at all hazard, and at whatever cost, the property of the mine must be secured," adding, "Castillero, we expect, will soon be here from Lower California, and if anything can be done in Mexico, he is the fittest person to procure what may be wanted." Recurring to the other letter, it will be seen that it was more guarded, but the writer recommends that his correspondent and agent should proceed, without fear of disapproval, or waiting for instructions, in taking such measures as shall preserve this valuable "negotiation" from any risk from those unprincipled claimants who have lately given him so much trouble, or from any other proceedings that may take place.
5. Another letter, also, was written by Alexander Forbes to James A. Forbes, under date of the 1st of December, 1849, in which he stated that the copy of the grant of land made to the claimant was, by mistake, not the one meant to be sent; and he explains the difference, which was, that the one sent was directed at the foot to the Governor, but the proper one was directed to the claimant, and was deposited at Monterey. Explanation is also given as to the difference in the legal effect between the two documents, which was, as explained, that by the first one the delivery by the Governor was perhaps necessary, whereas the other, being addressed directly to the claimant, did not require that formality, nor was any other proceeding necessary, thus making it, as the writer affirmed, a better document than the greater part of the other titles for lands in that Department.
Having made these explanations, he then expressed the hope that the well known cleverness of his correspondent had already enabled him to find out the mistake; suggesting, but rather doubtingly, that the one previously sent should be withdrawn. and the second one substituted in its place; but presently, as if upon reflection, mentions another difficulty which might arise, and that was that the copy of the grant of the two sitios of land *207 inserted in the contract of lease or avio was also directed to the Governor, and in view of that fact he finally decided to send a copy of all the documents and leave it to the good judgment of his correspondent to make such use of them as he should think proper. Nothing need be remarked respecting the copy of the document last sent, except to say that if it was addressed to the claimant it was a forgery, as the whole evidence shows that but one dispatch upon the subject was ever issued by the Minister of Relations, and that was directed to the Governor.
6. Reference will next be made to another letter from Alexander Forbes under date of the 3d of February, 1850, which is also addressed to the same person as the preceding letter. Among other things the writer states that he has every reason to believe that the documents mentioned by his correspondent would be found in the City of Mexico, and as the claimant would return that way he had no doubt they would be procured. In another part of the same letter he also states that at present they think it may be the best plan "to get an authenticated copy of the approval of the Mexican Government of the grant of three thousand varas given by the Alcalde on giving possession of the mine," "as a doubt may be started whether the Alcalde, acting as the `Jues de mineria,' had a right to make this grant, yet if approved by the Government of Mexico, before the possession of the country by the Americans, there could be no doubt on the subject." * * * * * * *
Castillero says such approval was given, and that on his arrival in Mexico he will procure a judicial copy of it. This is the plan we shall adopt if we hear nothing from you to alter this resolution. Writing from the mine, James A. Forbes, on the 26th day of February, 1850, replied to that letter, and the importance of that reply makes it necessary to give a somewhat extended extract from it as disclosing the intent and purpose of the entire series. Speaking of the claimant, he says:
"He succeeded in obtaining the grant of two sitios to himself on the mining possession in Santa Clara, while that very act of possession declares that the mine is situated on the lands of one José R. Berreyesa, five leagues distant from Santa Clara, and *208 you will at once perceive that such a discrepancy would not fail to attract the attention of United States Land Commissioners and to put the case of the mine in great risk in the judicial ordeal to which its title will be subjected.
"Without troubling you with what I have so many times written and explained to you verbally, on the importance of the acquisition of the document, I will only say now what it must be, and it is this:
"1. A full and complete ratification of all the acts of the Alcalde of this jurisdiction in the possession of the mine.
"2. A full and unconditional grant to Castillero of two sitios of land covering that mining possession, expressing the boundaries stated by me in the memorandum I left with you at Tepic. Both of these documents to be of the proper date, and placed in the proper governmental custody in Mexico; and 
"3. The necessary certified copies of them duly authenticated by the American Minister in that capital, taken and sent to me at the earliest possible moment."
Prompt reply was made by Barron, Forbes & Co., to that communication, under date of the 2d of March, 1850, in which they say: "Mr. Barron and Don Andres Castillero, are about to proceed to the City of Mexico and will attend to what you have recommended. When that letter was written, the persons therein named were about to proceed to Mexico, but Alexander Forbes, nine days later, wrote a letter to the same correspondent, in which he stated that Mr. Barron and Castillero have gone off to Mexico, and I wrote them to-day respecting the document you know of, which, if possible, will be procured." Wishing, doubtless, to keep his correspondent well advised of the efforts being made to comply with his requisition for the title papers to the mine, he wrote him again on the 7th of April, 1850, in which he stated "that Mr. Barron and Castillero have arrived in Mexico, and have every prospect of finding the documents you are aware of and which will, of course, be forwarded as soon as possible."
Counsel for claimant admit that every one of these letters are genuine, and the proofs in the case are full to that effect. Comments upon these extraordinary documents are unnecessary as *209 they disclose their own construction and afford a demonstration that those in the possession of the mine, holding it under conveyance for the claimant, knew full well that he had no title.
X. More than that can hardly be required in this case, but it is equally true, and satisfactory proofs are exhibited in the record to show it, that Mexico herself knew, must have known, that the pretensions of the claimant were unfounded, else she never could have agreed to the 10th article of the treaty, or, when that was stricken out, never could have given her sanction to the corresponding explanations that were signed by the duly authorized representatives of both countries. Remarks, however, upon that topic are unnecessary, and we forbear to pursue the subject.
The decree of the District Court in No. 133 is reversed, and in the other the appeal is dismissed, and the cause remanded with directions to dismiss the entire petition.
Mr. Justice CATRON, dissenting:
I am of the opinion that Castillero acquired an incipient right by the discovery of the mine, and the surface of the land lying above the mine to the extent that it was adjudged to him by the District Court.
I also think Castillero made registry of his discovery before the proper tribunal according to the Mexican laws as they existed in the Territory of California at the time the registry was made and notified to the public. That the Alcalde had jurisdiction as a judicial magistrate in the absence and non-existence of any other authority in California to make the registry and give possession; and that this state of the law was virtually recognized by the Mining Junta at the city of Mexico, when Castillero applied to that tribunal for assistance in money, lands, and retorts, to assist him in working the mine. The request was promptly granted by the Junta, with two leagues of land to furnish fuel for evaporating the quicksilver; and this proposed grant, the President of Mexico sanctioned, referring the application for the grant of land to the Governor of the Territory, but which was never presented, and could not be, owing to the American war.
*210 These officers of the Supreme Government were fully aware that no Mining Boards existed in California, nor any Courts of the First Instance; and that therefore the Court of the Alcalde was the tribunal exercising the powers of a Court of the First Instance. Such is the settled construction of the Alcalde's power in California. Mena vs. Le Roy, 1 Cal. R., 220. The rule in Mexico was, that in the absence of Mining Deputies, the ordinance Judges might act, and did in fact act, both in registering the discoverer's application and in giving him judicial possession of the mine. So various witnesses prove, and among them Mr. Larkin, our consul at Monterey, at the time of this discovery.
I think it true, beyond any reasonable ground for doubt, that in other parts of Mexico, Alcaldes did act on applications such as that of Castillero, where gold or silver was discovered, and that many mining titles are held by virtue of registries and acts of possession transacted before Alcaldes, and recorded in the form of espedientes in their Courts, just as the evidence of Castillero's was found in Alcalde Pico's office. Nor have I any doubt, whatever, that if the Mexican Government had continued in California, that the title to this mine would have been confirmed to Castillero, not only promptly, but without dispute, concerning small and immaterial irregularities. That Government, in my judgment, would have recognized the discoverer's equity, founded on the right of discovery. This discovery is free from doubt, nor is the fact of discovery disputed. So the Mexican officers from the President down, treated it when presented to them, and so the judges of the District Court held, when they confirmed the claim. Their judgment, and the reasons for it, we are called on to review; and it is due to them to say, that, in a long judicial life, I have never had presented to me, a case so laboriously and thoroughly investigated in the lower Courts. With them this case has been the study for years. The claim, perhaps, covers the most valuable mine in the world, and its title has been litigated at an expense and with a degree of labor and ability, rarely equalled, and never excelled within any experience.
I have examined the opinions of the judges who decided the *211 cause in the District Court and the briefs of counsel, and have verified the arguments by the record on all material questions, so far as I thought them material, and my opinion is, that the law and the facts discussed by the District Court, and on which its judgment is founded, furnish reasons that cannot be answered, showing that the claim is valid. And I adopt the opinion and reasons preceding the judgment below as my opinion in the case here.
Judge Hoffman's individual opinion displays an astuteness and a knowledge of the facts, and of the mining laws applying to the controversy, hardly to be excelled, and with which I fully concur, with the exception, that I think he was in error in maintaining that the President of Mexico granted the two leagues of land covering the mine. The President referred the request of Castillero for the land to the Governor of California, to be proceeded on by him, according to the Act of 1824, and Regulations of 1828. This was not done by the Governor, because the United States troops expelled him and broke up the Mexican authorities exercising the granting power, before he had time to act.
It was obviously a matter of great anxiety with the Supreme Government, that this quicksilver mine should be worked immediately, and as extensively as possible, because Europe had to be relied on for a supply of quicksilver, without which the gold and silver mines of Mexico were comparatively worthless. This discovery of Castillero was, therefore, esteemed by the Mining Junta and the higher officers as of the greatest importance. So important was it deemed, that our Government was officially notified by our Consul, Mr. Larkin, (acting nearest to the mine,) that the discovery had been made. The mine drew to its development a great amount of capital. Nearly a million of dollars has been expended in opening and bringing forth its resources The public have been benefitted many millions by the quicksilver furnished to those working the gold mines discovered in California, and on both sides of the Rocky Mountains. The public benefit, past and prospective, can hardly be over-estimated. So far from being the subject of reproach and severe criticism, the wealthy proprietors who have worked this mine *212 with success, are entitled to our approbation, as they have undoubtedly been public benefactors. Truly, their object was gain; but they have done that which poverty could not accomplish, and they have done that which the United States, as the successful litigant, will, in all human probability, fail to do; that of being successful miners.
Much stress has been laid on the fact, that James Alexander Forbes proposed to his associates to forge a title to this mining property: Forbes, apprehending that Castillero's claim was not valid, because the proceeding to acquire a legal interest was irregular. But no step was taken to fabricate an apparent title nothing was done towards its accomplishment. The proposition died in its conception, and as a controlling circumstance in the case the fact is worthless.
1. That Castillero discovered the mine, is true beyond controversy.
2. That he registered the fact of discovery in the Alcalde's office, and that it was made notorious, is, I think, true. It was officially communicated to the Mexican Congress by Secretary of Interior Relations; that it was prominently notorious in California; was officially communicated to our Government, and was published in the newspapers of the Sandwich Islands.
3. Nor is it open to any dispute, as it seems to me, that Castillero's right, as a discoverer, was recognized by the Supreme Government of Mexico, as a valid and highly meritorious claim.
4. The mine was never denounced by any one for irregularity in the proceeding to perfect the title to it, nor for abandoning the possession.
In this condition the claim stood when we acquired the country; and we are bound by the treaty to protect all just private interests in lands in the territory acquired by it. I, therefore, think the judgment of the District Court should be affirmed
Mr. Justice WAYNE, dissenting:
I concur with Mr. Justice Catron and Mr. Justice Grier, for the reasons given by them, and for other reasons expressed in the printed opinions of Judge *213 McAllister and Judge Hoffman, in dissenting from the judgment of this Court just announced in this case.
I think that the claim and title of the petitioner, Andres Castillero, to the mine known by the name of New Almaden, in Santa Clara County, Northern District of the State of California, is a good and valid claim and title, and that the said Andres Castillero and his assigns are the owners thereof, and of all the ores and minerals of whatsoever description therein in fee simple. In my judgment, also, I concur with the learned Judges of the District Court, &c., &c., that the said mine is a piece of land embracing a superficial area, to be measured on a horizontal plane, equivalent to seven pertenencias, each pertenencia being a solid, of a rectangular base, two hundred Castilian varas long, of the width established by the Ordinanza de Mineria of 1783, and in depth extending from and including the surface down to the centre of the earth; said pertenencias to be located in such manner as the said Andres Castillero or his assigns may select, subject to the following conditions: First, that the said pertenencias shall be contiguous, that is to say, in one body; and secondly, that within them shall be included the original mouth of the mine, known as New Almaden.
Having thus fully expressed my concurrence in the decree rendered by the District Court in favor of Andres Castillero and his assigns, and my dissent from its reversal by this Court, I will add that, in my opinion, it is fully shown by the testimony and documents in the record that in no thing done by Castillero or his assigns, in connection with the mining claim, is there any proof of fraud; and I believe, from the testimony and from those documents, that the petitioner and his assigns have rights under the 8th Article of the Treaty with Mexico, of which they cannot be deprived by any judgment rendered by this Court or its proceedings upon the record brought into this Court by appeal.
I adopt and herewith annex to this dissent the opinion of his Honor, Ogden Hoffman, District Judge, (as embodied in the record,) as the best way of showing my appreciation of the law *214 and merits of this case, and of his judicial learning and research in connection with it:
The claimant in this case asks the confirmation of his title to 
First. A mine of quicksilver situated in Santa Clara County, and called the mine of "New Almaden," including three thousand varas of ground measured in all directions from the mouth of the mine.
Second. Two square leagues of land situated upon the land of the above mentioned mining possession.
It is objected that this Court has no jurisdiction to decree a confirmation of the former claim. The objections relied on by the United States are two:
1. That by the Act of 3d March, 1851, the jurisdiction of this Court is confined to cases where the interest claimed is a fee simple interest, or such as in equity should be converted into one, and that such interest was not held by the owner or grantee of a mine by Mexican law.
2. That the subject-matter of this claim is not "land," within the meaning of the Act.
The first objection is not only wholly unsupported by the words of the Act, but it is inconsistent with the sense of justice and the sacredness of treaty stipulations which we must presume to have actuated Congress.
1. The Act declares that every person claiming lands by virtue of any right or title derived from the Spanish or Mexican Governments shall present his claim, etc.
There is thus no specification as to the nature of the claim, except that it must be to "land," nor of the estate or interest claimed. It may be leasehold or freehold, conditional or indefeasible, for years or in fee.
2. That such estates constitute property, in its fulles sense, will not be denied.
If, then, claims to such estates in lands cannot be presented for confirmation under the Act of 1851, or if presented are to be rejected, this species of property in land is not merely unprotected, but by the terms of the Act it is confiscated; for the 13th *215 Section provides that all lands, the claims to which have been finally rejected, or which shall not have been presented within two years, shall be deemed, held and considered as part of the public domain of the United States.
It cannot, therefore, be imputed to Congress that it meant to declare all lands public property the claims to which were not presented, and at the same time restrict the right of presenting claims to a limited number of cases, thus ignoring and confiscating all rights of property in land but those of a particular description, when all were equally sacred under the laws of nations and the stipulations of the Treaty.
3. But even if the jurisdiction of this Court were limited, as supposed, the estate of the owner of a mine under the Mexican and Spanish Ordinances was of at least as high a decree as a determinable fee at common law, and the concession of a mine conveyed to him full property in the very substance of the mine.
As, however, the nature of the mine-owner's estate in a mine cannot be considered without examining and ascertaining what was the nature of a mine itself, and whether it constituted "land," as that term is used in the common law, and in the Act of Congress, the point will be treated of in considering the second objection to the jurisdiction of the Court.
2. Is a mine land within the meaning of the Act of Congress?
"By the civil law," says Gamboa, "all veins and mineral deposits of gold and silver ore, or of precious stones, belonged, if in public ground, to the Sovereign, and were part of his patrimony, but if on private ground, to the owner of the land, subject to the condition, that if worked by the owner he was bound to render a tenth part of the produce to the Prince as a right attaching to his Crown. It subsequently became an established custom in most kingdoms, that all veins of the precious metals, and the produce of such veins, should vest in the Crown and be held to be a part of the patrimony of the King or Sovereign Prince. That this is the case with respect to the Empire of Germany, the Electorates, France, Portugal, Arragon, and Catalonia, appears from the laws of those countries, and from the authority of various authors." 1 Heath. Gamboa, 15.
*216 The reasons for attributing to the Sovereign this right of property in a part of the soil of the land of his subjects, it is not necessary to recapitulate; but that the distinction between the ownership of the surface, and that of the mines or minerals beneath it, was recognized at a very early period, appears from the law of the Partida, which declares that the property of the mines shall not pass in a grant of the land by the King, although not excepted out of the grant  and even if included in it, the grant shall be valid as to mines only during the life of the King who made it; and a similar rule prevailed in England with respect to mines of the royal metals, which alone were held to belong to the Sovereign by prerogative.
The distinction thus drawn between the right of property in the surface, and that in the minerals beneath, is founded on the essential difference in the qualities of the various substances of which the earth is composed. It has accordingly been recognized in the jurisprudence of all nations.
In Spain, as we have seen, mines do not pass in grants of land (fundos) by the Sovereign, unless particularly mentioned. (1 Heathf. Gamb. 132.) To the same effect is Solorzano, (Pol. Ind. lib. 6, ch. 1 No. 17,) who says: So that, although private persons may allege and prove that they possess such lands (tierras) and their appurtenances by special gift and concession of the Prince, no matter how general may be the words in which the grant is made, this will not of itself be of any avail or advantage to them for acquiring or gaining thereby the mines which may be discovered in the lands, unless it is so specially provided and expressed in said grant;" and Colmeira, (Der. Adm. Esp.) observes: "Jurisconsults and Publicists agree in the opinion that it is proper to distinguish in the soil (en el suelo) the right of property in the superficies (de la superficie) from that in the depth (del fondo.) Truly, the man who acquires a piece of land, gives not the least labor nor advances the smallest capital in consideration of the riches (las riquezas) which it may conceal. He examines its fertilty, its situation, its extent, and all the circumstances which determine its value as a building-lot or agricultural land, but he does not take into account the mines *217 which, perchance, it may conceal in its bowels. There is not, then, the least relation between the proprietor (of the land) and the subterranean matter from which any right can be deduced."
So, Lares, a Mexican author, in his Derecho Administrative, p. 93, remarks: "The law then, has not recognized property in the mine to be in the owner of the soil, but has made the property in the mine to consist in the grant which the Nation makes to him who registers or denounces it conformably to the ordinance."
By the French law of 1810, the same distinction is recognized, and all mines of gold, silver, platinum, lead, mercury, etc., are declared not to belong to the owner of the soil, but to be governed by the Mining Laws (Teulet's Sup. to Codes, Verb. Mines.) "From the moment," (says the author last cited, "when a mine shall be conceded even to the proprietor of the surface, this property shall be distinguished from that of the surface, and thenceforth considered a new property," and, Le Guay, in his Thesis on Mining Legislation, says he "agrees with Mirabeau in the proposition that any legislation which does not recognize two species of property, one in the surface of the earth, and the other in its depth, would be absurd." P. 125.
In his work on the General Jurisprudence of Mines, M Blavier observes: "It is a truth which has been admitted for a long time, that the preservation and prosperity of mines depend essentially on the adoption of a system of laws calculated to reconcile the interests of the public with that of those who work them. * * * It is these conditions which the governments of ancient and modern States have sought to fulfill in admitting, nearly all of them, that the Sovereign alone has the right to dispose of the public property in mines, or to confer on others the useful enjoyment thereof."
This regalian right, or right reserved by the whole State to dispose of subterranean property as public property, independent of the private ownership of the land which conceals it, seems to have been recognized in Germany from the earliest periods; (Cancrin. Dr. Pub. des Mines en Allemagne, p. 2;) and M Blavier remarks: "It is, therefore, not surprising that this *218 regalian right should have been confirmed by nearly all the governments of the northern countries."
But it is unnecessary to multiply authorities in support of a principle so universally recognized.
From the foregoing citations it is clear 
1. That the grant or ownership of the superficies or land which contains the mine, confers no right of property to mines in the bowels of the earth, or even on its surface; and
2. That this property in the mines is, by common consent of almost all modern States, deemed to be vested in the State represented by the Sovereign, and is a regalian right. Indeed, it would seem, that these two propositions are sufficiently demonstrated by the fact that mining ordinances exist in almost every State possessed of considerable mineral wealth; for those ordinances are but the dispositions made by law for the exercise of this regalian right, or right of property in all mines, whether in public or private land.
Having thus established that the right of property in mines is wholly distinct from the ownership of the soil, and that the former remains in the Sovereign, notwithstanding the possession of the latter by a private person, we proceed to inquire:
1. Did this right to the mine constitute a right to "land," as that term is used in the Acts of Congress?
2. If so, did the miner by registry and denouncement acquire an estate in "land," and what was its quantity and quality?
These two inquiries, though in form separate, are nevertheless intimately connected; for the nature of the subject-matter of the right of property reserved by the Sovereign, can best be ascertained by inquiring what was the subject-matter of the estate conveyed to the subject by registry and denouncement, as also the quality and quantity of such estate. "For how," as remarked by Lares, "can the nation grant that which it has not, or how can it give to one person what belongs to another?"
It will be shown that minerals owned by a title wholly independent of the property in the lands in which they are situated, still form a part of the land itself, and constitute land in the strictly legal acceptation of that term at common law. Independently *219 of authority, it would seem clear that, it being admitted that "various sections of the soil divided horizontally," (1 Eng. Law and Eq. Rep. 249,) may belong as separate properties to different persons, the sections which are beneath the surface must constitute "land," as much as those which are upon it. The vein of ore or the bed of coal is "land," as fully and completely as the superficial earth, and he who owns the former owns land as much as he who owns the latter. On this point the English authorities are agreed.
Nor is the application of those authorities to the question under consideration at all affected by the circumstance that, in England, the regalian right to mines is held to extend only to mines of the precious metals; for the owner of lands in which mines of the base metals are situated, having alienated to one person the mine, but reserved to himself or alienated to another the lands in which the mine is found, the question whether the owner of the mine is an owner of "land," would be presented precisely as if the severance of the two rights of property had originally existed, and the several properties derived by separate grants from the Crown.
"When the mines form part of the general inheritance, they will, of course, be transferred along with the lands without being expressly mentioned in the conveyance; but when they form a distinct possession or inheritance, a title to them must be established, without reference to the general title of the lands in which they are situated." Bainbridge on Mines, p. 4; Rockwell, p. 536.
In the latter situation, "they still, of course, retain the qualities of real estate, and will be transferred by conveyances applicable to the particular disposition of them intended to be made."  Ibid.
They are capable of livery and being made the subject of ejectment. Cro. Jac., p. 150.
"By the name of minera, or fodini plumbi, the land itself shall pass in a grant if livery be made, and also be recovered in an assize." Co. Litt., 6 a.
It is held that mines do not lie in grant, but pass like other *220 hereditaments by livery of seizin. Chetham vs. Williamson, (4 East, p. 476; 2 Barn. & Cress., p. 197.)
When a reservation in a deed of feoffment is made in favor of the grantor of mines, no livery is necessary, for the grantor will never have been out of possession; but when the exception is in favor of a stranger to the legal estate, livery cannot be dispensed with. Co. Litt., 47 a; 1 Ad. & Ell., p. 748.
In numerous English cases, the distinction is clearly drawn between a mere license to dig and carry away ores, in land of which the possession is retained by the grantor, and a demise of the mine itself, by which an estate in the land is created; nor is it necessary, to constitute such an estate, that the grantee acquire any right or interest in the surface  for minerals are capable of forming a distinct inheritance in the lands of which they are a part, and consequently, an actual estate may be both created in, and restricted to, any specified kind of minerals. 19 Vesey, p. 158; 4 East, p. 469; 2 Barn. & Ald., p. 724; Bainbridge on Mines, pp. 3, 55, 124, 141; 170.
In Stoughton vs. Leigh, (1 Taunt., p 403,) it was held, that a grant of a stratum of coal in the land of another is a grant in fee simple of a real hereditament, and that the widow of the grantee was dowable of all the mines of her husband, as well those which were in his own landed estates, as the mines and strata of lead, or lead ore and coal, in the lands of other persons.
In Wilkinson vs. Proud et als., (11 Mees. & Wels., p. 33,) it was held, that a right to a given substratum of coal lying under a certain close is a right to land, and cannot be claimed by prescription. But a bare right to dig and carry away coal in another man's land may.
An action of ejectment, an assize, a common recovery trespass, an action for use and occupation, and almost all the legal remedies applicable to "land," can be maintained at common law with respect to a mine. But they do not lie for an incorporeal thing. Ad. on Eject., p. 18-20; Co. Litt., 6 a.; Bain bridge on Mines, p. 141; 2 Barn. & Ald., p. 737; 4 Barn. & Ald., p. 401; 2 Strange, p. 1142.
The case of The Queen vs. The Earl of Northumberland, (Plow *221 den, p. 310,) is relied on by the counsel of the United States to show that in England the right of the King to royal metals in the lands of a subject is a merely incorporeal right or easement, like rights of common, way, estovers, and the like.
But it is not so said in the case. It is merely said, that as the subject may acquire by usage, title or interest in the freehold or inheritance of the King, as common, way, estovers, etc., so the King may possess by prerogative a title or interest in the freehold of the subject. It is not said that the title or interest of the King in royal mines is identical with the title or interest of the subject, who has a right of common, way, estovers, etc., in the King's lands.
If the private owner of the inheritance can, by his grant, sever the right of property in the soil from that in the mine, and vest the ownership of the former in one person, and of the latter in another; and if the mine so owned is "land," it is not easy to perceive why, when the severance is effected by law, and the King is the owner of the mine, he should not also be deemed the owner of "land;" and this, whether the royal right is confined, as in England, to a particular description of mines, or extends, as in Spain, to all mines.
That this was not meant to be decided in the case in Plowden, is clear; for no question was made as to whether the right of the King was a corporeal or incorporeal hereditament, and the judgment of the Court was, "that all ores of gold and silver in the lands of subjects, whether the mines thereof be opened or unopened, with power to dig in the lands of the subjects for the same, and to carry them away, with all other incidents thereto, belong of right to the Queen."
From the forgoing authorities, it is abundantly clear, that the law of England is not guilty of what Mirabeau calls the absurdity of refusing to recognize two species of property, one in the surface of the earth, and the other in its depth.
That in the case of royal mines, the property in the mines remains in the Crown, distinct from the general ownership of the land in which they are situate, and in the case of base mines, the general owner may sever by his own grant the property in the *222 mines from the property in the lands. But in both cases, the mine or strata of minerals form part of the land itself, and are land in as strictly legal a sense as the non-metalliferous portions of the soil.
Having thus seen that a property in veins of metals is a property in "land," notwithstanding it is entirely independent of the property in the soil which contains them, and that it is so regarded, whether the severance between the two species of property be effected by the grant of the Sovereign to whom royal metals belong, or by the owner of the inheritance, who, by the law of England, was the owner of the base metals within his lands, we will next inquire what was the nature of the estate which was acquired by registry and denouncement under the Spanish and Mexican laws.
This inquiry will necessarily involve a consideration of the nature of a mine under those laws; for it is admitted, as urged by the counsel of the United States, that an estate in a mine may closely resemble an estate in land, while the subject-matter of the two estates may remain essentially different.
It will, therefore, be shown not only that the estate of a mine-owner is nearly identical with a fee simple conditional estate in land, at the common law, but that the subject-matter of that estate, viz., "a mine," as defined in the Ordinances, is "land" in the strictest sense, as proved by its intrinsic nature, and by the application to it in Spanish and Mexican laws and treatises of terms which describe and express what is understood in our jurisprudence by the word "land."
In the earlier periods of the Spanish Monarchy, it was established as a principle of Castilian law, that all mines found in the Royal Seignory belonged to the Crown. All persons were prohibited from working them except under royal license. Part. 3, tit. 28, law 11; Nov. Recop. lib. 9, tit. 18, law 1.
In 1387, permission was given to every person to work mines found within his own inheritance, or in that of other persons with their permission. Nov. Recop. lib. 9., tit. 18, law 2.
And as early as 1526 and 1551, a general royal license was given to work mines discovered in the Indies, on giving an account thereof to the Governor, and payment of a certain proportion *223 of the product to the Crown. Recop. de las Ind. lib. 4, tit. 19, 61 14.
On the 10th January, 1559, Philip II., by a law promulgated on that day, extended to all mines of gold, silver and quicksilver found within the kingdom, whether on royal land or on those of lordships, or of the clergy, or in public, municipal, vacant or private lands, the right of ownership which had previously been vested in the Crown, as to mines found within the Royal Seignory; and all mines of the three metals named were declared "to be resumed and incorporated in the Crown and royal patrimony of the King," excepting only such mines of gold or silver, as had, under previous grants to individuals, been begun to be worked, and were then actually worked Nov. Recop. lib. 9 tit. 18, 1. 3, Halleck's Mining Laws, pp. 6, 15; Rockwell, 113, 116.
The reasons for this act of high sovereignty are set forth in the preamble of the law. They are chiefly founded on the policy of stimulating the discovery and working of mines, by giving to all subjects of the Crown the right of discovering and acquiring the ownership of them in limited parcels, in order that thereby this source of national wealth might be developed, instead of being locked up, as theretofore, in the hands of a few, who did not or would not develop it. Rockwell's Gamb. Comm., p. 127; Nov. Recop. lib. 9, tit. 18, l. 3; Halleck's Transc. p. 6-11.
It thus became an established and fundamental principle of the Spanish law, that all mines of gold, silver, quicksilver, and other metals, whether found on public or private lands, belonged to the Sovereign. Rockw. Gamb., 126, 137; Solorzano Polit. Ind., lib. 6, cap. 1, No. 17; Ordenanzas de Mineria, p. 68; Ordinances of 1783, lib. 5, art. 1; Ordinances of 1584, lib. 6, tit. 13, l. 9.
To carry into effect the policy thus inaugurated, ordinances were established in 1584, (called by Gamboa the Old Ordinances,) which continued in force until August 22d, 1783, when the New Ordinances, as they were called by Gamboa, were enacted.
By these new ordinances, all former edicts and ordinances were revoked, so far as they were opposed to the provisions of the new law except the provisions of the law of 1783, so far as they *224 treated of the incorporation into the royal patrimony of the gold, silver, and quicksilver mines of the kingdom.
The 2d article of the New Ordinances is as follows:
"And in order to benefit and favor our subjects and natives, and all other persons whatsoever, even though foreigners to these our kingdoms, who may work or discover any mines of silver already discovered, or to be discovered, we will and command that they shall have them, and that they shall be their property in possession and ownership, and that they may do with them as with any thing their own, observing, as well in regard to what they have to pay by way of duty to us, as in all else, what is prescribed and ordered in this edict." Halleck's Transc., p. 70.
By the laws of the Indies, the Emperor Charles and King Philip II. had made a similar grant to all their subjects, whether Spaniards or Indians, (except certain officers,) authorizing them to work the mines freely and without impediment, and "making them common to all persons, wheresoever situate;" provided, that the Indians should not be injuriously treated, and that no other parties be prejudiced. 1 Heathf. Gamboa, p. 20, book IV. lib. XIX., law 1; Recop. de las Indies; Halleck's Transc., pp 130, 140.
From the very ample terms of these grants a doubt arose, says Gamboa, whether the mines were still to be regarded as the peculiar right of the Crown, or whether they were to be considered as the absolute property of the subject.
On the one side, Don Mateo de Lagunez and Cardinal de Luca were of opinion, that as all mines in the Indies had been declared "common," and all persons were at liberty to try for them, wherever situate, it was to be inferred that the mines were no longer vested in the Crown, and that the effect of the Ordinances was precisely the same as if the mines had been made private property, (particulares,) as they may be by concession and privilege.
This opinion Gamboa combats, and after discussing the question at length, concludes that the mines remained a right of the Crown and annexed to the royal patrimony, and that the laws made the vassals "participants" of this right; not giving them *225 the private and absolute property to use at will, but in subjection to the Ordinances; and that although the laws concede to them the ownership and property (dominio y propiedad,) it is by "participation," and not by absolute translation, (por participacion y no por translacion absoluta;) the supreme right of property (alto dominio) remaining in His Majesty.
"The correct opinion then seems to be," says Gamboa, "that the mines remain attached to the Crown (que S.M. mantiene en su corona las minas,) and that the King, not being able to work them himself, has admitted his subjects to a share of them (dio parte a los vasalos) under various restrictions and subject to various liabilities."
The opinion advocated by Gamboa appears to have been adopted in the Ordinances of 1783, in which many of the suggestions of Gamboa were embodied. (Gamboa, chap. 11.)
The first two articles of title V. of that Ordinance are as follows:
"Art. 1. Mines are the property of my Royal Crown, as well by their nature and origin, as by their re-union, declared in law IV., lib. XIII, book VI., of the Nueva Recopilacion.
"Art. 2. Without separating them from my royal patrimony, I grant them to my subjects in property (en propiedad) and possession in such manner that they may sell them, exchange them, rent them, donate them, pass them by will, either in the way of inheritance or legacy, or in any other manner alienate the right which in the mines belongs to them, on the same terms on which they themselves possess it, and to persons capable of acquiring it." Halleck's Transc., p. 222.
It was under these last Ordinances that the rights of Castillero were acquired; but as they adopted the views of Gamboa as to the Ordinances of 1584, his Commentaries on the latter, and definition of the mine-owner's estate acquired under them, are of controlling authority in the interpretation of the Ordinances of 1788.
In Section 24, p. 19, Gamb. Comm. Heathf. Transc. pp. 27-8, he observes; "Having established then the regalian right of His Majesty in the mines, and that this right is entirely consistent *226 with the right of disposition and property (con el dominio y propiedad) of the subjects, it is indisputable, that as a consequence of their passing to the latter with power to dispose of them, as their own (como cosa suya) all the incidents of "property" (propredad y dominio) must attach in favor of the proprietor, and that they may therefore be exchanged, sold, leased or alienated by contract, donation and inheritance, may be given as a portion in marriage, or may be charged with a rent, and that interest may be demanded for the purchase-money while remaining unpaid, etc., etc.
"There passes, then, to the subject the direct dominion or property, as also the right to the use (dominio directo ó propiedad, y tambien el util,) by virtue of the favor and grant of the Sovereign  which we hesitate not to call a gift on conditions (una modal donacion,) as will appear upon considering the rules by which that species of grant is defined in law: that is to say, that it be a free and complete act, which being perfected, a charge attaches on the donee from that time forth, (and the being worded as a condition makes no difference,) and that upon the failure of the modification limited by the donor in his own favor or in that of a third person, or of the Kingdom or Republic, the gift determines, as will be seen by reference to the various text and doctors." Ch. 11, sec. 25.
Throughout the Commentaries of Gamboa, the estate of the mine-owner in the mine is called the "dominio y propiedad;" and in sec. 15, ch. XXI, he says: "Another privilege treated of by the authorities above alluded to, is that of appropriating nine parts of the metal, paying only the tenth to the King as an acknowledgement of his having shared with his subjects the direct and superficial ownership (de aver participado a sus vasallos el dominio util y directo,) of so valuable a kind of property (de tan preciosos fundos).
We have already seen that the "alto dominio" of eminent domain is reserved by the King, by virtue of which and of the conditions on which the grant is made, a new grant may be made if the first be forfeited by breach of the conditions, viz.: the payment of the fifth, and the observance of the Ordinances *227 which Gamboa calls the modo, or gravamen with which the donation is charged, and which make it a "donacion modal."  Chap. 11, art. 26.
From the foregoing citations the nature of the estate in the mine acquired by registry and denouncement under the Spanish laws, might seem sufficiently clear.
It will, however, not be inappropriate to show what in Spanish law is the meaning of various terms which are used in the Ordinances, and by Gamboa, as descriptive of his estate. Those terms are "propiedad," "propiedad y posesion," "propiedad y usufructo," "propiedad y utilidad," "plena propiedad," "dominio," "pleno dominio," "dominio absoluto y perpetuo," "dominio directo y util."
"Propiedad," is the right to enjoy and dispose freely of things which are ours, so far as the laws forbid not. Commonly, the dominion which is not accompanied by the usufruct is called "propiedad," or "nuda propiedad," and the dominion which is accompanied by the usufruct is called "plena propiedad." Escriches Dict., verb. "Propiedad."
"Dominio," is the right or power to dispose freely of a thing, if the law, the will of the testator, or some agreement does not prevent.
It is divided into the full, and the less than full  "dominio pleno y menos pleno."
"Dominio pleno y absoluto," is the power which one has over anything to alienate independently of another  to receive its fruits  to exclude all others from its use.
"Dominio directo," is the right a person has to control the disposition of a thing, the use (utilidad) of which he has ceded.
"Dominio util," is the right to receive all the fruits of a thing subject to some contribution or tribute, which is paid to him who reserves in it the "dominium directum."  Escriche's Dict. verb. `Dominio;" Alvares' Institutes, vol. ii., pp. 23, 33.
It appears, therefore, that the words which the laws and commentators apply to the miner's estate, viz.: "propiedad y usufructo" "plena propiedad," "pleno dominio," "dominio directo y util" etc., are descriptive in the Spanish law of the highest *228 estate or right of property in land which the subject can acquire.
It would seem to be higher than any right of property in land enjoyed in England; for, says Blackstone, "A subject has only usufruct and not the absolute property of the soil;" or, as Sir Edward Coke expresses, "he hath the `dominium utile,' but not the `dominium directum.'" Comm. bk. 2, ch. 7.
The ownership of the subject in the mine remains, however subordinate to the dominium altum, or eminens, or dominio alto of the Crown.
But this is merely the right tacitly reserved by the Government or sovereign authority of a State, and to which all individual rights of property are subject, to take possession of the property in the manner directed by the constitution and laws of the State, whenever the public interest may require. Per Ch. Walworth; Beekman vs. Saratoga R.R. Co., (3 Paige R., p. 45.)
The fact that the estate of the mine owner may be forfeited or determined by a failure to comply with those of the ordinances which impose that penalty, i.e., by breach of the conditions subsequent attached to the gift, in nowise affects its nature as an estate in fee.
Every estate held by feudal tenure was subject to forfeiture for breach of the conditions on which it was granted. Nor were these conditions always expressed in the grant; for every act of the vassal which amounted to a breach of his allegiance, or the tie which bound him to his lord, operated a forfeiture of the land.
In a grant of a mine the principal conditions, the breach of which worked a forfeiture, were: 1st, the payment to the Crown of its proportion of the products; and 2d, the working it according to the laws.
If no breach of these conditions occurred, the estate of the miner would continue forever.
It therefore closely resembled a conditional or determinable fee at common law. 1 Prest. on Est., 480. The number of cases where, by the Ordinances of 1584, the mine was declared forfeited, `perdida,) was no less than fifteen, but many of these causes of *229 forfeiture were totally abolished, and the rigor of the laws was essentially mitigated by the Ordinances of 1783, and subsequent laws.
The decree of the Cortes of Spain, of January 26, 1811, exempted the miners of quicksilver from the payment "of all duties, even including the duty of the fifth, or the proportion which the miner is bound to pay;" and annulled "all dispositions which opposed free trade in said mineral, and the security of absolute and perpetual ownership (dominio absoluto y perpetuo) of the miner; provided, that in managing and working them, he observe the general rules established on the subject."
In the communication from the Secretary of the Regency, transmitting to the Royal Tribunal-General of New Spain this decree, he says:
"Under this date I notify your Excellency, that the prerogative of Seignory, which from remote times the Vice-Royal Treasury has reserved to itself with respect to mines of quicksilver, has been annulled by the General and Extraordinary Cortes, in consequence of the resolution and manifestation of the Council of Regency, enacting at the same time that the said mines shall be worked under the same rules and ordinances as those of gold, silver, and other metals, and that their possessors shall preserve their ownership and usufruct (propiedad y usufructo,) and in no case shall they be obliged to alienate them to the State  giving them permission moreover to sell their products to any one who will pay the highest price for them. This measure affirms in a manner inviolable the ownership (propiedad) and profits (utilidad) of this kind of real estate (de talis juicas), and dispels the reasonable fears which prevented individuals from taking them under their care."
It would not be easy to find words to express more strongly the notion of a permanent and inviolate right of property, than the language of this decree and communication. Orden. de Min, pp. 79-82; Halleck's Mining Laws, pp. 381-385.
One of the principal causes of forfeiture established by the Ordinances of 1584, was the failure to work the mine for four consecutive months. But even this provision, so necessary to *230 secure the great object of the Crown in conceding the mine, viz., the development of the mineral resources of the country, was regarded as highly penal, and therefore to be strictly construed. It was thus easily evaded, for by working the mine for a few days every four months the forfeiture was avoided. This defect was remedied in the Ordinance of 1783, which declared that the omission to work for eight months, whether successive or interrupted, in any one year, should forfeit the mine; but the Judge, before whom the mine was denounced, was authorized to admit, in addition to the excuses allowed by the former law, any "other just causes which, combined with their former merit, might render the miners worthy of equitable consideration." Halleck Transc. 244; Ord. of 1783, Art. 15; Heathf. Gamboa, p. 80-86.
Some of the other causes of forfeiture were for the breach of directions in the Ordinances clearly necessary for the security of the mine or of the operatives  such as removing the pillars or supports of the mine, or in other ways neglecting to comply with the rules of the Ordinances, or the directions of the competent authorities, as to their security and preservation, and their better working. Ord. of 1783, Arts. 7, 10, 11, 12, 13, 14, 15; Halleck's Transc. 342, et seq.
In some cases these forfeitures were only imposed after repeated offences, (Art. 10,) and all the facts were to be judicially ascertained in appropriate proceedings.
From the foregoing it results, that although "the observance of the Ordinances," was in strictness a condition of the concession, yet in fact the forfeiture of the mine was a punishment or penalty imposed for violations of salutary and necessary rules, incurred in but a limited number of cases, and when no equitable considerations existed for mitigating their rigor.
A determinable fee, however, determined by the act or event expressed in its limitation, usually beyond the control of the tenant, and the occurrence of which could not be imputed to him as a fault, still less as a violation of law.
The annexing of conditions subsequent to grants, seems to have been a policy by no means peculiar to Spanish jurisprudence with regard to mines. It was intended to provide a *231 security for the attainment of those objects which formed the consideration for the grant.
These, in colonization grants, were generally occupation and cultivation. In Florida and Louisiana, the settlements were made under a preliminary concession or warrants of survey, and on the fulfillment of the conditions, the final or perfect title was issued.
In Mexico, however, under the Law of 1824, and the Regulations of 1828, a perfect title issued in the first instance, but charged with conditions as to occupation and settlement; and the grant provided that "if the grantee failed to comply with the conditions, he should lose his right to the land, and it might be denounced by another."
I am unable to perceive any substantial difference between the estate of the colonization grantee and that of the mine-owner. Both liable to denouncement and forfeiture for non-compliance with the conditions expressed in or annexed by law to the grant; and in both cases, equitable excuses could, in general, be received for the omission.
In the California land cases, the existence in the grants of conditions subsequent has never been regarded as presenting any obstacle to their confirmation  where no forfeiture had accrued and been judicially ascertained under the former Government.
Having thus ascertained the nature of the mine-owner's estate in the mine, we are next to consider what was the nature of a mine itself, considered as a subject of property.
From the quality of the estate, and the fact that it possessed all the incidents of an estate in land  that it was alienable devisable, and inheritable  that it could be leased, charged with a rent, mortgaged, and given as a portion in marriage, etc., it might reasonably be concluded that the Spanish law, like the English, regarded the mine as "land." But all doubt is removed by recurring to the terms which were applied to it. It is a "fundo," or land. 1 Gamb., ch. v., sec 5; id. ch. xxi., sec. 15. "bienes raices," or real estate. Id. ch. xvii., sec. 22. It is "bienes immobles," or immovables. Id. ch. xxiii., sec. 6. All the rules relating to pititory and possessory actions for lands are *232 applied to it, ch. xxiii., secs. 1, 6, 19; and in these cases the proceedings may be for the ore, or merely to substantiate the right of property in the mine, (sobre los metales ó puramente sobre la propiedad.) Ch. xxiii., secs. 20, 21.
The fact that a judicial delivery of possession was authorized to be made, indicates that the thing to which the title or right of property had attached was a corporeal hereditament. It is laid down by Alvarez (Inst. v. 11, p. 23, et seq.) as an axiom of the civil law, that "only things corporeal can be delivered, since only these can be transferred by corporeal act from one to another." And this corresponds with the rule of the common law, that corporeal hereditaments pass by livery of seizin, while incorporeal hereditaments lie only in grant.
As the Ordinances gave to the miner the right of property in and possession of the mine, the judicial delivery of the mine, after the title to the thing had been acquired by denouncement and registry, vested the mine-owner with the right in the thing, and gave him the full dominion  the title to and the right in the thing, the right to dispose of it, and the right to use  dominio directo y util. It is unnecessary to pursue this discussion further.
No one, I think, who examines the Ordinances and the Commentaries of Gamboa with care, can avoid the conclusion that the mine-owner, by denouncement and registry, and the delivery of the possession to him, obtained, under the Mexican law, a right to and property in the mine, and that the mine so acquired consisted of the very substance of the minerals of which it was composed  was a corporeal hereditament like a mine or stratum of ores in the English law, and was land in the strictest and fullest sense of the term.
The case of Fremont vs. The United States, (17 How. 565,) is relied on by the counsel of the United States as sustaining his objection to the jurisdiction. In that case the Court say: "In relation to that part of the argument which disputes the right on the ground that the grant embraced mines of gold and silver, it is sufficient to say, that under the mining laws of Spain, the discovery of a mine of gold or silver did not destroy the title of the individual to the land granted. The only question before *233 the Court is the validity of the title. And whether there be any mines on this land, and if there be any, what are the rights of sovereignty in them, are questions which must be discussed in another form of proceeding, and are not subjected to the jurisdiction of the Commissioners or the Court, by the Act of 1851."
It will be seen that the only question before the Court was whether the fact that mines of gold and silver had been discovered on land which had been previously granted under the colonization laws, destroyed the title of the individual to the land granted. It was of course held that it did not. Whether there were any outstanding rights of sovereignty in such mines, and, if so, what was their nature, and in what sovereign they were vested, the Court declared itself without jurisdiction to determine.
But it was not decided, nor could it have been intended to be decided, that a private grantee of a mine under Mexican law could not present his claim for confirmation under the Act of 1851. That question was not before the Court. And even if the language is to be construed as extending to a right to a mine acquired under Mexican law by a private individual, and is not to be restricted, as its terms imply, to rights of sovereignty outstanding in the United States or the State of California, it must be regarded as obitar dictum  not necessary to the determination of the case, and relating to a question which did not and could not have been presented by it.
A similar decision of the point presented for determination had already been made by the Supreme Court in Delassus vs. The United States, (9 Pet. 117.) The claim in that case was, like that of Fremont, for the confirmation of a concession of a tract of land. It differed from the case of Fremont in the circumstance that the motive of the petitioner in soliciting the grant was declared to be to make explorations for lead mines.
But the Court held that the concession was for land; and as all claims for lands were submitted to its jurisdiction, without any reservation in the Act of Congress of claims for lands containing lead mines, a confirmation could not be withheld.
In Fremont's case the same objection  viz.: that the land *234 granted contained mines  was taken, and the Court held, that that circumstance did not impair the validity of the grant, or divest its jurisdiction over it as of a claim to land. Such, it seems clear to me, was the whole scope and effect of the decision.
The nature of a claim to a mine, as distinguished from the right of an agricultural grantee to the surface, and the jurisdiction over such a claim confided to the Commissioners by the Act of 1851, were not considered, or intended to be decided.
My conclusions, then, on the question of jurisdiction, are 
1. That the jurisdiction of this Court is not restricted to those cases where the estate claimed in lands in California is a fee  or such as in equity should be converted into a fee.
2. That even if it were, the estate of a mine-owner in a mine is, under Mexican and Spanish law, a fee with conditions subsequent; closely resembling that of a grantee under the colonization laws.
3. That by the common law of England the ownership of the surface may be vested in one person, and that of the mine, or substratum of mineral in another; and that the latter is "land" in its strictest sense.
4. That by the Spanish and Mexican laws, a mine, considered as a subject of property, and distinct from the ownership of the surface, is "land," or rather, that terms are applied to it in those laws which are the precise equivalents of the common law term "land."
And that therefore this Court has jurisdiction to ascertain and settle a private land claim to a mine, the title to which is derived from the Spanish or Mexican Governments, as of a claim to "land."
Having thus ascertained that a mine is "land," and that the estate of the mine-owner closely resembled a conditional fee at common law, we will next briefly inquire by what proceedings and in what manner that estate was acquired.
Such an inquiry naturally precedes an examination into the genuineness of the alleged title to the mine, and the determination of its legal effect if found to be genuine.
In art. 4, tit. VI., of the Ordinances of 1783, entitled "Of the *235 modes of acquiring mines  of new discoveries, registries of veins, and denouncement of mines abandoned or forfeited," is as follows:
"Those mentioned in the preceding articles must appear with a written statement before the Deputation of Mining of that Territory, or the one nearest, if there should be none there, stating in it their name and those of their partners, if they have any; the place of their birth, their residence, profession and employment; and the most particular and distinguishing features of the place (sitio), hill (cerro), or vein, of which they ask the adjudication. All of which circumstances, and the hour at which the discoverer presents himself, shall be noted in a book of registry, which the Deputation and Notary (Escribano) of Mines, if there be one, shall keep, and this being done, his written statement shall be returned to the discoverer for his due security, and notices shall be fixed to the doors of the church, Government houses, and other public places of the town, for due information. And I order that within ninety days he shall have made in the vein or veins of the registry, a pit (poso) of a vara and a half wide, or in diameter, and ten varas down, or in depth; and that as soon as this is done, one of the Deputies shall personally go, accompanied by the Notary, if there be one  and if there be none, by two assisting witnesses and a professional mining expert of that Territory  to inspect the course and direction of the vein, its width, its inclination to the horizon, which is called echado or recuesto, its hardness or softness, the greater or less firmness of its sides, and the species or principal indications of the mineral  taking an exact account of all this, in order that it may be added to the corresponding part of its registry, with the evidence (fé) of possession, which shall immediately be given in my Royal name, measuring to him his pertenencias, and causing him to fix stakes (estacas) in his boundaries, as will hereafter be mentioned; which being done, there will be delivered to him an attested copy of the proceedings as a corresponding title.
"Art. 5. If during the ninety days any one shall appear pretending to have a right to said discovery, he shall have a brief *236 hearing in Court, and it shall be adjudicated to the one who best proves his claim; but, if he appear after that time, he shall not be heard.
Art. 7 provides, that when a question shall arise as to who is the first discoverer, he shall be held such who shall have first found metal in the vein  and in case of doubt, he who shall first have registered it.
It is well said by one of the counsel for the claimants, that the object of the various Mining Ordinances of Spain was to stimulate and promote to the utmost extent the discovery of mines and the development of their riches.
The means adopted to stimulate discovery were to give to the discoverer the mine he might discover  the State reserving for itself a small part of its products. The means by which the development of the riches of the mine was secured, consisted in making the continuance of the right of property dependent on working it to the extent and in the manner prescribed by law.
Discovery, therefore, was recognized by those laws as the real foundation of the right, and the true consideration for the grant of property in a mine.
Gamboa considered the discoverers of mines as entitled even to greater encouragement than the inventors of useful arts. Heathf. Gamb. 1, p. 259. And in all the Mining Ordinances of Europe, the right of the discoverer is recognized by the promise of a grant of the mine as a reward for the discovery.
In the Sala Mejicana, vol. 2, p. 58, discovery is declared to be one of the modes of acquiring mines, and it is recognized as a species of occupation, and as constituting a source of title, like the finding of a buried treasure, precious stones, and the like.
In the jurisprudence of Spain and the Continental Nations, discovery, with regard to mines, as a source of title and consideration for the grant, corresponds with occupation and cultivation under our own pre-emption laws with regard to vacant public lands; and in all the claims to lands in Florida and Louisiana submitted to the Supreme Court, the fact of settlement, under a contract for or with a just right to expect a title *237 has been regarded as a valuable consideration secured by the State, and creating an equitable obligation to confer the title.
But this inchoate right created by discovery must be perfected in the manner prescribed by law.
It is therefore required that the mine be registered; and without registry, says Gamboa, no mine could be lawfully worked, and it remains liable to be registered by any other person  the form of the ordinance not having been complied with. Chap. v., sec. 2. The reasonableness of this regulation, he remarks, is evident. It is not necessary to recapitulate the various arguments by which he vindicates its policy and necessity.
As the revenue was interested in a portion of the product of the mine; as the public policy required that an account should be taken of so important a part of the national wealth; as the mine-owner, from the moment of registry, became subject to laws designed to secure the development of the mine he had discovered; for these and other reasons, it was indispensable to provide a mode in which the discovery should be formally made known to competent authority and the right of the discoverer judicially declared and defined. Registry is, therefore, said by Gamboa to be the fundamental title, or the base of the title (el titulo fundamental de las minas), and the attributive cause of the subject's right of property in it; for the Crown has conceded the mines and made them common, subject to this burden or condition (gravamen). Ch. v., sec. 2.
And in other places he speaks of registry as "el titulo fundamental de el dominio de las minas." Ch. xi., sec. 2; ch. vii., sec. 3.
The registry, however, did not constitute the title to the mine in the sense of being itself a concession or grant.
The registry, or formal declaration of the discovery in the manner prescribed by law, was the fulfillment of the condition imposed in the general grant by the Sovereign on the discoverer of mines, and on its performance the law itself annexed the title as the legal consequence of discovery and registry. It still remained subject to further conditions  some to be performed *238 before a formal delivery of possession could be given, and some to be perpetually observed under penalty of forfeiture.
The registry was therefore required to be made before a judicial tribunal, and not before an administrative officer, who, like the Governors of California, might exercise a discretion as to whether or not the concession should be made. The declaration of the ownership of the discoverer was termed an "adjudication," and even after registry, and at any time during the period allowed the person registering for digging the pit, any person pretending to have a right to the discovery, was entitled to a hearing "in Court," and the mine was adjudicated to him who best proved his claim.
In sec. 14 of chap. v., Gamboa states that "registries of mines in the Indies are not to be made before royal officers, but before the Justices of the Department alone; and the oath of the discoverer, that he will bring in to be stamped all the gold and silver, etc., is to insure the due levying of duties, and is not to be made upon the registry of a mine, the title to which comes under the cognizance of the Justice."
In section 15, he says: "But judicial matters, such as registry, denouncement, the giving possession, etc., are the province of the justices, and, by way of appeal, of the royal audiences."
In sec. 24, he defines registry to be "any judicial order, or proceedings (autos ó diligencia,) which authenticate and afford evidence of some judicial act."
The whole proceeding thus seems to have been the judicial recognition and declaration of a previously existing right, asserted and established in the manner required by law, rather than the creation and conferring of a title which had no previous existence.
Thus, Gamboa, in speaking of the necessity of registering says: "And therefore, the discoverer, if he would preserve his right, should give notice of his discovery, and make himself known." Ca. v., 4.
So, in sec 17 of the same chapter  "If, after the expiration of the term of twenty days, some other person should come forward and register, the discoverer loses his right, this being *239 the penalty he is liable to pay for his culpable default, in neglecting to register his mine, and thus frustating the ends of the ordinances; for a mine which is worked without being registered, is not properly to be called a mine, and does not merit the name, even though it should yield good ore.
"The ordinances give the name of mines to such only as are registered, because the registry is the fundamental title (el titulo fundamental) to every mine; and because the omitting to make registry evinces a vicious intention to dispose of the ore or silver clandestinely, in fraud of the right of the Crown, and to put impediments in the way of other individuals who might wish to take mines upon the same vein, or at the same spot."  1 Heathf. Gamb. p. 150.
In neither the Ordinances of 1584, nor in those of 1783, is mention made of any title-paper to be delivered to the party, containing, in terms, any grant or concession of the mine.
His "statement" is, by the Ordinances of 1783, to be returned to him, after its contents have been duly noted in the register, "for his security," and when he shall have dug his pit he is to be put in possession, if no adverse claim be interposed. But the only evidence of his title consists in the judicial ascertainment and record of the fact that he declared his discovery in the form required by law, which being done, the law itself gave the title on the conditions fixed by the ordinances. When the pit had been dug, and judicial possession given, the 4th Article of the Ordinances of 1783, directed, as we have seen, that an authorized copy of all the proceedings (de las diligencias) should be given him as his corresponding title (como titulo correspondiente). To perfect and secure the right to a mine, registry was, in all cases, indispensable. In making it, all that was necessary was "to manifest the person, the place, and the ore." But if the mine had previously been worked, and was denounced for abandonment or other cause of forfeiture, a preliminary proceeding called a denouncement was required. This was in the nature of an accusation against the former owner, charging him with having left the mine unworked, or having come within some other ground of forfeiture. Upon this question a summary *240 judgment was had, after notice to neighbors, proclamation, etc. If the mine was declared forfeited, the denouncer was, nevertheless, obliged to register it and go through the same proceedings as the discoverer had done. Heathf. Gamboa, ch. v., sects. 21-22, p. 153.
That the discoverer of a mine was recognized by the law as having acquired a right to it, even before registry, is further shown by the terms of the 20th Ordinance of 1584, which enacts that "No person shall presume to register, or to enter in the register a mine which is not his own property, under the penalty of one thousand ducats," etc.
Among the cases mentioned by Gamboa, to which this law applies, is that of a person other than the discoverer of the ore registering a mine before the expiration of the twenty days allowed by the ordinance to a discoverer for registering his mine. 1 Heathf. Gamboa, pp. 156, 158.
The discoverer is thus treated as the true owner of the mine, until, by failing to register within the time prescribed, his rights are lost; and the registry of the mine within that time by any person in his own name is considered and punished as a fraudulent attempt to acquire the property of another, like a similar act by the mortgagee of the mine, or by the curator or tutor of a minor, and other cases mentioned by Gamboa.
From these and many other provisions in the ordinances and passages in the Commentaries of Gamboa, the nature and effect of registry is unmistakably manifested; nor can our views of it depend upon the meaning we attach to a single phrase of Gamboa (el titulo fundamental), as to the correct translation of which a question was raised at the bar.
The foundation of the right to a mine was discovery. But this right was lost unless the discoverer made known the fact before the judicial tribunal authorized to receive such declarations. The proceeding for the purpose was entirely ex-parte, and consisted merely of a production of the ore, a description of the place where it was discovered, and the person of the discoverer. These facts being duly made known and recorded, the title passed by operation of law, unless within the time limited *241 some one having a better right appeared. The foundation of the denouncer's right was in principle the same.
Having brought to the notice of the Court, and established that a mine was abandoned or had been forfeited, the law gave him the right to register it in his own name, like a new mine, except that not being an original discoverer, the mining space (pertenencias) to be assigned to him was more limited.
The registry cannot be regarded as the base of the title to the mine, in the sense, that without registry a right of property could, in no case, be asserted to it; for as we have seen, even after registry by an alleged discoverer, and after he had dug his pit, obtained judicial possession, and even had his pertenencias measured, any one pretending to have a right to the discovery, could within ninety days from the date of the registry assert his claim and procure the mine to be adjudicated to him; but where no objection was interposed, and the person registering was the true discoverer of the mine, the causing it to be registered, or the formal declaration of his discovery, was the fulfillment of the condition established by law upon which his inchoate right as a discoverer became a perfect right of property (although until the pit was dug he was not entitled to a judicial delivery of possession, nor could he alienate the mine). And the register itself, or the record of the procedure, became his fundamental title paper, or evidence of his title, for it established judicially the fact of the discovery, and the fact that he had declared it as required by law.
I have thus endeavored to arrive at a clear conception of the nature and effect of the registry of a mine, and of the rights of a discoverer, that we may be better able to judge of the validity of the alleged registry by Castillero, and correctly to estimate the equitable or inchoate rights he may have acquired as the discoverer of a new mine.
Having premised this much as to the rights of a discoverer, and the nature, objects and effect of a registry we will now particularly consider the provisions of the articles under examination.
It will be observed, that to effect a registry, and to entitle himself to the judicial delivery of possession of the mine, the *242 only acts required of the discoverer were: 1st, his appearance before the Deputation, with a written statement of the facts necessary to set forth; and 2d, that he should within ninety days thereafter, make a pit in the vein of his registry of the required dimensions.
The noting in the book of registry of the contents of the statement, the hour at which the discoverer presented himself, the notices for due information, etc., were acts to be performed by the Judge or Deputation. It would seem that any injurious effect on the discoverer's right by the omission of the first of these formalities, was intended to be provided against by the direction that the written statement should "be returned to him for his due security," and it is presumed, with a certificate annexed of the fact and time of its presentation.
We learn from Gamboa, that in 1727, the Viceroy Marquess of Cassa Forte issued an order, dated at Mexico, commanding the royal officers and justices to send an account of the mines within their several districts, whether at work or abandoned, etc.; and in case they should have no book of registry for the mines which might have been registered there, to form one with all possible dispatch, that an account might thus be obtained of all the mines in the kingdom, from which a general book might be made up, etc. "But we are not aware," says Gamboa, "that this order, so agreeable to the spirit of the Ordinances now under consideration, and so important to the interests of the revenue in a public, and of the subject in a private point of view, was soon carried into effect." We find here no intimation that the failure of the officer to enter the registry in a book in any way impairied its validity, and this, notwithstanding that the ordinance he was considering (Art. XIX,) expressly requires the Mining Administrators of each District to keep a book in which all registries made in such District were to be entered, and for this purpose the miners were required to send authenticated copies of such registry to that officer.
Gamboa goes on to observe, that "the original proceedings (diligencias) ought not to be given into the custody of the owners until the registry, etc., be made in the proper book; for *243 otherwise these important instruments would be exposed to the contingencies alluded to above, and very serious difficulties may arise in subsequent dealings in ascertaining whether the registry or denouncement was made with due solemnity, the time and manner of making it, the greater or less antiquity of the mine," &c.
This suggestion appears to have been adopted in the Ordinances of 1783, which provide, as we have seen, that the contents of the statement and the hour at which it was presented, shall first be noted in the book of registry, and the statement then returned to the discover "for his due security."
The registry having been effected, the working of the mine could lawfully be commenced at once, and within ninety days the pit was required to be dug. As soon as this was done formal possession could be given.
If, however, the party who had registered the mine failed to do this, his rights were, by the Ordinances of 1584, forfeited and the mine might be denounced by and adjudged to another. As, however, from the nature of the vein, a pit of the depth of three estados might be wholly unnecessary, or the hardness of the rock, the caving in of the pit, the breaking out of springs of water, &c., might prevent the digging of the pit within the time limited, it was provided by the ordinance, that the justice, on an application made to him, and an investigation, might dispense with this requirement of the law, or enlarge the time for its fulfillment, as might be necessary.
In the Ordinances of 1783, the penalty of forfeiture is not in terms imposed for the omission to dig the pit within ninety days. It is presumed, however, that a breach of so positive and important a provision of law would, if without excuse, under the later ordinances have rendered the mine liable to denouncement.
By Art. 4, of the Ordinances of 1783, the pertenencias of the mine were required to be measured, and the stakes fixed in the boundaries at the time possession is given.
By the Ordinances of 1584, the miner was not obliged to do this, until cited by some neighboring miner "who asked for *244 stakes. Ten days were then allowed him to select the ground he might prefer, or, using our mode of expression, to locate his pertenencias  subject, however, to the condition that his original pit of possession, or fixed stake, should be within the limits of the boundaries he might select. If he failed to make his selection within ten days, his boundaries were established by the justice. But this designation of his pertenencias was not final; for he might at any time afterwards, on discovering the true course of the vein, &c., apply to have his stakes bettered (mejorar las estacas), and his boundaries might be altered in any way not injurious to the neighbor, between whose mine and his own the boundaries had already been established.  1 Heathf. Gamb., pp. 297, 298, 325; 2 Heathf. Gamb., p. 10.
The frauds and litigation to which this practice gave rise led Gamboa to suggest that every one should, by positive ordinance, be required to set out his boundaries at the time possession was given, under pain of incurring the forfeiture of the mine and of being ipso facto deprived of it, even though not denounced by any other party. 2 Heathf., pp. 10, 11.
This suggestion was adopted in the Ordinances of 1783, except that the omision to set out the boundaries at the time possession is given, was not declared to forfeit the mine ipso facto.
But, notwithstanding this establishment of boundaries, the miner could improve the location of his stakes (mejorar las estacas) or change his boundaries by the authority of the Deputation of the District, provided it could be done without injury to his neighbors, who were to be summoned and heard in the matter. Ord. of 1783, art. 11, Halleck's Transc., p. 236.
It thus appears that the giving possession was, under the Ordinances, a formal proceeding, like a livery of seizin, of which the measurement of pertenencias, or the establishment of boundaries, did not of necessity form a part; and that although these acts were required to be done by the Ordinances of 1784, their omission did not forfeit the right of property acquired by the registry; still less does it appear that their performance was a condition precedent to the vesting of the title.
In all cases where land was granted under the Mexican colonization *245 laws, a formal judicial delivery of possession was in strictness required. But it has never been held by the Supreme Court that this formality was necessary to vest the title or right of property; and in the majority of cases passed upon by this Court it was not given. In its own nature, it was an act which supposed the existence of a title acquired, but had no effect in conferring one, that having already been done by the concession or grant. I see no reason to make any distinction between the judicial delivery of possession of an agricultural grant and that of a mine, or for considering that the omission of that formality would be fatal to a right of property already acquired in the one case more than in the other.
We shall see, however, when we examine the proofs in this case, that the Alcalde, accompanied by witnesses of assistance, gave to Castillero judicial possession of the mine he had discovered, as well as of three thousand varas in all directions from it, which he undertook to grant him; that no pertenencias were measured or stakes fixed, but that Castillero had already commenced working the mine and had dug a pit, the precise dimensions of which do not appear; that he continued in possession, and working his mine, with the full knowledge not only of the authorities of the Department to whom he made known his discovery, but of the American Consul, and the inhabitants generally; and that this possession has been retained by his assigns and representatives to this day.
I proceed to consider the evidence as to the registry of the mine by Andres Castillero, and having ascertained what was in fact done by him, to determine its validity and effect.
The documents relied on by the claimants as constituting the registry of the mine of New Almaden, are:
1st. A written statement by Andres Castillero, addressed to the Alcalde of the First Nomination of the Pueblo of San José, dated November 22d, 1845, setting forth his name, office and residence, and the fact that he had discovered a vein of silver with a ley of gold on the land of the retired sergeant José Reves Berreyesa, which he desired to work in company. He *246 therefore requests the Alcalde to fix up the proper notices in order that his right might be made sure when the time for giving the judicial possession should arrive.
2d. A second statement addressed by Castillero to the same officer, and dated December 3d, 1845, setting forth that on opening the mine previously denounced by him he had taken out, besides silver with a ley of gold, liquid quicksilver. He therefore asks the Alcalde to unite this representation to the previous denouncement and to place it on file.
3d. The act of juridical possession. In this document the Alcalde recites:
"There being no Mining Deputation in the Department of California, and this being the only time since the settlement of Upper California that a mine has been worked in conformity with the laws, and there being no Juez de Letras, (Professional Judge) in the Second District, I, the Alcalde of First Nomination, citizen Antonio Maria Pico, accompanied by two assisting witnesses, have resolved to act in virtue of my office, for want of a Notary Public, there being none, for the purpose of giving juridical possession of the mine, known by the name of Santa Clara, in this jurisdiction, situated on the land of the retired Sergeant José Reyes Berreyesa, the time having expired which is designated in the Ordinance of Mining for citizen Don Andres Castillero to show his right, and also for others to allege a better right between the time of denouncement and this date; and the mine being found with abundance of metals discovered, the shaft made according to the rules of art, and the working of the mine producing a large quantity of liquid quicksilver, as shown by the specimens which the Court has; and as the laws now in force so strongly recommend the protection of an article so necessary for the amalgamation of gold and silver in the Republic, I have granted three thousand varas of land in all directions, subject to what the general Ordinance of Mines may direct, it being worked in company, to which I certify, the witnesses signing with me; this Act of Possession being attached to the rest of the espediente, deposited in the archives under *247 my charge; this not going on stamped paper because there is none, as prescribed by law.
"Juzgado of San José Guadalupe, December, 1845.
 "ANTONIO MARIA PICO.
 "Assisting witnesses: Antonia Suñol,
 "José Noriega."
These documents are produced from the Recorder's Office of Santa Clara county. They were found in the Mayor's office at that place in 1850, by Capt. H.W. Halleck, and by the Mayor transferred to the Recorder's office, where they now remain. It appears that a large portion of the archives or papers belonging to the former Alcalde's office in San José, were deposited in the Mayor's office of that place, a knowledge of which circumstance induced Capt. Halleck to institute a search in the latter place, which resulted in the discovery of the document.
The espediente thus produced contains several papers besides those enumerated above. These papers will hereafter be referred to.
In investigating the genuineness of these documents, it will be convenient to consider:
1d. The proof of the signatures attached to them.
2d. The evidence tending to establish that the documents were executed at the time they bear date, and were filed or archived in the Alcalde's office. And
3d. The proofs which show that, in fact, the mine was discovered and denounced, and the judicial possession given, as stated in the Act of Possession.
The Act of Possession is signed by Antonio Maria Pico, as Alcalde, and by José Noriega and Antonio Suñol, assisting witnesses. All these persons have been sworn, and testify to the genuineness of their signatures, and that they were affixed on the day the instrument bears date. The genuineness of these signatures, and that of Castillero, is also proved by other witnesses.
I do not understand that the fact that the instruments were signed by the parties whose names they bear, is seriously questioned, as all of them, except Castillero, were produced, and *248 testified not only to their own signatures, but to the facts which the documents recite. The theory of the Government, which supposes these statements to be false, must admit their readiness to affix their names to ante-dated documents.
The real questions, therefore, are, when were these documents prepared and signed? and when were they placed in the Alcalde's office?
2. On this point we have, as before stated, the evidence of Pico, the Alcalde, and the two subscribing witnesses, Suñol and Noriega.
We have also the testimony of José Fernandez, who was Sindico del Juzgado and Escribano of the Court in 1845. This witness not only swears to the handwriting of the documents and the genuineness of the signatures, but states that he saw the espediente in 1845, when it was brought to him by Gutierrez, in whose handwriting the body of the decree is. He also swears that he saw it again in 1849, among the archives of the office, he being then Second Alcalde.
James W. Weekes, a witness called by the Government, testifies that he saw the espediente in 1846-7, when Burton was Alcalde, and in 1848, when he was himself Alcalde. He is unable, however, positively to identify the espediente now produced with the "little book" which he saw in the office when Burton was Alcalde. This witness, in 1848, certified, at the request of Mr. James Alexander Forbes, to a copy of the espediente. The copy was prepared by James Alexander Forbes from a document handed to him by Alexander Forbes, of Tepic, (who was then in California), not from the original in the Alcalde's office. The certificate of Weekes, that it was a faithful and literal copy of the latter document, was obtained, but no comparison was made of the copy made by Mr. Forbes with the original; the witness supposing, as he states, that it was correct. The copy thus certified to by Weekes differs from that found in the Alcalde's office in several particulars, which will hereafter be noticed.
The claimants have also produced the original inventory of papers and effects in the Alcalde's office, which, as was custom *249 ary, was on the 1st of January, 1846, signed by the out-going Alcalde, Pico, and receipted by the in-coming Alcalde, Chavolla.
This document is produced by the Clerk of the City of San José. It was found amongst other papers which had accumulated under the government of the Alcaldes of the Pueblo, and which now form part of the archives of the city. The signatures and rubrics of Pico and Chavolla to the inventory are proved; and the document itself is in the handwriting of José Fernandez, the Escribano or Secretary of the Juzgado.
In this inventory, amongst nearly a hundred entries of papers and records, and of the smallest objects belonging to the office  such as candlesticks, old knives, tables and benches  is found a note of a document entitled "Pesecion de la mina de Santa Clara a Don Andres Castillero."
No attempt has been made to impeach the genuineness of the signatures to this document, nor is it said that there is anything in the handwriting of the important entry in question, or in its position on this list, which could suggest the idea of a possible interpolation. Unless this entry be forged, it would seem conclusive evidence that a document of the kind described was on file in the Alcalde's office on the 1st of January, 1846.
Another inventony, of a similar kind, made on the 10th day of November, 1846, about nine months subsequently to the former, has been produced by the United States from the archives of San José.
In this inventory, no entry of the document in question is found. If the lists were in other respects similar, the omission of this one item might possess much significance. But the two lists seem to be different in many particulars; and though some of the entries are alike in both, several which appear in the first are wanting in the second. That all the papers mentioned in the first inventory must have existed on the files of the office, and should have been noted in the second inventory, is evident. When, therefore, we find not only the "Posecion" of the Mina de Santa Clara, but several other documents, omitted in the second inventory, we necessarily conclude that the latter was prepared in the loose and inaccurate manner in which the *250 public business of such offices was usually conducted in those primitive times.
A striking illustration of the incompleteness of the second inventory is presented by the evidence offered by the United States. Three documents are produced from the Archives of San José, purporting to be orders by the Alcalde for the publication of the denouncements of mines  one of the lands of Justo Larios, another on those of José de J. Vallejo, and a third on the rancho de Ojo de la Coche. These orders are dated in April, March and June, 1846. I find no one of them noted in the inventory made in the succeeding November. And yet, both the documents and the inventory are produced as genuine by the United States.
I can see nothing, therefore, in the omission of the entry of the possession of the mine of Santa Clara in the second inventory which, in the absence of any suggestion that the handwriting or the color of the ink of the entry in the first inventory differs from those of the rest of the document, (as would be the case if it had been interpolated after any considerable interval,) or that the position of the entry on the list would have rendered such an interpolation possible, should weaken the force of the evidence afforded by the inventory that a document, purporting to be the possession of the mine of Santa Clara, was on file in the Archives of the Alcalde's office of San José on the 1st January, 1846
3d. As to the proofs which show the facts of denouncement, judicial possession and working of the mine about the time indicated by the documents.
We have already seen that the subscribing witnesses, the Alcalde and José Fernandez, testify to the fact that the possession was given as described by them.
It is shown, however, by evidence, which is uncontroverted, that in December, 1845, and early in 1846, Castillero and his partners were notoriously known to be working a mine of quicksilver, of which they claimed to be the owners by denouncement. That these facts were made known to the Governor of the Department, and by him communicated to the *251 Supreme Government. That they were known to the United States Consul, and by him communicated to his own Government, and also to a Cabinet Minister of the Government of the Sandwich Islands, with whom he corresponded, and by whom his letter was published in a Hawaiian newspaper of the date of July 25th, 1846, a copy of which is produced. That the mine was, in December, 1845, worked by Indians under the superintendence of Chard, an American employed by Castillero, who is produced as a witness, and whose employment continued until about the middle of 1846. That in December, 1845, it was visited and examined by Col. J.C. Fremont, to whom Castillero. who claimed to own it, explained the Mexican mode of acquiring titles to mines by denouncement and registry, but declined some overtures for its purchase made to him by Fremont.
Other allusions to and recognition of the possession and grant of three thousand varas, in letters, judicial proceedings, &c., at a late period, but previous to the supposed date of their fabrication, will subsequently be considered.
Among the documents alleged to have come from the City of Mexico, traced copies of which are exhibited, was a communication from Pio Pico, Governor of the Californias, to the Minister of Relations, dated February 13, 1846. In this letter Governor Pico states that he incloses a letter from Don Andres Castillero, apprising him of the important discovery of a quicksilver mine, and transmitting a sample of the quicksilver. He therefore begs the Minister of Relations to bring it to the superior knowledge of His Excellency the President, &c.
On the margin of this letter is the usual note, stating its reception on the 6th of April, 1846, and that it is noted with satisfaction, &c. The letter of Castillero alluded to in the foregoing, dated 10th December, 1845, is also produced from the Mexican Archives. On searching the Archives in this City, for records of this correspondence, there was found the borrador, of office copy, of the letter from Pio Pico, and a letter from Castillero  not the one inclosed by the Governor in his communication to the Minister of Relations, for of that, he states in that communication, he sends the original; but a subsequent letter *252 dated December 15th, 1845. In this letter he states: "I have the satisfaction of informing you, if you have not received my other letter through the Prefecture, that I have discovered," &c., repeating substantially the contents of the former letter, which had, in fact, been received and inclosed to the Minister of Relations. It is not disputed that these documents are in the Archives. The borrador, or draft, of Pico's communication to the Minister, is in the handwriting of Olvera, who was Secretary of the Assembly at the time.
There was also found, at the same time, by Mr. Hopkins, the Keeper of the Archives, amongst those records, a letter from Manuel Castro, the Prefect of the Second District, to the Secretary of the Departmental Government, dated December 31, 1845. In this letter he states that "Castillero has denounced and is now working a quicksilver mine;" and after falicitating the Secretary, and through him the Governor, on so beneficent a discovery, he adds, that he incloses a petition by Castillero for two square leagues of land adjacent to his mine. A borrador, or draft of the reply of the Secretary to this letter is also found in the archives, but it appears to have been cancelled by black lines drawn transversely.
The handwriting and the signatures of these documents are proved by Pio Pico, who also states his recollection of having dispatched J.M. Covarrubias with his letter of the 13th of February, 1846, to the Minister of Relations, and the bottle of quicksilver sent to him by Castillero.
The testimony of Pico on this point is corroborated by that of José M. Covarrubias, who swears that he left San Pedro in the schooner Juanita, Captain Snook, on the 14th of February, 1846, taking with him the Governor's dispatch, Castillero's letter, and a bottle of quicksilver, all of which he delivered on his arrival at Mexico to the Minister of Relations, Mr. Castillo y Lanzas. Files of the "Diaro Oficial," the Government newspaper, published in Mexico, and of the "Monitor Republicano," and the "Republicano," also published in Mexico, are produced, and under the heading of marine news there are found notices of the arrival of the "Juanita," Captain Snook, at Mazatlan, on the 2d *253 of March, 1846, twelve days from San Diego; of her departure on the 12th of the same month from Mazatlan for San Blas, having on board as passengers José Maria Covarrubias and others.
It cannot, therefore, be doubted that the letter of Castillero of the 10th of December, 1845, a traced copy of which is produced from the Mexican Archives, was in fact sent to Governor Pico, and by him transmitted in February, 1846, to Castillo Lanzas, Minister of Relations, together with the dispatch, the borrador of which is found in the archives in this city, and a bottle of quicksilver.
There are also produced by the claimants two letters from Castillero to M.G. Vallejo, of Sonoma.
In the first of these, dated December 2, 1845, Castillero says:
"While waiting for the time of my departure, I have employed myself as a miner, having extracted from the same vein quicksilver, silver, and gold, in surpassing quantities."
In the second letter, dated December 21, 1845, he, amongst other things, informs Vallejo that he has found such abundance of quicksilver that he has extracted twenty pounds of it from twenty arrobas of ore, &c.
These letters are produced and proved by General Vallejo. I do not understand that the genuineness of Castillero's signatures to them is disputed. As Castillero left California in the spring of 1846, and has never returned, they must have been written about the time they are dated, unless we suppose they have since, and after an interval of many years, been written in Mexico, ante-dated, and sent on to Vallejo to be produced by him  a supposition which the contents of the letters and the allusions in them to personal matters and contemporaneous events of slight importance render wholly inadmissible. There is also produced by the claimants a copy of the Polynesian, of the date of July 25th, 1846, which contains a letter from G.P. Judd, the Minister of Finance of the Hawaiian Kingdom, to the editor of the newspaper, inclosing a letter received by the Minister from Thomas O. Larkin, United States Consul at Monterey, dated June 24, 1846. In this letter, which is also published in the Polynesian, *254 Mr. Larkin informs Mr. Judd of the discovery of a quicksilver mine seventy miles north of Monterey, and states, that in 1845, "a Mexican being in the vicinity examined the rock and immediately denounced the place before the nearest Alcalde, and then made known what it contained. The owner, with a priest, in a small and imperfect manner has commenced extracting the metal." After describing the process adopted by them, he adds: "They obtain about fifteen per cent. of the metal."
The receipt of this letter in the Sandwich Islands is sworn to by the editor and publisher of the newspaper. He is wholly unimpeached. The fact that it was published in the newspaper on the day alleged, is sworn to by a gentleman of San Francisco, who read it, and whose attention was particularly drawn to it. A copy of the paper is produced and filed. From among the papers of the late Mr. Larkin is produced, by his son, the reply of Mr. Judd to his father's communication. The reply is dated July 20, 1846. It acknowledges the receipt of Larkin's letter of the 24th ultimo, (June,) with a specimen of the ore, and it states that he had sent it to the editor of the Polynesian for insertion. The handwriting and signature of Mr. Judd are proved by persons intimate with him.
It has already been mentioned that files of several Mexican newspapers, published in 1846, have been produced by the claimants. In the "Diario del Gobierno de la Republica Mexicana," of the 27th December, 1846, we find credited to the "Espia de la Frontera," a newspaper not produced, a notice of the account given in the "Polynesian," of the 24th July, of the discovery of a quicksilver mine seventy miles north of Monterey, and the same notice purporting to be taken from the same paper, the "Spy of the Frontier," is found in the "Republicano," of the 9th December, and in the "Monitor Republicano," of the 6th.
It is unnecessary, however, to dwell on these incidental corroborations; for the fact of the reception of Larkin's letter by Mr. Judd, and its publication in the Polynesian cannot be doubted.
The claimants have also produced from the files of the State Department at Washington, extracts from official dispatches of *255 Mr. Thos. O. Larkin to the then Secretary of State. These extracts are certified by Mr. Cass, November 28, 1859.
The first dispatch of Mr. Larkin is dated May 4, 1846.
The extract produced states that 
"Near the Mission of Santa Clara there are mountains with veins of quicksilver ore, discovered by D. Andres Castillero, of Mexico, in 1845, which the undersigned has twice seen produce twenty per cent. of fine quicksilver, &c. * * * * * * * * By the laws and customs of Mexico respecting mining, every person or company, foreign or native, can present themselves to the nearest authorities and denounce any unworked mine. The authorities will then, after the proper formalities, put the discoverer in possession, &c. * * Up to the present time there are few or no persons in California with sufficient energy or capital to carry on mining, although a Mexican officer of the army, a Padre, and a native of New York, are on a very small scale extracting quicksilver from the San José Mine."
There is also produced from the consular book of Mr. Larkin, a dispatch addressed by him to the American Minister at Mexico, dated April 3, 1846.
After mentioning the intended departure of Don Andres Castillero from this port (Monterey) in a few days, for Acapulco, on board the Hawaiian barque Don Quixote, as Commissioner to Mexico, from General José Castro, and that he would arrive in Mexico by the 25th or 30th of this month, (April,) Mr. Larkin says: "At the town of San José, eighty miles from Monterey, Don Andres Castillero has discovered a quicksilver mine. The ore produces from fifty to sixty per cent. I have seen him, from an old gun-barrel, in thirty minutes run out about thirty per cent. in pure quicksilver. This must be a great advantage to California." In a letter to Captain Montgomery, of the U.S. ship Portsmouth, dated May 2, 1846, Mr. Larkin communicates to that officer substantially the same information.
These extracts from Mr. Larkin's correspondence are important, not only as showing that the mine had been discovered, and was being worked in the spring of 1846, but that the mode of acquiring a mine, as understood by Larkin, was precisely that *256 alleged to have been adopted in this case. And further, that "the officer," the "Padre," and "the native of New York," spoken of as working the mine, were undoubtedly Castillero, Padre Real, and William G. Chard, as will hereafter appear.
The whole official dispatch of Mr. Larkin to the Secretary of State, is produced by the son of the former, from the letter-book of his father. The portions extracted and certified to by Mr Cass are all that is important to notice.
That the mine was worked by Castillero in January, 1846, is shown by the deposition of Col. Fremont.
That gentleman states, that in January, 1846, he visited the mine in company with Capt. Hinckley; that the latter introduced him to Castillero, the owner of the mine, who showed him the excavations, the heaps of ore, &c., and explained the process of extracting the metal. Impressed with the value of the mine, he spoke slightly to him about purchasing it; but Castillero was not disposed to converse on the subject. Castillero informed him that he had acquired his mine by denouncement, and explained the nature of the proceeding. Acting on this information, Col. Fremont subsequently denounced the mines upon his own property of Mariposa.
He also adds, that Capt. Leidesdorff, with whom he had spoken as to the purchase of the mine, supposed it might be effected for $30,000, "an immense sum of money in California in those days."
The working of the mine, so far back as December, 1845, is also proved by Mr. Wm. G. Chard. This witness testifies that he was employed by Castillero and the priest Don José Maria Real; that he went there to open the mine in November or December, 1845; that the metal was extracted by heating the ore in gun-barrels; that while working in this way, the possession was given, in December, 1845, or January, 1846. The witness enumerates among those present on that occasion, the Alcalde Pico, Suñol, Noriega, Fernandez, and the old man Berreyesa. He does not recollect to have seen Castillero on the ground when possession was given  a circumstance, as observed by counsel, not surprising  for Castillero, Chard states, was constantly coming and *257 going, and on one visit stayed there eight days; but the statement indicates the good faith of the witness in declining to swear to what he did not recollect.
Mr. Chard describes the operations at the mine. They were conducted by himself, another white man, a blacksmith whom they called Old Billy, and some Indians. He built a furnace and smelted the ore in some large whaler's try-pots, capable of holding three or four tons of ore. He remained in this employment until August or September, 1846.
Chard states himself to be a native of Columbia county, New York. He is evidently the "native of New York" to whom Mr. Larkin refers in his dispatch. His testimony is uncontradicted, and his character unimpeached.
There is much other testimony which corroborates the foregoing on various points, but which it is unnecessary to notice. It relates chiefly to the first visit of Castillero to the mine; his first experiments with the ore; his trip to Sutter's Fort and visit to Vallejo, at the baptism of whose child he was godfather, and who thus became his compadre, by which title he addressed him in his letters already cited; his return to Santa Clara, and the formation of the partnership between himself, Castro, Father Real and the two Robles, in November, 1845. As this writing of partnership is conceded to be genuine, and as it relates to the working of the mine of silver, gold, and quicksilver, on the land of José Reyes Berreyesa, the fact that the mine was discovered at that time must be taken to be admitted.
We thus find that early in December, 1845, the discovery and denouncement of the mine was made known to the Governor of California, and the information, with a sample of the quicksilver produced, by him transmitted to Mexico. That in May, 1846, Mr. Larkin officially communicated the fact of the discovery and the working of the mine, with an explanation of the mode of acquiring title to it under Mexican laws, to our Government.
That in June of the same year, he informed Mr. Judd of the discovery of the mine in 1845, and the fact that it had been immediately denounced.
That in January, 1846, Col. Fremont visited the works, and *258 conversed with the "owner;" that its reputed value was then about $30,000.
That it had been worked from the November or December preceding by a person employed by Castillero, and continued to be worked by the same person, until August or September, 1846.
It has appeared to me incredible that Castillero, a Mexican, acquainted with mining laws, should, on discovering so valuable a mine, have omitted to denounce it. That he knew the necessity of the proceeding, we learn from Fremont, as did also Larkin, a foreigner, as is shown by his dispatch.
To suppose that Castillero, with a knowledge of the great value of the mine, of the necessity and efficacy of a denouncement, neglected, notwithstanding his statements to the Governor, to take the simple proceedings he is alleged to have done, and that Larkin was entirely mistaken as to the fact of his having done so, is to suppose what I cannot but consider a moral impossibility.
I am aware that the fact that the mine was denounced by Castillero, and claimed and worked by him as owner, does not necessarily show that a juridical possession of it was given, or that the record of that possession is genuine. It is shown, however, by evidence in part introduced by the United States, that the juridical possession, as alleged to have been given, was recognized and alluded to in the correspondence of the parties, and in official acts of Alcaldes, before the date at which, on the hypothesis of the United States, the forgery was committed.
So early as January 30th, 1846, James Alexander Forbes, in a letter to Eustace Barron, of Tepic, apprises the latter that "D. Andres Castillero, a sort of Commissioner from the Mexican Government, is now working a quicksilver mine near the Mission of Santa Clara, which has yielded forty per cent. upon the assay of mineral employed;" and on the 5th of May, 1847, the same person, who had in the interval been placed in charge of the mine, in a letter to Alexander Forbes, who had become a part owner, urges him "to obtain from the Government of Mexico the unqualified ratification of the judicial possession which was *259 given of the mine by the local authority of this jurisdiction, including, if possible, the three thousand varas of land given in that possession as a gratification to the discoverer." The fraudulent nature of this suggestion is obvious, but it nevertheless implies that a juridical possession and a gratification of three thousand varas had already been given, a ratification of which was thought necessary.
In the preceding March, the same person, together with Castillero, Castro, Real, and the Robles, had been sued by the owner of an adjoining rancho for working on it contrary to law. It would seem from the imperfect record of that suit, produced from the archives of the Alcalde's office, that a survey of the mine was ordered and the plaintiffs mulcted in costs; a result which could hardly have occurred if the persons working the mine on the lands of another had been destitute of record evidence of their rights. The fact that a survey of the mine was ordered, would seem to be a recognition of the mine owner's right to his mine, and that the boundaries of his possession were capable of being ascertained.
On the 14th of August, 1847, allusion to this suit, and a still more explicit reference to the juridical possession, is made in an official letter of James Alexander Forbes, then H.B.M. Vice-Consul for California, to John Burton, Alcalde.
In this letter Mr. Forbes informs the Alcalde that "two persons have commenced digging a pit, by the direction of Mr. Cook (the plaintiff in the former suit), within the limits of the juridical possession of the mine." He adds, "Permit me to refer you to the documents which exist in your office, upon which was founded your conviction of the justice of your decision in March last in relation to the claim of Mr. Cook, and to request that you will be pleased to adopt such measures for the protection of the owners of the mine, and of those who are legally interested in the same, as you may deem most conducive to that end."
The genuineness of this letter is not disputed. It will be observed that, though written in August, 1847, it refers the Alcalde to documents existing in his office upon which a decision rendered in the March preceding was based.
*260 On the 19th of January, 1848, Alexander Forbes, who had come to California, made a petition to the Alcalde, Weekes, to "visit and inspect the mine, as required by the Ordinances, and to determine the direction and inclination of the vein, for the purpose of reforming and correcting (since there is occasion for it) the boundaries of the former Act of Possession, and to correct such other mistakes as may appear in it."
In conformity with this petition, the Alcalde proceeded to inspect the works; and having ascertained the true course of the vein, and admitted the right of the owner to an improvement of stakes (mejora de estacas), he established his boundaries, assign ing to him four pertenencias, the location of which he designates but without prejudice to the right and title of the mine (siendo constante el derecho y titulo de la mina) to the gratification or gift (gracia) of land conceded in the original Act of Possession.
Whether the four pertenencias which were thus designated were all which, under the ordinances, a discoverer, though working in company, was entitled to, we will hereafter consider. The only purpose for which the proceeding is now referred to, is to show that its date (January, 1848) and about the supposed time of the alleged forgery, "an original Act of Possession," containing a "gracia" of land of a much larger extent, is plainly alluded to as existing; nor is the force of this fact weakened by the circumstance that Weekes, the Alcalde, may have been ignorant, and willing to comply with all that Alexander Forbes required; for the fact that the latter inserted such an allusion in the document he may have caused Weekes to execute, is at least evidence that at that early day he claimed that there was in existence an original Act of Possession, including a gracia of an extensive tract. It will be observed that the petition of Alexander Forbes to Weekes is dated January 19th, 1848. Its object was to procure the judicial ascertainment of the inclination and depth of the vein, to correct the boundaries of the former Act of Possession, and to decide upon an increase of pertenencias and the square corresponding to them. But if, at that very time, Forbes had already fabricated, or was about to fabricate, an Act of Possession, which was to be ante-dated and placed in the archives *261 where no document of the kind had hitherto existed, the application to Weekes, and the designation of pertenencias by him, would be wholly superfluous, if not absurd; for in the forged paper which was to serve as the original Act of Possession by the Mexican authorities, the designation of pertenencias might have been inserted and the boundaries established in any way the forger might desire. All objections or doubts as to the authority of an American Alcalde to act under Mexican Mining Ordinances would thus have been avoided; and the same Alcalde who, according to the theory of the United States, was induced to recognize and affirm the existence of an Act of Possession, either not in his office or recently forged and placed there, could, with equal facility, have been brought to recognize an Act of Possession which should be free from the errors and uncertainties which he was called on to correct, and which should contain as many pertenencias as he was desired to designate.
Similar allusions to the original registry and Act of Possession are found in various judicial proceedings during the year 1849. On the 18th October of that year, Robert Walkinshaw, between whom and James Alexander Forbes a contest for the possession of the mine had arisen, filed a complaint against the latter, averring himself to be "the owner of one-eighth of the mine, by title derived under the original act of registry."
Previously to the filing of this complaint, Mr. Horace Hawes, a lawyer of much acuteness, and very familiar with Mexican law, had denounced the mine before the Alcalde for abandonment. In this denouncement he describes it "as known in its original title of registry as the Mine of Santa Clara."
In the proclamation issued thereupon, on the 23d October, 1849, the Alcalde describes the mine "as known and designated in its original act of registry as that of Santa Clara, and now known by the name of New Almaden." On the refusal of the Alcalde to take jurisdiction of the proceeding, Mr. Hawes files a protest, dated 15th November, setting forth that, "besides having failed to work the mine, the alleged owners had never acquired any title thereto, by reason of the insufficient registry *262 thereof, which he stands ready to prove in Court by witnesses records and documents," &c.
As Walkinshaw, though he had originally obtained possession of the mine as the agent of Castillero and his assigns, was in these proceedings endeavoring to acquire the mine for himself, and co-operating with and assisted by his attorney, Mr. Hawes, these references to the original act or title of registry conclusively show that such a document was on all sides admitted to exist, though Mr. Hawes maintained it to be "insufficient;" nor is it conceivable that when Hawes and Walkinshaw, by possessory suits, by denouncement for abandonment, by purchasing the lands of adjoining rancheros, &c., were struggling with so great pertinacity to obtain the mine for themselves, they should have utterly failed to disclose the fact, of which Walkinshaw could not have been ignorant, that no registry had ever been made, and that the document purporting to be the act of possession was a recent forgery, then lately interpolated among the archives.
In the correspondence between James Alexander Forbes and Alexander Forbes, and the other owners of the mine, the necessity of procuring fraudulent and ante-dated title papers from Mexico, is repeated and urgently represented. But the fraud recommended is the fabrication of an absolute grant of two sitios of land, and a ratification of "the acts done by the Alcalde in the possession given by him of the quicksilver mine in his jurisdiction."
Such are the very terms of the memorandum of "documents to be procured by Castillero," alleged by James Alexander Forbes to have been left by him in Tepic, in May, 1849. And in October of the same year, chagrined, it would seem, that his suggestions had not yet been acted on, he complains that he is obliged to depend on "the precarious and illegal possession of the mine granted by the Alcalde of this District to Castillero who was in reality the judge of the quantity of land given by the Alcalde."
Whether the doubts here expressed as to the legality of the possession be well or ill-founded, it is clear that in this most *263 confidential communication, where no motive existed for suppressing or distorting the facts of the case, that possession is treated as having actually been given, and the record of it as actually existing and genuine, though the possession itself is considered precarious and illegal.
Having thus reviewed the evidence which establishes the genuineness of the act of possession by the testimony of the witnesses to the document; of those who were present when the possession was given, and who testify to the fact; by the production of documents from the Archives of California, and the correspondence, both private and official, of the United States Consul at Monterey; by the testimony of unimpeached witnesses that the mine was, early in 1846, claimed by and recognized as belonging to Castillero, and worked by him as such; by the proofs afforded, by a correspondent admitted to be genuine, that the act of possession was treated and spoken of by the parties, when writing in the most confidential manner, at a time when they could not have been ignorant of the facts, as genuine, though perhaps invalid, and was so recognized in various judicial proceedings by persons who would certainly have discovered and denounced any forgery which might have been committed; and finally, the intrinsic improbability of the supposition that Castillero would have omitted to denounce a mine, of the great value of which he was fully aware, and the means of acquiring a title to which, under the Mining Ordinances, he was well acquainted with, as was also Mr. Larkin, a resident foreigner. I shall next consider more particularly the nature and contents of the documents produced by the claimants, as well as the principal objections to them urged by the counsel for the United States.
These documents are four in number. The first is the original espediente, produced from the Archives of the City of San José, and discovered by Capt. Halleck, in 1851, among the Archives of the old Alcalde's office, in the office of Belden, the Mayor of San José.
This document contains the two representations of Castillero *264 and the act of possession with the original signatures of Castillero, the Alcalde, and the assisting witnesses.
It also contains a petition of José Castro, dated June 27, 1846. In this petition, Castro states that he represents the person and rights of Capt. D. Andres Castillero, and other individuals composing the company in the quicksilver mine which Señor Castillero denounced on the 3d day of December, 1845, and of which possession was given on the 30th of the same month and year. He therefore claims that, in conformity with the Mining Laws, there be given three pertenencias in continuation of the first; and that this petition be attached to the espediente of denouncement, and remain among the Archives. On the margin of this petition is an order, signed "Pacheco," directing it to be archived as prayed for.
If this document be genuine, it affords important evidence of the date of the judicial possession.
The handwriting of the petition is sworn by Fernandez to be that of Benito Diaz. The signature of Castro is proved by himself, and he testifies that it was signed at its date, having been prepared from a draft left with him by Castillero. He also states that the handwriting of the marginal order is that of Salvio Pacheco, and the signature that of Dolores Pacheco; and that after sending the petition to the Alcalde he left Santa Clara, but was informed, on his return, by the Alcalde, in presence of Manuel Castro and Juan B. Alvarado, that this petition had been granted.
Salvio Pacheco is also produced, and testifies to his own handwriting and the signature of his brother, the Alcalde. He swears that the order was written at its date. As this witness has been produced by the United States to sustain the character of a witness impeached by the claimants, it is presumed that his own character is not liable to the imputations from which the United States rely on him to shield another.
The only evidence tending to show that the petition was not written at its date is that of Benito Diaz. He does not precisely specify the time at which it was written; but it can be gathered *265 from his testimony that it was at the end of 1847, or the beginning of 1848.
But this witness is, unfortunately, too well known to the Court to permit any reliance to be placed upon his unsupported declarations. I have not been able exactly to understand on what theory this petition is supposed to be forged.
If the act of possession be genuine, it is immaterial, so far as the rights of the parties are concerned, whether the petition be ante-dated or not; but it is not easy to imagine the motive of the parties in fabricating a petition addressed to an Alcalde who had ceased to be in office, and whose ante-dated marginal order did not even purport to convey any rights. Had the marginal order contained a grant of an increased number of pertenencias, some motive for fabricating it would have existed; but it merely directs the petition to be archived; and the application for an increase of pertenencias is in substance renewed in the petition of Alexander Forbes to Weekes, made in 1848, at the very time when we are asked to suppose this petition of Castro was fabricated. If the act of possession be genuine, and the Castro petition be ante-dated, the conduct of the parties seems to me inconsistent, absurd, and inexplicable. But if the act of possession was itself fabricated in 1848, and did not exist at the date when the Castro petition was fabricated, the acts of the parties are equally incomprehensible. Of what use could it be to have a petition for an increase of pertenencias included among archives which contained no registry or denouncement, or grant of any pertenencias whatever? It may be said that the fabrication of the act was then in contemplation; but if so, why not make that document contain all that was desired as to the number of pertenencias, designation of boundaries, ? Why accumulate superfluous forgeries, involving the necessity of new perjuries, and largely increasing the risks of detection; and why resort to the proceedings had before Weekes for the ascertainment of boundaries and an increase of pertenencias, when it was known that the fundamental title to the mine had yet to be forged, and might be framed in any way to suit the interests of the parties?
*266 The counsel for the United States has urged upon the Court the inconsistency between the petition of Castro for three additional pertenencias and the supposition that a concession of three thousand varas in all directions, amounting to nine hundred pertenencias, had already been obtained. But this objection, whatever be its force, seems to admit the genuineness of the Castro petition; or, it attributes to the fabricators the absurdity of contriving at the same time two forged documents repugnant to each other. That an act of possession, either genuine or forged, was in existence when Castro's petition was drawn, is evident, for the dates of the denouncement and of the judicial possession are given. To what end then, file a petition which could have no other purpose than to furnish a plausible argument against the genuineness of the previous concession of three thousand varas?
From all the evidence, and on consideration of all the circumstances connected with this petition, I confess myself unable to discover any sufficient reasons for considering it forged.
The claimants have also produced a document alleged by them to have been delivered to Castillero shortly after the date of the judicial possession.
It contains certified copies of the two representations of Castillero, purporting to have been made on the 13th January, 1846, and a duplicate original of the act of possession signed by Antonio Maria Pico. Appended to these is a receipt by Pico for twenty-five dollars, dated December 30, 1846.
This document was recently found among the papers of Robert Walkinshaw, deceased. It is shown in the deposition of Hall McAllister, Esq., who was counsel for Walkinshaw in a suit respecting a share of the mine, that the document was placed in his possession by Mr. Walkinshaw early in the year 1853, and that it remained in his office until May, 1858, when be delivered it to Walkinshaw.
The genuineness of the signatures is testified to by all the assisting and subscribing witnesses, except José Suñol, who is dead.
This espediente does not contain the petition of Castro, for *267 the certified copies appear to have been made on the 13th January, while the Castro petition was not filed until the June following. There is one circumstance, however, which, though entirely accidental, affords important proof of its genuineness. In copying the first representation of Castillero, it appears that a line was omitted. This has been supplied by another hand, and the handwriting is that of Castillero. As Castillero left California early in 1846, and has never returned, we must suppose that this interlineation was made before he left, or else that the document was fabricated here at a later period, sent on to Castillero in Mexico, interlined by him, and returned to Walkinshaw's possession before January, 1853, when he delivered it amongst other papers to Mr. McAllister. But that he was in possession of "some important papers of the original registry of the mine," in 1849, appears from James Alexander Forbes' letter of October 28, of that year; and it also appears from the certified copy made out by Weekes on the 20th January, 1848, that the espediente we are now considering must have been the document which James Alexander Forbes copied, and which Weekes erroneously certified to be a literal copy of the original in his office. The year in which it is supposed by the Government that these titles were fabricated, in 1848. How, then, could this espedient have been made, certified to by the subscribing witnesses, sent to Castillero, interlined by him, and returned to California in time to be copied by Forbes, and certified to by Weekes, on the 20th January, 1848? And why, if the Castro petition had then recently been written by Benito Diaz, and ante-dated, was it not included in this espedient, concerning which so much pains were taken?
The omission of the Castro petition in this espediente seems to me, I confess, an important corroboration of the statements of the witnesses who prove the genuineness of the signatures.
There is also produced the copy of this espediente, by Weekes, already alluded to. Weekes himself swears that he made it and he is corroborated by James Alexander Forbes. I do not understated this fact to be disputed.
The claimants have also produced a copy of the original espediente, *268 certified by Pedro Chabolla, on the 13th August, 1846, to be a literal copy of the original acts (autos) in the archives of his office.
The whole of this copy is proved by Salvio Pacheco, to be in his own handwriting, and to have been made at its date. It contains the Castro petition, which had been made in the preceding June, and attached to the original on file, and it even omits, like the original, the date of the act of possession  that date being on both papers December  1845, and not December 30th, as in the testimonio or duplicate original given to Castillero. That the document was scrupulously compared is further evident from the fact that in the copy of the date of Castillero's first representation is the Mission de Santa Clara, November 22, de 845, instead of 1845  and on turning to the original, we find in the printed copy that the first figure of the date is separated by a comma from the three other figures. I have not had an opportunity to examine the original, which remains at San José but it would seem from the printed Transcript that the date is written in an unusual manner, which has been either exactly reproduced or has led to the omission of the first figure in the copy.
It has been earnestly contended by the counsel for the United States, that the non-existence of the original espediente in the archives of San José, even so late as December 23d, 1850, is proved by the affidavit of Mr. Halleck, at that time, and since, Superintendent of the Mine, and counsel for James Alexander Forbes in a suit brought against him and Walkinshaw by the Berreyesa. In this affidavit, which was made in answer to an order obtained by the plaintiffs, in the suit upon the defendants, requiring them to produce the papers on which they intended to rely as a defence, or copies thereof, Mr. Halleck swears:
"That the defendants have exercised all due diligence to procure and produce said papers in Court, by writing immediately on the receipt of the above-mentioned order to the parties in Mexico who hold them. But to this date the defendants have not received them. * * * And the defendants specify among others he following papers and documents as absolutely necessary *269 to them before they can proceed with the trial of this cause, viz.:
"1st. The original denouncement of the mine of New Almaden, and the juridical possession given of the same year 1845.
"2d. The confirmation of said denouncement and possession by the Supreme Government in 1846, and prior to the late declaration of war by the United States against Mexico.
"3. The original grant of land, including said mining possession, made by the Supreme Government of Mexico, prior to the declaration of war as aforesaid, to the owners of said mine."
It is obvious that this affidavit states that the original denouncement and judicial possession of the mine was then in Mexico, and not in the Alcalde's office. That Mr. Halleck, then lately appointed Superintendent of the Mine, might have been ignorant of the fact that those papers were among the archives of the Alcalde's office, is conceivable; and he may also have accepted the assurances of his client, James Alexander Forbes, that he had exercised all due diligence to procure them, as sufficient to authorize his affidavit of that fact; but it cannot be supposed that James Alexander Forbes could have labored under a similar misapprehension. We have already seen that in August, 1847, he had, in an official letter to Alcalde Burton, referred him to the documents existing in his office, upon which was founded his conviction of the justice of his decision in relation to the claim of Mr. Cook, in the preceding March.
In January, 1848, he had himself copied and procured Weekes to certify to the espediente containing certified copies of Castillero's representations and a duplicate original of the act of possession. This espediente has since been produced from among Walkinshaw's papers, and its possession by him, or his counsel, is traced back as far as 1853. The circumstance that it is interlined in the handwriting of Castillero, proves it to have been at some time in his possession. As Castillero left California early in 1846, it is in a high degree improbable that the document could have been fabricated here sent on to him in Mexico, and returned before January, 1848, when it was copied by Forbes and certified; nor does such a hypothesis comport with the *270 theory of the United States, which supposes the forgeries to have been committed about the time of the Weekes certificates. It is almost equally improbable that this document, after being copied by Weekes, should have been again sent to Mexico, and returned to Walkinshaw in time to be found among his papers in 1853.
There is no reason to presume that the Weekes copy ever left this State. It was produced by the claimants when proceedings were first instituted before the Board of Commissioners, in 1852. It is clear, therefore, that as the order of the Court called for the documents on which the defendants relied, or copies thereof it was easy for Mr. Forbes to have satisfied the order by furnishing the copy required.
It also appears from his own letters that he had already received a notarial copy of the Lanzas dispatch on which they rely. A copy of this could also have been furnished. We are thus compelled to seek for some other motive for withholding those copies which the order required, and which, on any theory of the case, he could readily have furnished. That motive seems to me apparent. From the 5th of May, 1847, up to the 26th of February, 1850, James Alexander Forbes had not ceased to urge upon his associates the necessity of obtaining fabricated documents of title. In his letter of February 26th, 1850, he again dwells upon the necessity of carrying his suggestions into effect, and specifies the required documents as follows:
"1. A full and complete ratification of all the acts of the Alcalde of this jurisdiction, in the possession of the mine.
"2. A full and unconditional grant to Castillero of two sitios of land, covering that mining possession, expressing the boundaries stated by me in the memorandum I left with you at Tepic. Both of these documents to be of the proper date and placed in the proper Governmental custody in Mexico."
On the 7th of April, 1850, Alexander Forbes, of Tepic, writes to James Alexander Forbes: "Mr. Barron and Castillero have arrived in Mexico, and have every prospect of finding the document you are aware of, and which will, of course, be forwarded as soon as possible"
*271 When, therefore, in December 1850, James Alexander Forbes represented to Mr. Halleck, that papers had been sent for, and were daily expected from Mexico, it cannot be doubted that be referred to the documents, the fabrication of which he had so urgently recommended. The description of the expected documents in the affidavit, in no respect applies to the Lanzas dispatch; for the ratification, and the grant of two sitios, are evidently described as two separate instruments, and they are spoken of as "of the proper date," viz.: "prior to the late declaration of war by the United States against Mexico;" that is, prior to the 13th of May, 1846; whereas the Lanzas dispatch is dated on the 23d of May.
We have already shown that James Alexander Forbes could readily have complied with the order of the Court by furnishing "copies" of the denouncement and registry, and of the Lanzas dispatch, both of which he must have then had in his possession. The statements, therefore, which he made to his counsel, and on which the affidavit was founded, were evidently made for delay, and to enable him to receive the more full and explicit documents he so much desired. Such being the motive and intent of Mr. Forbes, the allegation that "the original denouncement of the mine was in Mexico," may well be taken as made in furtherance of the same object, and to give increased force to his showing, for the postponement which he was so anxious to obtain.
That Mr. Halleck should have embodied in an affidavit these representations of Forbes will, perhaps, not be surprising to any one acquainted with the facility, often too great, with which counsel receive and adopt in affidavits statements made by their clients in the progress of a cause. Such has seemed to me the more probable explanation of this affidavit. For, whatever may have been therein sworn to, I can see no reason for concluding, on the strength of that affidavit alone, and in the face of the mass of testimony which had been adduced to the contrary, that the espediente of the mining possession was not then in the Alcalde's office.
It was also strongly urged by the counsel of the United *272 States, on the hearing, that the non-existence of the alleged act of possession and concession of three thousand varas was proved by the acts of the parties themselves and their dealings with each other.
The circumstances chiefly relied on were 
1. The fact that in the Castro petition, drafted by Castillero, three pertenencias are asked for, in continuation of the one already obtained.
2. That in the power of attorney executed by Castro, on the 12th June, 1846, to McNamara; in the contract by McNamara, under the power of attorney, executed in Tepic on the 28th November, 1846; and in the ratification of that instrument by Castillero in Mexico, on the 17th December, 1846, the mine is spoken of as consisting of only three pertenencias, while the grant of three thousand varas is not mentioned.
3. That in the numerous deeds and acts of sale by which barras or shares in the mine were transferred, the writing of partnership executed by the original owners of the mine is the only document referred to, no allusion is made to the possession of three thousand varas, or to any tract of land whatsoever; and the Espediente of Registration is, for the first time, mentioned in the deed from Padre Real to Walkinshaw, dated August 9th, 1849.
These objections, so far as they relate to the mention of the pertenencias, will more conveniently be considered in treating of the legal effect of the judicial possession; but in respect to omission of all allusion in the deeds, either to the registration or to "lands," it is to be observed that to many of these deeds, James Alexander Forbes was a party. We find by his letter of May 5th, 1847, that at that date the "ratification" of three thousand varas of land given by the Alcalde, and the concession of two sitios of land to Castillero, were known to and spoken of by him as having actually been made, the object of that letter being to urge the necessity of obtaining an unqualified ratification of the mining possession, and a positive, formal and unconditional grant of the two sitios. Similar references to the act of possession, and the order of Castillo Lanzas, occur throughout *273 his correspondence. And as we have already seen, the former document and the fact of registration is referred to in various legal proceedings by Forbes and Walkinshaw in the years 1847-8; as also in Alexander Forbes' petition to Weekes, in January, 1848.
The inferences, therefore, which might otherwise be drawn from the silence of the deeds on this point, seem to be repelled by the fact that, in letters and various judicial proceedings, the registration, the grant of three thousand varas, and the concession of two leagues, are frequently spoken of and claimed to have been made.
It will be noticed that in the first representation of Castillero, dated November 22, 1845, the mine is described as a vein of silver with a ley of gold; and, by his second representation, it appears that he subsequently, and at some time previous to December 3d, discovered it to contain quicksilver. The writing of partnership, however, dated November 2d, describes a silver mine with a ley of gold and quicksilver, showing that twenty days previous to his first denouncement he must have been aware of the existence of quicksilver in the vein. This discrepancy is forcibly urged by the counsel of the United States, as affording conclusive proof that the alleged denouncements are forgeries.
It seems, from the evidence produced by the claimants, that in the month of October, 1845, Castillero and Castro set out from Monterey, to visit General Vallejo, at Sonoma, and General Sutter, at Sutter's Fort. On their way, Castillero, at the suggestion of Castro, examined the spot which, as the latter told him, had for a long period been reported to be a mine, but of what kind was unknown. He assayed the ore, and found a little gold and silver, and a small quantity of quicksilver. The latter he considered of no importance.
The party proceeded to Sonoma, and thence to Sutter's Fort, and set out on their return on the 12th November. On reaching Santa Clara, Castillero made further assays of the mineral. "He then discovered," says Castro, "abundance of quicksilver, denounced the mine as a quicksilver mine, and formed a company *274 to work it." But this statement is evidently erroneous, for the writing of partnership is dated November 2d, and, if executed at its date, must have been made when the parties were on their way to Sonoma and Sutter's Fort, and not on their return from the latter. But if Castillero, at the latter date, had discovered quicksilver in large quantities, how can we account for his first representation, which omits all mention of that metal nor for his second representation which announces the discovery of it, as having been made after the date of his first representation, i.e. after November 22d.
It is quite probable, however, that Castro may be in error, if he means to state that Castillero discovered the abundance of quicksilver and denounced the mine as a quicksilver mine immediately on his return to Santa Clara, Castro himself went on, as he states, to Monterey. The party, having left Sutter's Fort on the 12th November, must have reached Santa Clara between the 16th and 20th. It may well be said, therefore, that Castillero made his first representation immediately on his arrival, and subsequently made the further assays spoken of by Castro, in consequence of which he prepared his second or amended denouncement. On this hypothesis we can account for his omission to mention the existence of quicksilver in his first denouncement, as he did not then know that it existed in sufficient quantities to deserve attention. But whatever explanation of this discrepancy be offered or conjectured, I have been unable to perceive how it furnishes the conclusive evidence of the fraudulent character of the denouncement, which the counsel for the United States supposes it to afford.
If these papers were forged about the year 1848, they must have been forged at a time when the character and great value of the mine were well understood. What motive, then, can be suggested for fabricating two representations, in one of which the existence of quicksilver in the vein was entirely ignored?
Impressed, as the parties must then have been, with the great value of the mine, as a mine of quicksilver, can it be supposed that, merely to give the appearance of truth to the documents *275 they were fabricating, they caused them to express a pretended ignorance of the nature of the vein?
Even if so refined and subtle a cunning could be attributed to them, the same cunning would not have suffered them to overlook the fact that the writing of partnership existed, which fixed upon them the knowledge of the existence of quicksilver in the vein twenty days before the date of the first denouncement.
I confess that, though unable to demonstrate how his discrepancy has occurred, I perceive in it rather what the ingenious counsel for the United States has on another occasion characterized as the "deshabille of truth," than that meretricious ostentation of consistency, which falsehood would not have neglected to display.
But the circumstance that I have found most difficult to account for, and which most strongly suggests suspicions as to the genuineness of the Act of Possession, is the failure of Castillero to exhibit, or even mention, it during his protracted negotiation with M. Negrete. The correspondence of the latter with his principal, Alexander Forbes, shows that Castillero was called on to exhibit his title-papers. He responded by producing the writing of partnership and, after a little delay, the Lanzas dispatch. He not only does not exhibit the "copia autorizada," which, if genuine, he must have received before his departure from California, but he does not even mention that he has been put in possession and received a concession from the Alcalde of a tract of three thousand varas in extent, nor that any such possession had been ratified by the Supreme Government. So far as appears from the instrument executed at that time, and the testimony of Mr. Negrete, the writing of partnership was the only document of title to the mine relied on, and an interest in the two leagues grant during the term of the lease is added as a kind of voluntary cession to the Aviadores. In all the deeds which passed between the parties for several years, no allusion whatsoever to the Act of Possession occurs, but the writing of partnership and a mine of three pertenencias are alone spoken of
That the parties were ignorant of the precise number of pertenencias allowed by the law is not improbable, and that they *276 should have treated the mine as consisting of the number of pertenencias assignable to a discoverer, can be reconciled with the facts as they are claimed to have existed. But the omission of Castillero to exhibit the Act of Possession, which constituted his only title-paper for the mine, and the only evidence of his denouncement and registry, and which alone showed that the persons, or any of them mentioned in the writing of partnership, had any rights whatever in the subject-matter of their contract, is a circumstance which I have found it impossible to account for.
Even on the hypothesis that he had neglected to bring with him, through accident or otherwise, a copy of the Act of Possession, it would still seem almost inevitable that he should have given to Mr. Negrete some information of the existence of such a paper, and at least mentioned the Alcalde's concession of three thousand varas. No explanation of this circumstance is offered by the claimants. I have been much impressed with its significance. It might well seem to justify the inference, not that the mine was not discovered and worked as alleged, or that it was not in some manner denounced, or that the Alcalde did not give a possession, as sworn to by the witnesses  for of these facts, there can, I think, be no doubt  but that the record of the Act of Possession has been since fabricated and antedated.
But when we consider the vast number of perjuries and complicated forgeries which such a supposition involves, and the grave and almost insuperable objections which present themselves to any theory of forgery, no matter what date be assigned for its commission, and especially if we accept the date fixed by the counsel for the United States, (viz., subsequent to February 2, 1848,) it seems impossible, under the proofs, to adopt the hypothesis of the United States.
Our daily experience apprises us that events are constantly occurring which would, a priori, be pronounced in the highest degree improbable. That which is true does not always present the appearance of truth, and it is not usually safe to discredit positive testimony to a fact on an estimate of what would be likely to have happened.
*277 But in this case, if, reasoning on the extreme improbability that Castillero would have failed to produce to Mr. Negrete the Act of Possession, if it existed, we adopt the conclusion that it did not then exist, we encounter improbabilities greater than those we are seeking to avoid.
For admitting, as we must admit, that he discovered the mine; that its great value, estimated by Col. Fremont at $30,000, was known to him; that he denounced it in some form, as is stated by Mr. Larkin to Mr. Judd, and to his own Government by himself, and by Castro to the Governor of California, as was notorious throughout the country  it is, as before observed, almost incredible that he should not have made the denouncement in writing, and substantially as is now claimed. If the papers were fabricated after February, 1848, how can we account for the copy certified to by Weekes in January of that year, and which must then have contained the interlineation in Castillero's handwriting, who was absent in Mexico?
How can we account for the useless forgery of the Castro petition, which the counsel for the United States allege to have been made by Diaz in 1847, and which speaks of the denouncement and act of possession, which had not yet been fabricated? Why, if the parties were then preparing their spurious documents, did they, at the same time, ask for additional pertenencias, when the documents they were forging could be made to express all that they desired?
How shall we explain the absence, throughout James Alexander Forbes' voluminous correspondence, of any reproach, or even regret, that the forgery had been so clumsily effected as to leave the Act of Possession "precarious and illegal;" how account for the allusions to the documents of registry in judicial proceedings, official letters of Forbes to the Alcalde, and the entire absence of any accusation or hint of forgery, when Walkinshaw, who must have been in the secret, was struggling so fiercely with Forbes for the acquisition of the mine?
These, and many other considerations which might be offered, are sufficient, without now alluding to the large number of witnesses who swear to the genuineness of the documents, to apprise *278 us that the theory of forgery is beset with greater difficulties than the supposition that Castillero, for some unexplained reason, omitted to produce or allude to the Act of Possession, which, nevertheless, existed.
Assuming, then, the genuineness of the Act of Possession, I proceed to inquire what this document and the proofs show to have actually been done  and what was its legal effect.
In the first place, it appears that the written statement required by Art. 4, tit. VI., of the Ordinances, to be made by the discoverer, was in fact presented by Castillero. The vein was described as situated on the lands of Berreyesa, and the discoverer declared that he wished to work it in company. The names of his partners were not stated as enjoined by the ordinances.
It does not appear that the corresponding entry, in a book kept by the Alcalde, was made, nor was the "statement returned to the discoverer for his" due security.
Whether notices were affixed, as required by the ordinances is perhaps not clearly established, although some witnesses testify to the fact.
It further appears, that within the ninety days limited by law a pit had been dug, the mine opened and working commenced, and that at the expiration of thirty-eight days from the date of the denouncement, judicial possession of the mine was given.
It is not pretended that any number of pertenencias were measured to Castillero when possession was given, nor that he was called to fix stakes in his boundaries, as directed by the ordinance.
It has already been shown that, by the spirit and terms of the ordinances, discovery was recognized as the true foundation of title to a mine. That the registration was but a formal announcement of the fact of discovery, and only required, in the language of Gamboa, three things to be manifested  "the person, the place, and the ore." That upon this declaration, the law itself annexed the title, and the mine was said not to be granted, but to be adjudicated, by the judicial tribunal which had jurisdiction in such matters. That from the moment of denounce *279 ment the discoverer had the legal right to commence working his mine, and was required within ninety days to dig a pit of certain dimensions under penalty of forfeiture of his right, but that as soon as this was done he was entitled to receive judicial possession of his mine; and this, notwithstanding that the period allowed for others to show a better right, had not elapsed.
It was also shown that under the old ordinances no measurement of pertenencias was required to be made when possession was given; though this was required by the Ordinances of 1783, the penalty of forfeiture was not by those ordinances annexed to the omission to do so, though such a provision had been recommended by Gamboa. It was also shown that the requirement of the ordinances with regard to noting the contents of a statement in a book, &c., was directory to the Alcalde, and that his neglect of duty in that respect ought not to impair the vested right of the discoverer any more than the omission to record a colonization grant should effect the title of a bona fide grantee of land. The duty of recording registries in a book to be kept for the purpose was also imposed by ordinances prior to the time of Gamboa; but that author, though he strongly urges its policy and convenience, nowhere intimates that a failure by the mining tribunals to comply with this requirement of the law affected the title of the mine-owner  whose rights were evidenced by the copy of the "diligencias" or proceedings which was delivered to him  which corresponded to the "attested copy of the proceedings" which, by the Ordinances of 1783, was required "to be delivered to the party as his corresponding title."
If these views be correct, it follows that all the provisions of the ordinances indispensably necessary to vest the title in the discoverer of a mine have in this instance been followed. And Castillero, by his denouncement, the digging of a pit within ninety days, and the judicial possession given, acquired by law a right to his mine, with a number of pertenencias allowed to a discoverer working in company.
But it appears, from the loose and informal document executed by the Alcalde, that in addition to the juridical possession *280 which he was empowered to give, that officer "concluded to grant to Castillero three thousand varas in all directions, subject to that which the General Mining Ordinance indicates."
It will be observed, that the Alcalde does not here pretend to adjudicate the mine to the discoverer, nor to put him in possession of any designated number of pertenencias, but to grant him a large tract of land about his mine. It is unnecessary to say that such a concession, even of public land by an Alcalde was wholly void, and as against either the Sovereign or a private owner, conveyed no rights whatever.
It is insisted by the counsel of the United States, that this distinction between the possession of the mine and the gracia, or gift, of three thousand varas, is due entirely to the ingenuity of counsel for claimants, and is not found in the words or sense of the instrument.
We have already seen that the same distinction is clearly taken in James Alexander Forbes' letter of May 5th, 1847. We will hereafter see that it is alluded to in Castillero's communication to the Junta, in which he states "that he has taken possession not only of said mine, but also of an extent of three thousand varas in all directions from that point."
The distinction is not, therefore, a recent suggestion of ingenious counsel.
That it is very clearly expressed in the very inartificial document called the Act of Possession, is not pretended.
Taken literally, that document merely states that, "I, the Alcalde, have resolved to act, by virtue of my office, in order to give juridical possession of a mine known by the name of Santa Clara, and (after sundry recitals) have concluded to grant him three thousand varas in all directions, subject to what the Mining Ordinance indicates."
Nor is it pretended that any possession of the mine as distinguished from the three thousand varas, was given. That the Alcalde, the assisting witnesses and others, went to the mine for the purpose of giving a possession of some kind, is clear; but he made no measurements, and fixed no stakes. He probably told Castillero that he gave him possession of the mine *281 and added that he might take three thousand varas in every direction around it.
The explanations of this act given by Pico himself, are confused and contradictory.
In his first deposition, taken on behalf of the claimants, Pico says: "Castillero told me he required three thousand varas in all directions, and I told him to take them. He told me he had that right by reason of his being the first discoverer of the metal. According to what Castillero told me, I believed that I, as Alcalde, had authority to do that, there being no other Juez de Letras. He was a man learned in all those subjects." He adds: "I do not know whether it [the land of which he gave possession] was round or square, because I made the division in different directions, as I proposed to Castillero; that is to say, that he should take it where it was vacant, or in the mountains, because the rancheros would not have mountains  they wanted plains only."
In a subsequent deposition, taken some three years afterwards  viz., in 1860  Pico admits that he had stated in a deposition taken in another case, that he pointed out the boundaries which Castillero was to take, but gave him no fixed possession; that there was a question between Castillero and Berreyesa  Berreyesa would not consent that possession should be given to Castillero unless he would admit that he (Barreyesa) should have an interest in the mine. In consequence of this, I did not give any fixed possession of the land.
In a subsequent part of the deposition of 1860, (Ans. 17,) Pico says: "I intended to grant only what was intended by the ordinance around the mine, and the rest to be taken on public land." "I never intended to grant another man's land." (Ans. 16.) When reminded by the counsel for the United States that the mine was at some distance from the nearest body of public land, recognized as such at that time by himself, and asked how he could have granted three thousand varas, to be measured in all directions from the mouth of the mine, if he intended only to grant public land, the witness replies: "It was because Berreyesa agreed with Castillero at the time, and told me I might *282 grant the land, provided I did not include the land needed for cultivation; and, therefore, I made the grant." And in Answer 24, he admits that three thousand varas in all directions would include part of Berreyesa's land as well as public land.
Amidst these confused and contradictory statements it is, I think, not difficult to perceive what was really done, or attempted to be done, by the Alcalde. He was aware, and so informed Berreyesa, as he states, that "the ordinances authorized a certain quantity of land around the mine to be granted, whether on public or private land  that is, that to the discoverer and to the one working in company, a certain number of pertenencias were to be assigned. How many, neither he nor probably Castillero knew. But in addition to these pertenencias, which determined the extent of the mine, he also undertook to grant a tract of three thousand varas to be taken on public, or on Berreyesa's land, if the latter consented. The transaction with regard to this grant seems to justify the observation of James Alexander Forbes, in his letter of October 30th, 1849, that the possession of the mine granted by the Alcalde to Castillero "was precarious and illegal; the latter being in reality the judge of the quantity of land given by the Alcalde."
The concession of the three thousand varas is by its terms provisional, for it is declared to be "subject to what the general Mining Ordinance indicates;" nor does it purport to be a concession of the tract described, as of so many pertenencias of the mine, but rather a grant of land as a gracia or gift.
The difference is important, for in the one case Castillero (if the grant were valid) would, under the Mexican laws, have been the owner, not only of the large tract conceded to him, but of all the mines which might be discovered within it; in the other, he would merely have owned the mineral veins within the pertenencias allowed by law, while all others within the three thousand vara tract would have remained liable to denouncement by any one who might discover and be ready to work them.
Castillero himself seems to have understood that he was entitled to four pertenencias, for in the petition of Castro, which was drafted by himself, there is asked "three pertenencias in continuation *283 of the first." It is not, however, very clear that three additional pertenencias are here asked for, or perhaps Castro may have misunderstood Castillero's instructions, for it appears that in his ratification of McNamara's contract, made at Mexico, December 17, 1846, Castillero describes the mine as of three pertenencias only. That such was understood to be the dimensions of the mine by all parties, in 1846 and 1847, appears not only from their acts of sale, but from the testimony of James Alexander Forbes.
This witness states, that "in 1846 he received from Padre Real possession of the mine, the hacienda, about a mile distant from it, the mining utensils and some ores. No definite extent of land was specified. It was understood that the mine contained three pertenencias at that time, but the hacienda was not understood to be within the three pertenencias." The possession transferred by him to Walkinshaw in 1847, and again on his return from Tepic received back from Walkinshaw, is stated to have been like the original possession received from Padre Real. It comprised the hacienda and the mine, but no definite tract of land.
In a subsequent part of his examination he says: "There was only one act of possession which I understood to have been given. This embraced three pertenencias, so far as regarded the mine. Three pertenencias, and also lands about the hacienda, I understood to have been given to Castillero in 1845."
"These lands were understood to be of the extent of three thousand varas," he adds; and in the deed received by him from the Robles, and which conveys "all their rights and shares in each one of the three pertenencias of the mine," their interest in the lands and hacienda passed; for, "by Mexican custom, a sale of barras in a mine includes an interest in the hacienda."
In the possession obtained by Alexander Forbes from Weekes, Alcalde, in January, 1848, four pertenencias seem to have been considered the number to which the parties were entitled, and a tract two hundred varas long and eight hundred wide, comprising exactly four pertenencias, is designated by the Alcalde.
It is, I think, apparent, that from 1846 down to a late period *284 the parties interested considered themselves the owners of a mine, with the number of pertenencias allowed by law  whether three or four, they seem to have been uncertain  and that this ownership, acquired by registration and denouncement, carried with it the ownership of the hacienda or reducing establishment But they seem to have attached, so far as we can discover from their acts of sale, proceedings at law, &c., little importance to the rights in the large tract six thousand varas square, which the Alcalde assumed to grant them partly on public and partly on private land. On no other hypothesis can we account for the omission to mention the word "lands" in any of their conveyances during so long a period.
No inference of fraud can, however, be justly drawn from this circumstance, for the same omission is observable in deeds and proceedings after the date of the supposed forgery as before it.
But whatever may have been the notions of the parties as to their rights, it is, I think, plain that the possession given to Castillero should legally be treated as having included two entirely distinct objects: one, the mine properly so called, comprising the pit or "pozo de posecion," with the limited number of pertenencias allowed by the ordinances; and the other, a tract of land six thousand varas square, which the Alcalde assumed to grant, but of which no "fixed possession was given."
This distinction between the judicial possession of the mine, which the tribunal having jurisdiction of mining matters had a right to give, and a grant of more than a square league of land, partly on private and partly on public, is not only admitted but insisted on by the counsel for the claimant. Its importance will appear hereafter when we come to consider the alleged "ratification" of the mining possession by the Supreme Government.
By art. 14, tit. VI., of the Ordinances of 1783, it is provided, that "Any one may discover and denounce a vein or mine, not only in common land, but also in the private lands of any individual; provided he pays for the land of which he occupies the surface, and the damage which immediately ensues therefrom, according to the valuation of experts appointed by both parties, and a third in case of disagreement. The same being understood *285 with respect to him who denounces a place (sitio) or waters for establishing works, and working the machines necessary for the reduction of ores, which are called haciendas; provided they do not include more land, nor use more water than may be necessary."
It is not pretended that in this case any denouncement of a sitio or of waters for a hacienda, was made. Had such been the case, and the title to a hacienda duly acquired by the mine-owners, it may well be that, as affirmed by Mr. Forbes, a sale of a barra, or share, in the mine would have conveyed, by Mexican usages, a corresponding interest in the hacienda. But the parties appear to have selected and taken possession of this hacienda relying on the grant of six thousand varas square, made by the Alcalde, or on some arrangement made with Berreyesa, the reputed owner of the land.
Antonio Maria Pico, in his last deposition, seems to desire it to be understood that Berreyesa gave an oral assent to the grant provided it did not include the level land; and in a previous deposition before the Land Commissioners, the same witness testified that a written contract was entered into between Berreyesa and the owners of the mine, by which the former was to have a share in the mine, and was to be paid for the wood and limestone used in the establishment. After the possession was given, Berreyesa demanded a compliance with the contract, and wrote to Padre Real to that effect. It does not appear that any arrangement was entered into with him. He was soon after killed by the Americans, and the hacienda and tract of three thousand varas in every direction has remained in the possession of the New Almaden Company to this day.
I am unable to perceive how, under these circumstances, and in the absence of any denouncement of the sitio used for a hacienda, Castillero can be deemed to have acquired, by the attempted concession of the Alcalde, any title whatever to lands beyond the limits of the pertenencias which the law allowed.
With respect to these, the Ordinance does not expressly declare whether the denouncer of a vein or mine on private land is required to pay for the land of which he occupies the surface as *286 a condition precedent to the vesting of his title. It would seem that he is not.
The denouncement or formal declaration of discovery is evidently the first step to be taken; the pit is then to be dug and the discoverer is, by the terms of Art. iv., to be put at once into possession. No provision is here made for a suspension of proceedings until the land can be valued and paid for, nor until the expiration of ninety days can the denouncee be sure that some one having a better right will not present himself; as the private land owner is only to be paid for the surface land which is occupied, and the ensuing damage, it would seem impossible to ascertain what amount of surface land is to be occupied until the number of pertenencias is fixed and their boundaries marked out, which can only be done when judicial possession is given.
The ordinance seems to contemplate a claim or proceeding instituted by the land owner; for it provides that the land shall be appraised by experts appointed by both parties. If, therefore, the payment for the land, and satisfaction for damages, are conditions precedent to the vesting of any title to the mine, the land owner might, by refusing to appoint an expert, indefinitely postpone its acquisition  thus defeating the policy of the Mining Laws, as well as the right of the discoverer, which those laws so fully recognized, and so amply protected. For it is not to be forgotten, that under the Spanish as well as all other Mining Ordinances, the discoverer was considered the true owner and creator of the wealth he had discovered, and that the grantee of the superficies had merely the right to an idemnity for actual damage done by the occupation of a small portion of the surface. But to hold, under the circumstances of this case, that no title vested by denouncement and discovery, because the claim of Berreyesa was not first satisfied, would be peculiarly inequitable.
The mine, it is true, was generally understood to be on his land, and denounced as such. But no judicial measurement of his land had been made, nor were his boundaries established. It is to this day unsettled, whether in fact the mine is within the boundaries of Berreyesa, or those of his neighbor. Justo Larios *287 or without both, on public land. Had Berreyesa been paid, as required by the ordinances, it may yet prove that the payment was unnecessary, because the mine was on public land; or to the wrong person, because it is on the land of Justo Larios. Where land was gratuitously distributed in tracts from one to eleven square leagues in extent, the indemnity which experts would have awarded for the occupation of a few rectangles of the surface, two hundred varas long by two hundred wide, would have been little more than a nominal sum; and to defeat the meritorious title of a discoverer, because under such circumstances the indemnity was not paid, would seem unjust and absurd.
The next question to be considered on this branch of the case is, whether the Alcalde had, under Mexican laws, jurisdiction to receive denouncements, make registrations, and adjudicate the titles of mines.
By art. iv., tit. vi., of the Ordinances of 1783, the discoverer was required to present himself before the Deputation of that Territory (territorio), or the one nearest if there should be none there.
It is unnecessary particularly to examine the nature and organization of the Special Tribunals to which the ordinance refers. It is sufficient to say that they were composed of deputies chosen by the enrolled miners of each mining territory, who themselves were members of the great mining corporation or body of matriculated miners throughout the Kingdom of New Spain.
These Special Tribunals were in the Federal territory abolished by the Constitution of 1826 and by the law of 1837.
But by the law of December 2d, 1842, Courts of First Instance, composed of three Territorial Deputies elected in the manner prescribed in the ordinance, were required to be established in each of the Departments by the Governor, in concert with the Departmental Junta, and with the previous approval of the Supreme Government.
To these Courts were given substantially the powers formerly possessed by the Territorial Deputations under the ordinances.
Under this law mining tribunals were established in various Departments, but none were ever organized in the Californias.
*288 It is contended, that inasmuch as these tribunals existed in some parts of Mexico, it was the duty of the discoverer to address himself to the one nearest to his mine; and that that tribunal alone had jurisdiction in the premises.
It is not disputed, as a general principle of Mexican law, that in default of any of the authorized special tribunals, their functions devolve upon the Courts of general jurisdiction. The question then is, was there any special tribunal to which the discoverer of a mine in the Department of the Californias could address himself.
It seems to be considered by the counsel for the United States, that the provision of the ordinance which directs the discoverer to the deputation of the nearest territorio, in default of any deputation within his own territorio, of necessity directs him to the nearest Departmental Court organized under the law of 1842 if there be none in his own Department. But this provision of the ordinance is not adopted or alluded to in the law of 1842, The small territorios, in each of which a Mining Deputation was by the Ordinances of 1783 to be established, in no respect corresponded to the great divisions of the Mexican Republic called "Departments," in a single one of which both the Californias were included. The Deputies under the ordinances were to be elected in each Real or Asiento of mines by the matriculated miners "of that place" (lugar), whose names were embraced in a book kept by the Judge and Notary of that mining place (Mineria).
I am not informed what were the ordinary territorial limits of the Reales or Asientos of mines here spoken of; but it is obvious that they could not have been larger than would be consistent with the convenience of the miners who were required to enroll their names, and every year to vote at elections. When, therefore, it happened that in a newly discovered mining district, no deputation had been elected, the discoverer was reasonably directed to the nearest deputation, which would ordinarily be at no great distance.
But to send him to a remote Department of Mexico on such an errand would be absurd, and a practical denial to him of any *289 right whatever to register his mine. Nor could in such case the other provisions of the ordinances be complied with; for to what purpose affix notices on the doors of the churches in Chihuahua, that an individual had discovered or denounced a mine in Upper California, and how could one of the Deputies personally go, and within ninety days inspect the mine, examine the pit, and give the possession as enjoined by the ordinances?
That no such proceedings could have been contemplated by the law of 1842, is also clear from the terms of the law itself. The Governor and Junta of each Department were to establish, as we have seen, as many Courts of First Instance as were required within their limits.
It is to be presumed that the jurisdiction of each of these Courts was restricted to the territorial limits assigned to it; but it certainly did not extend beyond the boundaries of the Department. Art. XXVI., provides, that "Each one of these Courts shall exercise within its territory the executive and economical powers given by the old ordinance," &c, How, then, can it be supposed that, organized under the authority of the Department, and with its jurisdiction restricted to its territory, it could take cognizance of mining matters in another Department, separated from it by hundreds of leagues, and with which communications were rare and difficult.
It is, I think, beyond doubt, that at the time of the discovery of this mine, there were not only no special tribunals in California which had jurisdiction in mining matters, but there were none anywhere established in Mexico which possessed jurisdiction to make a registration of a mine discovered in California. On the principle of Mexican law already referred, the functions of the special tribunals, under these circumstances, devolved on the Courts of ordinary jurisdiction  or rather the jurisdiction remained in them, as it had done in the Federal Territory from the adoption of the Constitution of 1824 and the law of 1837; it never having been divested in this Department by the establishment of special tribunals under the law of 1842.
If, then, the ordinary Courts had cognizance of mining matters *290 in the Californias, the jurisdiction must have been vested in the Alcaldes, for no ordinary Courts of First Instance existed.
By the decree of May 23, 1839, the judiciary of each of the Departments was to be composed of Justices of the Peace, Alcaldes, Judges of First Instance, and a Superior Tribunal.
But this organization was not perfected in the Californias, and the Alcaldes in this Department appear to have exercised the functions and jurisdiction which would otherwise have belonged to the Courts of First Instance.
In the decree of March 2, 1843, it is stated, that in the Californias there had been no Courts of Second and Third Instance established in the Californias, New Mexico, and Tabasco; and by Act 28th, the Governors of those Departments are ordered "to take care that justice is punctually and completely administered in First Instances by Judges of that grade, if there be such, or by Alcaldes, or Judges of the Peace." But even if the authority of an Alcalde to take cognizance of mining matters were doubtful, it ought, I think, to be sustained as that of a de facto officer exercising an undisputed jurisdiction.
The registration of a mine was a simple proceeding, of which the principal objects were to apprise the Government of its existence, so that it might secure its portion of the produce  to give an opportunity to other persons to show a better right than that of the alleged discoverer or denouncer, and to subject the latter to the salutary rules of the ordinance as to its working and preservation. When the discoverer had made known his discovery in the manner prescribed by law, and dug his pit of possession, the law itself gave him the title.
It would seem, therefore, that if the discoverer addressed himself to the only judicial authority of the country, and if that authority, with the knowledge and acquiescence of the Governor and inhabitants of the Department, took cognizance of the matter and adjudicated the mine to him, a presumption in favor of the rightful exercise of power ought to be indulged. Nor should we affirm the Alcalde's acts to be void, except on the clearest proofs that he was wholly without jurisdiction in the premises.
Having thus seen that by the discovery and registration of his *291 mine, and by the possession given by the Alcalde, Castillero acquired a right to the mine, with the number of pertenencias allowed by law, I proceed to inquire what number of pertenencias he thus became entitled to.
By art. 1, tit. vi., of the ordinances, it is provided that "the discoverers of one or more mineral hills, (cerros,) absolutely new, in which there is no mine nor trial pit open, may acquire in the principal vein which they select, as many as three pertenencias, continuous or interrupted, according to the measurements which are hereinafter prescribed; and if they have discovered more veins, they may have one pertenencia in each vein, said pertenencias being discovered and marked out within the term of ten days."
Art. 2, tit. xi., provides: "Although by these ordinances I prohibit any individual miner who works in the ordinary limits from denouncing two contiguous veins on the same vein  not withstanding this, I grant to those who work in company, although they be not discoverers, and without prejudice to the right which by reason thereof they may have in case they are such, (y sin perjuicio del derecho que por este titulo deban tener en caso de que lo sean,) the right to denounce four new pertenencias or mines which have been worked and abandoned, even when they are contiguous and on the same course."
It is claimed that, under these provisions, Castillero was entitled as a discoverer to three pertenencias, and as one working in company, to four additional pertenencias, making seven in all.
The counsel for the United States contends that the allowances of pertenencias mentioned in the foregoing articles, are not cumulative; and that four, or the number given to him who works in company, are all that can be acquired.
The determination of this question entirely depends upon the true meaning of the Spanish text. The counsel for the United States insists that the Spanish phrase quoted above reads when properly translated: "And without prejudice to the right which by this title [viz., that of discoverers] they may be entitled to have in case that they may be such."
*292 That is, that although it was prohibited to an individual miner to denounce two contiguous mines, yet those who work in company may denounce four pertenencias, either new and unopened, or old and abandoned mines; and this right is not to prejudice their rights as discoverers, in case at any time thereafter they may become such.
If, however, we attribute a present and not a future signification to the verb, the meaning of the phrase would be, that all persons working in company shall have four pertenencias, and shall enjoy this right without prejudice to their rights as discoverers, in case they are such; that is, all persons working in company shall have four pertenencias, and if they be also discoverers, their rights as such shall remain to them.
I do not pretend to be able to determine, from a knowledge of the Spanish, which is the true translation of the phrase. I have therefore addressed myself for information to several persons skilled in that language. They all concur in adopting the translation suggested by the claimants.
There are some general considerations which serve to strengthen my belief in its correctness.
The object of the law was to determine the extent of mining spaces, or pertenencias, to be allowed to miners. As the merit of the discoverer was greater than that of one who merely denounced a forfeited mine, and as the policy of the law was to encourage and reward discoveries, it gave to the discoverer, though working alone, three pertenencias, if his discovery were of an absolutely new hill, in which no mine had been opened; but if the discovery were of a new vein in a hill known and worked in other parts, he was allowed to acquire two pertenencias. It was also the policy of the law to promote the development of mines by encouraging the formation of companies, the associated capital of which would enable them to prosecute the works on a larger scale and with greater efficiency. Title ix., in the 1st article, enjoins upon the Viceroy to encourage, promote, and protect all such partnerships by all convenient measures.
In furtherance of the same policy, article 2d gives to all those *293 who work in company the right to acquire either four new and unopened pertenencias, or four mines (of one pertenencia each) which have been worked and abandoned. The law which prohibited the acquisition of two contiguous pertenencias by an ordinary miner, is pro tanto repealed, while those which determined the rights of discoverers are allowed to remain.
Such would seem the natural mode of carrying out the evident policy of the law-giver.
For why should the ordinary miner be rewarded with three additional pertenencias, because he works in company, and the discoverer only be allowed one additional pertenencia?
The law recognizes the two species of merit  that of discovery, and that of working in company. If a miner possesses both, ought he not to receive the rewards allowed for both?
The phrase, "and without prejudice to their rights as discoverers," &c., is evidently intended to guard against interpretation of the provision prejudicial to the rights of the discoverers. It is the exclusion of a possible conclusion which might otherwise have been drawn.
But could it have been supposed that because persons working in company are to have four pertenencias, no one of them could have the rights of a discoverer, if at any future time, and perhaps at a distance from his mine, he discovered an entirely new hill? Such a construction of the provisions in favor of partnerships would have been wholly unwarranted. This could not, therefore, have been the conclusion intended to be excluded. But it might have been supposed that the law, in giving to partnerships four pertenencias, meant to fix the maximum number of contiguous mines which the same individuals could in any case acquire. If, as discoverers, they were already entitled to three the formation of the partnership would give them but one more. Both provisions would thus have been satisfied. Three of the pertenencias would be held by a double title  that of discovery, and that of working in partnership  while the fourth would be given for the latter reason alone.
To guard against this construction, the provision was inserted that the allowance to partners should be without prejudice to *294 their rights as discoverers, in case they were such; and in this view the provision was sensible, and perhaps necessary. It left to each kind of merit its appropriate reward, and gave to the miner who united both in himself, all the privileges which the law attached to each.
I am, therefore, of opinion, that under the Mining Ordinances referred, Castillero, as a discoverer, and as one working in company, was entitled to seven pertenencias.
Having thus ascertained what acts were done and rights acquired by Castillero in California, we will next consider the title claimed to have been obtained by him from the Supreme Government of Mexico.
The facts as alleged by the claimants, are as follows:
Early in 1846, and while he was yet in California, Castillero, impressed with the importance of the brilliant discovery he had made, communicated the fact in two letters addressed to J.J. De Herrera, former President of Mexico, dated at the Mission of Santa Clara on the 19th and 22d February, 1846, respectively, and also in another letter written on the last mentioned day to Don Tomas Ramon del Moral, at Mexico.
These letters, together with some specimens of cinnabar and a small flask of quicksilver, were sent by the hands of Lazaro Piña, who sailed from Monterey for Mazatlan in the brig IIannah, in the early part of March, 1846.
Extracts from the two letters to Herrera were, it appears, furnished by him to Señor Moral, and a note embodying these extracts, together with a copy of Castillero's letter to himself, were, by Senor Moral, about the middle of April, 1846, communicated to the Junta de Fomento y Administrativa de Mineria, a body chargeo with the development and encouragement of mining interests in Mexico, and the administration of certain funds connected with the same object.
There were also transmitted by Moral to the Junta, at the same time, some specimens of cinnabar which had been delivered to him by Piña.
On the 21st April, 1846, the Junta addressed a letter to José Maria Tornel, Director of the College of Mining, transmitting to *295 him copies of Castillero's letters and the specimens of cinnabar, and requesting that an assay might be made of the latter.
On the 23d April, Tornel, by an order on the margin of the letter of the Junta, directed the specimens to be sent to the Junta Facultativa, or Faculty of the College, for assay.
The result of the assay was communicated to Tornel by Señor Moral, President of the Junta Facultativa, on the 24th April, 1846, and the receipt of this letter was acknowledged on the 29th of the same month by Tornel, who, on the same day transmitted the letter of Moral of the 24th, announcing the result of the assay, to the Junta de Fomento. His official communication on the subject was received by them on the 3d May, and on the 4th, ordered by an "acuerdo" or marginal order to be sent to the Government. On the succeeding day, viz., the 5th, a communication signed by Vicente Segura, President of the Junta, and Isidro R. Gondra, First Clerk, was accordingly addressed to the Minister of Justice, in which was stated the reception of the specimens, and their transmission to the Director of the College for assay. A copy of the communication of the Director of the College, stating the result of the assay, was also embodied in the Junta's letter, and the Minister of Justice was informed that the Junta had already asked Castillero what kind of aid or protection he needed for the encouragement of his brilliant enterprise, &c., &c.
This letter was received by the Minister of Justice on the 9th May, as shown by the marginal note of its contents and reception, and on the same day the Minister formally acknowledged its receipt in a dispatch addressed to the Junta.
On the 12th May, 1846, Castillero, who had sailed from California in the barque Don Quixote, and arrived in Mexico, submitted to the Junta nine propositions in writing, in which he indicated the kind of aid and protection he required. He had previously, however, appeared before them, given a verbal account of his discovery, and been requested by the Junta to furnish a written statement as to what aid he required.
On the 14th May, 1846, the Junta transmitted the written statement of Castillero to the Minister of Justice, retaining a *296 copy in their own office. In this communication of the Junta, the Government is urged to accept the propositions of Castillero.
Among the propositions thus made by Castillero to the Junta, and by the latter transmitted to the Minister of Justice, were the following:
"7th. The Junta shall represent to the Supreme Government the necessity of approving the possession which has been given me of the mine, by the local authorities, in the same terms as those which I now hold it."
"8th. It shall also represent the advantage of there being granted to me, as a colonist, two square leagues upon the land of my mining possession, with the object of being able to use the wood for my burnings."
The communication of the Junta, inclosing the propositions of Castillero, and urging their acceptance, was received by the Minister of Justice, and on the 20th May, the following "acuerdo" was noted on the margin:
"Granted in the terms which are proposed, and with respect to the land, let the corresponding order issue to the Minister of Relations for the proper measures of his office, with the understanding that the Supreme Government accedes to the petition."
This "acuerdo" is signed with the rubric of Becerra, Minister of Justice.
On the same day (May 20th) Becerra addressed to the President of the Junta an official dispatch, as follows:
"Ministry of Justice and Public Instruction.
"MOST EXCELLENT SIR:  Having reported to His Excellency, the President ad interim of the Republic, your Excellency's communication of the 14th inst., with which you were pleased to transmit with a recommendation the petition of Señor Don Andres Castillero, for the encouragement of a quicksilver mine which he has discovered in the Mission of Santa Clara, in Upper California, His Excellency has been pleased to approve in all its parts the agreement made with that individual in order to commence the working of said mine, and on this day the corresponding communication is made to the Minister of Exterior Relations and Government, to issue the proper orders with respect to that *297 which is contained in the 8th proposition for the grant of lands in that Department.
"I repeat to your Excellency the assurance of my esteem.
God and Liberty. Mexico, 20th May, 1846.
 "BECERRA.
 "To His Excellency, D. Vicente Segura,
 President of the Junta de Fomento de Mineria."
On the same day Becerra addressed to the Minister of Relations an official communication, in which he transcribes the foregoing dispatch to Segura, and adds:
"And I have the honor to transcribe to your Excellency, to the end that with respect to the petition of Señor Castillero to which his Excellency the President ad interim has thought proper to accede, that there be granted to him as a colonist two square leagues upon the land of his mining possession, your Excellency will be pleased to issue the orders corresponding."
In obedience to these orders, the Minister of Exterior Relations, Castillo Lanzas, on the 23d of May, 1846, directed an official dispatch to Pio Pico, Governor of California, in which, after transcribing the foregoing communication of Becerra, he says:
"Wherefore I transcribe it to your Excellency, in order that in conformity with what is prescribed by the laws and dispositions upon colonization, you may put Señor Castillero in possession of the two square leagues which are mentioned.
"God and Liberty, Mexico, May 23d, 1846.
 "CASTILLO LANZAS.
"To His Excellency the Governor of the Department of the Californias."
Upon these last dispatches, viz., that from Becerra to the Junta de Fomento, of May 20th, and that from Castillo Lanzas to the Governor of California, of May 23d, the claimants rely, as constituting a ratification of the grant by the Alcalde of three thousand varas in every direction, and a concession of two square leagues of land. They also claim that the "acuerdo" or margina order found in the communication of the Junta of May 14th *298 1846, amounts, in equity at least, to a concession of all that the Junta recommended.
The proofs of the foregoing allegations consist of a large number of espedientes from various public offices in Mexico  of certified copies of the actas or minutes of the proceedings of the two Juntas, viz., the Junta de Fomento and the Junta Facultativa, of the College of Mining  of certified transcripts of entries in official books of the Ministers, and of the parol testimony of Members of the Juntas, Clerks in the offices by whom the documents were written, and of the Minister himself, Castillo Lanzas, who was the author of the dispatch of May 23d. These witnesses swear, not only to the existence of the archives, the hand writing and the genuineness of the various documents, traced copies of which are produced, and to the accuracy of those copies, but also to the facts stated to have occurred, or to such parts of the transactions as each was personally concerned in.
Some of these witnesses, who were brought from Mexico by the claimants at great expense, have held distinguished official positions, are of advanced years, and independent fortunes.
The United States aver that their testimony is false and perjured, and that the documents sworn to by them are forged and ante-dated. To arrive at a just estimate of the force of the evidence and reasons on which the United States rely to support this accusation, a brief statement of the nature and amount of the proofs offered by the claimant is necessary.
In the short summary of the evidence which I propose to give, I shall follow rather the chronological sequence of the events alleged to have occurred, than the order in which the various documents were produced.
It will be remembered that the Junta de Fomento was first notified of the discovery of a mine of quicksilver by Castillero, by receiving from Don Tomas Ramon del Moral a communication, containing copies of letters from Castillero, that this communication was sent to the Director of the College that an assay might be made, and by him referred to the President of the Faculty, who in due time reported the result of the assay to the *299 President, who in turn communicated it to the Junta, and the latter to the Minister of Justice.
There is accordingly produced from the Archives of the College of Mining the original communication of the Junta de Fomento, signed by the President, Vicente Segura, and addressed to the Director of the College, together with copies of the communication of Moral, which, with the specimens of cinnabar, were sent to the Director. The accuracy of the traced copy produced, and the existence of the original in the College of Mining, is testified to by Joseé Maria de Bassoco, for many years a member of the Junta, and by Balcarcel and Castillo, Professors in the College. These witnesses also swear to the handwriting of the dispatch, and of the copies of the letters, to the genuineness of the signatures of Vicente Segura, President of the Junta, and of Gondra, the Chief Clerk of the Junta, who certifies to the copies which accompany the dispatch. On the margin of the dispatch is an acuerdo, or order signed "Tornel," directing it to be sent to the Junta Facultativa. The fact that Tornel was Director of the College, and the genuineness of his signature, are also proved by the same witnesses.
From the archives of the Junta Facultativa of the College, are produced traced copies of the minutes of a session of the Board on the 24th April, 1846, (erroneously dated 24th March). These minutes show a resolution of the Board, that a report of what had been done, and the result of the assay made by Professor Herrera, be communicated to the Director of the College. From the same archives is produced a traced copy of the reply of the Director General Tornel to the report of the Board, in which he acknowledges the receipt of a letter from Moral, President of the Faculty, of the 24th April, communicating the result of the assay. The accuracy of these traced copies, and the existence, genuineness and handwriting of the originals, are proved by the Professors Castillo and Balcarcel, who were present at the meeting of the Faculty, and who not only swear to their personal recollection of the facts, but also testify that the cinnabar was received, an assay made, a meeting of the Faculty on the subject held, and the specimens deposited with appropriate *300 labels in the Cabinet of the College, where they now remain.
From the archives of the Junta de Mineria are produced traced copies of the office copy of the communication sent to the Director of the College, the original of which is found, as we have seen, in the archives of the latter; also a traced copy of the communication received from the Director of the College, announcing the result of the assay  with a marginal note directing it to be transmitted to the Government, signed by Segura, President of the Junta de Fomento.
There is also produced from the same archives, a traced copy of the borrador or office copy of the communication thereupon addressed by the Junta to the Minister of Justice together with a traced copy of his reply, dated May 9th, 1846.
There is also produced from the same archives a traced copy of the borrador or draft of a second communication from the Junta to the same Minister, transmitting to him the petition of Castillero, for aid, &c., and recommending it to the favorable consideration of the Government.
A traced copy of the reply to this communication by the Minister of Justice, is also produced from the same archives.
Appended to the espediente containing it, are certificates of Manuel Couto, Secretary of the Administration of the Mining Fund, and in charge of the archives of the office of Mineria.
A certificate of Vicente Segura, certifying to the official character and handwriting of Couto.
A certificate of P. Almazan, Chief Clerk of the Ministry of Encouragement, Colonization, &c., certifying to the official character of Segura, Administrator of the Mining Fund, and to that of Couto, the Secretary, and that the archives of the office are in charge of the latter, and also to their signatures and seals.
A certificate of J. Miguel Arroyo, Chief Clerk of the Ministry of Exterior Relations, certifying to the official character of Almazon, and to his signature and the seal of his office.
And, finally, a certificate of John Black, U.S. Consul, certifying to the official character and signature of Arroyo, and also that he is the person authorized by law to legalize Mexican documents *301 to be used in foreign countries, and that the seal of the Department affixed to the documents is the same used in the legalization of all documents by that officer.
The accuracy of the traced copies, the existence and handwriting of the originals, where those originals are borradors or drafts, and the existence and handwriting of the signatures to the originals, where they are the original communications received by the Junta, are proved by Mr. Bassoco, by the Professors Balcarcel and Castillo, by Miranda and Yrisarri, who were employed in the Ministry of Justice, by Manuel Couto, who testifies that he copied Castillero's petition from his rough draft, and by Castillo Lanzas, the former Minister of Relations of Mexico.
From the archives of the Ministry of Relations, to which the archives of the Ministry of Justice have been transferred, are produced traced copies of the communication addressed by the Junta to the Minister of Justice, informing him of Castillero's discovery, and embodying the communication received by the Junta from the Directors of the College, informing the Junta of the results of the assay.
A traced copy of the draft of this communication, as we have seen, is produced from the archives of the office from which it emanated. A traced copy of the borrador or draft of the Minister's reply to this communication, is also produced from the same archives, in all respects conforming to the original reply, a traced copy of which, as before stated, is produced from the archives of the office to which it was directed.
There is also produced, from the same archives, a traced copy of the communication of the Junta, inclosing and recommending Castillero's petition, corresponding with the borrador produced from the archives of the Junta, and a traced copy of the borrador of the reply of the Minister, in like manner corresponding with the original produced from the archives of the Junta.
On the margin of the communication of the Junta is the usual membrete or memorandum of its contents, and an "acuerdo" or order of the Minister in regard to it. The latter is signed with the rubric of the Minister, and the official dispatch transmitted *302 to the Cabinet conforms entirely to the acuerdo or resolution taken on the subject, and noted in the margin of the communication. There is also produced from the same archives a certified copy of the draft of the communication addressed by the Minister of Justice to the Minister of Relations.
From the archives of the Ministry of Relations is produced a traced copy of this last communication of the Minister of Justice, the borrador of which is found in the office of the latter; and a borrador of the communication or dispatch addressed, in pursuance of the order of the Minister of Justice, by the Minister of Relations, Castillo Lanzas, to Pio Pico, Governor of California. And, finally, the claimants produce from their own custody, the original of the last mentioned dispateh, signed by Castillo Lanzas, and addressed to the Governor of California.
It may here be observed, that from the archives of the Ministry of Relations is also produced a traced copy of the communication of Pio Pico, of February 13, 1846, addressed to the Minister of Relations, informing him of Castillero's discovery, and transmitting Castillero's letter of December 10th, 1845. There is also produced from the same archives a traced copy of the borrador of the reply of the Minister, dated April 6th, 1846.
We have already seen that the borrodor of Pico's communication, and the original of the Minister's reply, are found among the archives of California in this city. Their genuineness is undisputed.
To the traced copies from the archives of the Ministry of Justice are affixed the certificate of Arroyo and seal of his Department, as also the certificate of Black, the United States Consul, in the same terms as those already mentioned.
The accuracy of the copies, the existence of the originals in the archives of the offices to which they belong, their handwriting and the genuineness of the signatures they bear, are sworn to by the escribientes, or clerks, by whom they were copied, some of whom are still connected with the Ministries, by M. de Bassoco, and by the ex-Minister Castillo Lanzas himself.
There is also produced a traced copy of an extract from a book now existing among the records of the Ministry of Justice *303 It contains various entries or notes, purporting to have been made from May 11th, 1846, to May 20th, 1846. Amongst those made on the 20th, is an entry of the membrete or memorandum of contents of the Junta's letter to the Minister, of May 14th and of the acuerdo or resolution taken by the Minister on the subject. On the top of the first page on which the communication of the Junta is written, are found these letters and figures "L. g' 15, S. f. 140 vat."
José M. Yrisarri, the Fifth Oficial of the Ministry of Justice, being interrogated as to the meaning of this inscription, testifies that it means "Libro General, vol. 15; reverse of page 140," and that the entry already mentioned is found in the volume and page referred to. He further states that this inscription, or reference, was made by himself, as was also the entry on the book to which it refers.
The original dispatch of Becerra to the Minister of Relations, is stated by Miranda and Yrisarri, to be in the handwriting of the former. The "acuerdo" on the margin is said by Castillo Lanzas to be in his own handwriting and signed with his genuine rubric; and the draft of the dispatch addressed by him to Pio Pico, to be in the handwriting of Mr. Quintanar, an employé of the Ministry of Relations in 1846. The original dispatch addressed to Pio Pico is proved to be in the handwriting of A.J. de Velasco, by Castillo Lanzas, and by Velasco himself. The signature of Castillo Lanzas is proved by Lafrague, former Minister of Relations in Mexico, by Velasco, who wrote the dispatch and by Castillo Lanzas himself.
It is also testified by Mr. Negrete, that this identical dispatch was handed to him in December, 1846, by Castillero; that a copy of it was inserted in the instrument by which Castillero ratified the McNamara contract, and the original sent by him (Negrete) to Alexander Forbes, of Tepic, on the 19th of December, 1846.
In corroboration of this statement of Mr. Negrete, there is produced a series of letters written by him to Alexander Forbes, from December 5th, 1846, to February 6, 1847. In these letters Mr. Negrete informs Mr. Forbes of the state of his then pending negotiation with Castillero; and in his letter of December 18th. *304 advises him that he transmits "the document showing the grant which the Supreme Government made in favor of Don Andres Castillero for two leagues of land," &c.
These letters, which Mr. Negrete swears he saw for the first time since they were written, when produced to him by the claimants in this country, he testifies are in his own handwriting and that of his clerk, Oruña, and signed by himself. He also identifies three checks or orders drawn by himself on his banker, Don Donato Manterola; one in favor of Castillero for $4,000, and receipted by the latter, and two in favor of Dor Nazario Fuentes, the Notary, for $137.25, and $29.75, respectively, both of which are receipted by Fuentes.
The testimonio or authenticated copy of Castillero's instrument of ratification, containing the Lanzas dispatch, is exhibited It is signed by Nazario Fuentes, the Notary Public, whose signature and signo are attested by three Notaries Public in a certificate under the seal of the National College of Notaries of Mexico, dated December 19, 1846.
A second copy of the same instrument, issued from the office of the Notary Fuentes, under his hand and seal, is also produced. It is dated February 6, 1847, and is certified by three Notames Public, under the hand and seal of the National College of Notaries. Among the three Notaries signing these certificates is Villalon. This gentleman has been examined as a witness. He testified that his signature and signo on each of the certificates are genuine, that they were affixed at their respective dates; that the signatures of the other Notaries are genuine, as is also the seal of the National College. It is also shown that this instrument of the ratification was brought to California by Mr. Walkinshaw in 1847, when he took charge of the mine and the terms of James Alexander Forbes' ratification, in which the language of Castillero's act is copied, show that the latter must have been before him when writing his own ratification of the McNamara contract  a conclusion rendered certain by the very distinct allusion in Forbes' letter of May 5, 1847, "to the possession of two sitios ordered to be given by the dispatch of Señor Castillo Lanzas."
*305 The claimants have also produced from the Archives of the Junta de Fomento, traced copies of the original borradores, or drafts, of the minutes of the Junta in April, May, September, November and December, 1849; also a traced copy of the clean copy made from those minutes, and authenticated by the rubrics of the members of the Junta who assisted at the sessions; and finally, a copy of the entire volume 3d of the Minutes of the Junta from April 2, 1846, to June 30, 1847.
In these minutes, amongst a great number of other entries, we find a record of the action of the Junta from the reception of the specimens of cinnabar to the payment of the Notary Calapiz, when further proceedings were abandoned.
In the Actas of the session of April 23d, 1846, is an entry of the receipt of specimens of cinnabar from the Presidio of Santa Clara, in California, and a resolution that they be sent, with copies of Castillero's letters, to the Director for assay.
On the 4th of May, the receipt of the letter of the Director inserting the report of the Junta Faculatativa is noted, and it is resolved that it be transcribed to the Supreme Government, representing that a reply has been made to Señor Castillero, asking him what kind of protection or assistance he requires
On the 6th of May, the Actas show that Don Andres Castillero appeared and made a verbal report, &c., and the Junta resolved that Señor Castillero should present his indications in writing. On the 14th of May, the receipt of the communication from the Minister of Justice dated May 9th is noted.
On the 25th of May is a like note of the receipt of Becerra's dispatch of the 20th, approving the agreement made with Castillero, &c., and a resolution of the Junta that the proper judicial agreement be drawn up immediately, &c.
On the 29th of May, is a note of an order for the payment of $25 to the Notary Calapiz, for proceedings in the instrument of agreement which had been made with Castillero to assist his quicksilver enterprise, &c.
The accuracy of the traced copies of the Actas is testified to by Mr. Bassoco, who compared them with the originals; and he also proves the existence and authenticity of the originals in the *306 Archives of the Junta, and the genuineness of his own rubrics and those of his colleagues affixed to them.
The claimants have also produced, and filed as an exhibit, an original report made by the Junta de Fomento to the Minister of Justice relative to the matters confided to its care. This report is embodied in a report made to the National Congress by José M. Lafragua, Minister of Relations, and read before that body on the 14th, 15th, and 16th December, 1846.
The original manuscript "Memoria," or report by the Junta, is stated by Mr. Bassoco, to have been procured by himself from Escalante, the agent of Lafragua. Its proper place of custody was the Ministry of Relations, but M. de Bassoco supposes that it had probably been taken by Mr. Lafragua to his own house, when the latter was preparing his report to the National Congress, and accidentally remained among his papers. He identifies the signatures and rubrics of Vicente Segura and Isidoro R. Gondra, which are affixed to it, and states his conviction that it is the identical document sent in by the Junta to the Minister.
On referring to the "Actas" of the Junta, we find it noted on the 5th of November, 1846, that a dispatch was received from the Minister of Relations, dated November 3d, calling for an account of the labors of the Junta, to be furnished within eight days.
It also appears, that on the 9th the reading of the report was commenced; that it was concluded at the session of the 16th, and a resolution adopted, that the report should be transmitted to the Government; and that on the 5th of December, a communication from the Minister acknowledging its receipt was received by the Junta.
Two copies of the report of Lafragua, in which the Memoria was embodied, are also offered in evidence by the claimants. It is a printed volume of considerable size.
Of these copies, one was originally produced by the claimants and identified by Mr. Lafragua, Mr. Bassoco and others.
A second copy has recently been produced and identified by the Hon. J.P. Benjamin, one of the counsel in the cause, as having been received by him in 1849, from Don José Garay, the *307 validity of whose grant he was then investigating. The volume remained in Mr. Benjamin's possession until about two years ago, when Mr. Rockwell, also of counsel for claimants called on him to retain him in this cause. In the course of conversation Mr. R. alluded to an official report of Mr. Lafragua, which, in his opinion, contained conclusive proof of the genuineness of the title of the claimant. From his description Mr. Benjamin thought he recognized the volume in his possession as the one referred to, and immediately procured it from an adjoining room. On examination it was found to contain the passages relating to the discovery of the mine, &c., which are found in the copy previously produced by the claimants. Mr. Benjamin was not, until that time, aware that it contained anything in reference to the mine. At Mr. Rockwell's request, he allowed him to retain the volume, which he recognizes as the one now produced.
The claimants have also offered in evidence files of the "Diario," the "Republicano," and the "Monitor Republicano," newspapers, in which the reading of Lafragua's report, on the 14th, 15th and 16th December, 1846, is noticed.
It is unnecessary to extract at length the passages in this report, in which reference is made to Castillero's discovery, and the action of the Government upon it.
Thèy merely contain an account of the presentation of the specimens to the Junta by Señor Moral  the assay, the inquiry of Castillero as to the assistance he desired, his petition, and the Junta's agreement to it; the approval of the agreement by the Supreme Government, and the failure to carry it into effect, owing to the order of the Supreme Government, of May 10th, 1846, directing the suspension of all payments from the public Treasury.
In the foregoing statement of the documentary and other proofs on which the claimants rely to show the action, by the Mexican authorities, in reference to the important discovery of Castillero, much evidence as to various handwritings, signatures &c., has been omitted.
Enough has been set forth to show the nature and the force *308 of the proofs offered in support of the genuineness of the documents exhibited.
It will be seen that the proofs do not consist of any one set of papers derived from a single office, the archives of which might have been falsified and the officials corrupted.
Each document is found in two, and some in three, distinct repositories. The barradores are produced from the offices from which the communications emanated; the originals from the offices to which they were sent; and in some instances the communications are, according to the Mexican custom, inserted in dispatches from the office to which they were originally directed, and those dispatches are found in the archives of the Ministry to which they are addressed.
All the papers are so intimately connected and complicated with each other, that it is almost impossible to suppose any one to have been fabricated, unless the whole series be spurious. They are written in various handwritings, with a multitude of signatures, rubrics, etc., of well-known individuals attached to them. The same document contains, in some instances, no less than four different handwritings, viz., that of the clerk who drew it, of the official who signed it, of the clerk who wrote the membrete and acuerdo, and that of the Minister by whom the latter was signed.
The writing is sworn to be that of clerks attached for many years to the offices from which the papers emanated. Their handwriting must, therefore, be well known, and a forgery of it could readily be detected.
When we consider the long series of forgeries, and the almost innumerable perjuries, which must have been committed if these documents are not genuine, the crimes imputed to the witnesses are as appalling as the extent and almost endless ramifications of the conspiracy to commit them are incredible.
We must suppose that Professors in a National College, for saking their scientific pursuits, have carefully fabricated false minutes of the proceedings of the faculty of which they were members; that they have made a tedious and dangerous journey to sustain by carefully-prepared perjuries, the forgeries they *309 had committed; and that they have had ingenuity and lepravity enough to give to their statements the appearance of truth, by inventing circumstantial details as to the reception of the specimens, the assay made of them, their deposit in the cabinet of the College, and even the purport of the tickets or labels upon them, which, as they state, can be seen by any visitor to the College.
With regard to the Junta de Fomento, the forgeries and perjuries imputed are still more complicated and improbable. Not only must the various dispatches alleged to have been addressed by them to the Director of the College, and to the Minister of Justice, with the signatures of the President of the Junta, and of the Secretary, the handwriting of the Clerk who drew the marginal notes upon them, and the rubic of the Minister appended, have either been forged, or falsely sworn to have been written at their dates, but a series of actas, which record the proceedings and resolutions of the Junta, must have been fabricated, or extensively interpolated, and the rubrics of the members forged. And, as if reveling in supererogatory crimes, they must also have fabricated the borradores, or rough drafts, from which the clean copies of the minutes were made out  the existence of which would hardly have been suspected, and which it would naturally be supposed had been destroyed.
Thèy must also have prepared a voluminous report to the Minister, in which has been inserted an account of these proceedings, precisely such as, if they had taken place, we should expect to find. The manuscript of this report, which is claimed to have been accidentally left among the private papers of the Minister to whom it was addressed, must have been forged, or the interpolated passages inserted in it, in a manner to defy detection. And they must also, at least as early as 1848, or in the beginning of 1849, before this case was presented or a tribunal constituted to decide upon it, have procured the same interpolations to be made in the printed report of the Minister Lafragua, read to the National Congress in December, 1846, a copy of which was in the hands of Mr. Benjamin at least as early as the fall of 1849.
After procuring these various forgeries and interpolations to *310 be made, the claimants must have induced numerous witnesses to elaborate and swear to a series of perjuries  minute, circumstantial and plausible  the invention of which displays nearly as much skill and ingenuity as the testimony in regard to them if false, discloses moral turpitude.
They must have succeeded in suborning, not merely a few nameless and obscure individuals, but numerous persons in high official and social positions; and especially Mr. de Bassoco, a gentleman venerable for his years, and respectable for the singular intelligence and amenity with which he sustained the protracted, acute, and most searching cross-examination of the counsel for the United States.
They must also have procured two ex-Ministers of Relations to perjure themselves, not merely by false testimony before a Commissioner in Mexico, but in Court, within our jurisdiction and subject to our laws, with a full knowledge that the Government alleged the claim to be spurious, and that no efforts would be spared to detect and punish those who were concerned in the supposed conspiracy to defraud it.
Again this vast conspiracy, from its nature, could not have been successfully carried out without the complicity or connivance, not only of nearly all the officials in the various offices at the alleged dates of the papers, from the lowest probationary clerk or "meritorio," up to the Minister of State himself, but also of those officers employed when the forged papers were afterwards placed in the archives, as well as of all those who still more recently have certified to their genuineness; and yet, from all these persons concerned in or cognizant of the crime, no whisper has been heard betraying the important secret. Mr. Black, the United States Consul, continues to attach his certificate to the papers without suspecting that he might be lending his aid to a conspiracy to defraud his own Government; and Mr. Forsyth, the United States Minister to Mexico, and for some time resident at the Capital, examines the documents at the various Ministries, and states that "they are found in the several offices where they appropriately belong, were produced by the *311 officers having custody of them, and that he saw nothing whatever to cause him to doubt their being genuine originals."
But the proofs of the genuineness, in part at least, of the documents obtained from Mexico, are obtained from another and an unquestionable source.
Among those documents was found, as has been mentioned, the dispatch of Pio Pico, with the original letter of Castillero of December 10th, 1845, conveying to the Supreme Government the first news of the discovery. There was also produced a traced copy of the borrador of the reply of the Minister.
It is stated by counsel, that the reception of these documents from Mexico first suggested to them the propriety of instituting a search for evidence of the correspondence in the Archives in the Surveyor-General's office.
The search was accordingly made, and there was found the draft of Pio Pico's letter to the Minister, the original of the Minister's reply, together with a letter from Castillero, clearly referring to a previous one of the 10th December.
I am not aware that the genuineness of these documents produced from the archives in this city is questioned.
It thus appears that the archives from Mexico are corroborated on the only points where, from their own nature, they were susceptible of corroboration by other records.
The existence of the documents now relied on to establish the title of the claimants, at least as early as the spring of 1847, and prior to the date of the supposed forgery, is also shown by testimony adduced by the United States.
We have already seen, that in James Alexander Forbes' letter of May 5th, 1847, he alludes to "the possession of two sitios ordered to be given by the dispatch of Señor Castillo Lanzas."
In his letter of July 14th, 1847, he speaks of the "two leagues conceded to Castillero and socios," and throughout his correspondence frequent and unmistakable allusions occur to the Lanzas dispatch, with reiterated expressions of distrust of its validity.
The same objections made to the document in 1847, are repeated and enforced up to February, 1850, long after the date of *312 the alleged forgeries, but without the slightest intimation that during that interval a second Lanzas dispatch had been fabricated. The document now exhibited is open to all the objections, and liable to every criticism originally made, and so constantly repeated, to the document received by Mr. Forbes in 1847. He complains, in 1850, that his suggestions relative "to the attainment of the important document," explained in his memorandum left at Tepic, in 1849, have not been acted upon. He expatiates upon the insufficiency and discrepancies of the Castillo Lanzas dispatch; but he nowhere breathes a word of reproach or complaint that an abortive and absurd forgery had been committed, the only result of which had been to leave the title as "imperfect and ambiguous" as before.
Had such been the case, we learn enough of Mr. Forbes' disposition from this correspondence to feel sure that reproaches would not have been spared.
There is one other consideration, and it is the last to which I shall advert, which naturally leads us to infer, independently of the proofs, that some proceedings similar to those alleged to have been had, must have taken place in Mexico.
So far back as the Ordinances of 1783, quicksilver had been the subject of distinct and special legislation. The fact that it was indispensably necessary to the extraction of the precious metals, gave to it an exceptional character, and an ample and cheap supply of it had been recognized as essential to the development of the mineral wealth of Spain and Mexico.
It is unnecessary to recapitulate the various decrees and laws of those countries designed to promote the discovery and production of this metal. It is sufficient to say, that out of the public revenues of Mexico a part had been devoted to the formation of a fund called the "Fondo de Azogues," to be used in searching for and developing mines of quicksilver. On every quintal produced a bounty was paid, and to those who should succeed in producing a specified quantity per year, a large sum of money was to be given.
The hope of discovering rich mines of quicksilver within the Republic had led the Junta to institute expensive explorations *313 in various parts of the country, and on all sides it seems to have been considered a national object of primary importance to liberate the Republic from its almost entire dependence on the mines of Almaden, from which the chief supply was obtained.
When, therefore, Castillero discovered a mine of which the "ley" surpassed in richness any that had previously been known, and when shortly afterwards he proceeded to Mexico, it is not conceivable that he should have neglected to inform the Junta of his discovery, and requested of it the assistance in the prosecution of his enterprise which it was one of the most important objects of its institution to furnish. That he would have desired the ratification of his mining possession, and especially a grant of two leagues, we may infer from the fact that he had already solicited a similar grant from the Governor of California.
That the Junta would have received the announcement with the utmost satisfaction, and zealously co-operated with him by recommendations to the Supreme Government, and aiding him by all means in its power, we might conclude even without any proofs of the facts; and proceedings similar to those alleged to have occurred, would have been the natural and almost inevitable consequence.
These proceedings may, it is true, have been interrupted by the breaking out of war and the alarming condition of public affairs; nor do the considerations last suggested authorize us to assume that the dispatch of Becerra, or that of Lanzas, were in fact written at their dates; but they justify the conclusion that the proceedings were initiated, and that the records of them produced from Mexico are at least in part genuine.
Having thus given an imperfect summary of the proofs offered by the claimants, I proceed to consider some of the objections urged on the part of the United States.
It is contended that neither Lazaro Piña, who is alleged to have carried the specimens of cinnabar to Mexico, nor Castillero himself, could have arrived in that city at the time indicated by the documents produced. If this be true, and an alibi can be proved as to those persons, we may well regard with suspicion documents found to be false in so important a particular. But *314 the proofs offered by the claimants on these points are too clear to admit of doubt.
We have already had occasion to notice the letters addressed by Castillero while in this country to Gen. M.G. Vallejo, at the christening of whose child he had assisted, and who thus became his compadre.
In a letter addressed to Vallejo, and dated February 21, 1846, Castillero says: "By the brigantine schooner which brought these communications," (referring to communications spoken of in the preceding sentence of the letter) "we have received information," &c. "This vessel sails shortly, and will carry communications of what has occurred lately. Myself or Piña will leave in it, or both together. I am only detained waiting the arrival of the division which may touch here in a day or two."
In another letter dated March 11, 1846, to the same person, he says: "Piña embarked on the 4th of this month in Monterey, and was dispatched in perfect order. He will travel post to Mexico."
These letters are produced by General Vallejo. He swears that they were received shortly after they were written. The signature and handwriting of Castillero are not disputed. If antedated, they must have been written by Castillero in Mexico, and sent on to Vallejo to be produced and sworn to by him  a supposition extravagant in itself, and disproved by the intrinsic evidence of the letters themselves, which contain allusions to passing events, and are couched in a style impossible to invent after the lapse of years.
In corroboration of this statement, the consular books of Mr. Larkin, then United States Consul at Monterey, have been produced. They are identified by Mr. Swasey, the consular clerk at that time. From these books it appears that the brigantine schooner "Hannah" was noted as about to sail to Mazatlan on the 4th of March, the day on which Castillero supposed she had actually sailed. It also appears that the Consul, desirous of sending dispatches to the United States, detained her three days, and a note in his memorandum book shows that she in fact sailed on the 7th.
*315 Shortly after the sailing of the Hannah, becoming alarmed for the safety of Colonel Fremont, who was then encamped on the peak of Gavilan, and expecting an attack, Mr. Larkin sent by a special courier dispatches to Santa Barbara, in the hope of intercepting the Hannah at that port, and of having them conveyed by him to Commodore Sloat at Mazatlan.
That the Hannah arrived at Mazatlan on the 1st April, we learn from various sources.
First. The "Diario Oficial," a newspaper published in the City of Mexico, contains in the number published on the 22d April, under the head of "Marine news. Mazatlan,  arrivals of vessels," a notice of the arrival at Mazatlan, on the 1st April, of "the American brigantine schooner `Hannah' of eighty-nine tons, Captain Benjamin F. Thusum, and a crew of ten men."
Second. From a letter of Mott, Talbot & Co., merchants of Mazatlan, addressed to Mr. Thomas O. Larkin, and found among his papers since his decease.
This letter is dated "U.S.S. Portsmouth, 1st April, 1846," and informs Mr. Larkin that his letters have this moment arrived "per `Hannah.'"
Third. Mr. Larkin's letter to Capt. Gillespie, a copy of which is found in his consular book, which Mr. Swasey swears to have written himself.
In this letter Mr. Larkin says: Capt. Montgomery, of the Portsmouth, being under sailing orders (the 1st or 2d instant), was waiting at Mazatlan for the Mexican mail, when Commodore Sloat heard per brig Hannah, of the situation of Capt. Fremont near St. Johns, and immediately dispatched the ship; she was twenty-one days from Mazatlan to Monterey."
Fourth. The positive statement of Mr. Swasey, clerk to Mr. Larkin, that the latter sent dispatches by the brig Hannah, in March, 1846, in consequence of which the Portsmouth came to Monterey.
These proofs leave no room for doubt as to the sailing of the "Hannah from Monterey, in the early part of March, with Piña on board as a passenger, unless, indeed, we adopt the theory of the Government, and assume that the letter of Castillero to *316 Vallejo is forged, and that the latter has committed perjury; that the notes of entries and departures in Larkin's consular book are also forged; that the letter of Mott, Talbot & Co., is forged; that the letter of Larkin to Fremont, of March, 8th, as also his letter to Captain Gillespie of April 23d, are forged; that a number of the "Diario Oficial," purporting to be dated April 22d, has been prepared and procured to be printed, and a false entry of pretended marine intelligence from Mazatlan inserted in it; and, finally, that Mr. Swasey, and probably Mr. Larkin's son, have committed deliberate perjury in swearing to the genuineness of the books and papers of the deceased Consul. All this we must assume on the faith of a single statement made by Captain Paty, of the bark Don Quixote, to the effect that "Don Andres Castillero and his servant (Lazaro Piña, I think, was his name,) were passengers" on board his vessel, on her voyage from Monterey, in April, 1846. But, even supposing that Captain Paty's memory is accurate, and that Lazaro Piña did not sail in the Hannah, but remained to accompany Castillero in April, it only proves that the latter was mistaken when he wrote to Vallejo from Santa Clara that Piña had embarked on the 4th of March from Monterey. It may have happened, that in the three days during which Larkin detained the Hannah, something occurred to induce Castillero to countermand his orders to Piña, and to send his letters and specimens by another hand; for, it must be borne in mind, that proofs of the precise mode in which a few letters and specimens of ore were sent to Mexico fourteen years ago, cannot reasonably be exacted of the claimants. It is surely enough if they show that a vessel sailed about the time supposed, in which Lazaro Piña, or any other messenger of Castillero, might have been a passenger. If the United States contend that the letters and specimens were not and could not have been received in Mexico at the time indicated in the documents produced from that city, and therefore that those documents are false, it is for them to establish the fact.
It is also suggested that Castillero was not in Mexico at the time at which he is alleged to have presented himself before the Junta de Fomento.
*317 The evidence relied on by the United States to support this assertion, consists of a publication in an evening paper in Mexico, of the 6th of May, 1846, of the receipt by the Government at the last moment before the paper went to press of important intelligence from California. As this intelligence was undoubtedly contained in the dispatches sent by the vessel which carried Castillero, it is inferred that he could not have arrived in time to be present on the 6th at a meeting of the Junta; and, therefore, that the actas are false.
That Castillero might have reached Mexico in the first days of May, is evident from the fact that he left Acapulco on the 24th of April.
As to the precise time at which the dispatches of which he was the bearer, or which had been sent by the vessel which conveyed him to Acapulco, arrived in Mexico, we have no means of ascertaining, except from the publication referred to.
The paper purports to have been published at three o'clock. P.M. of the 6th; as the dispatches were addressed to the Government, and not to the newspaper, it may be assumed that they were first delivered at the appropriate Ministry. What the diligence or energy of Mexican journalists may be, in obtaining the latest news, and how long an interval would probably elapse before they would possess themselves of the contents of a Government dispatch, we are wholly uninformed. That the news was communicated to the newspapers shortly after twelve M. of the 6th, may be inferred from the fact that it was in print at three, P.M. It is not surely unreasonable to suppose that the dispatch reached the Government on the previous evening, or early in the same morning. I see no reason why Castillero might not, after delivering his dispatches, have presented himself to the Junta on the same day. It appears from the minutes of the session of the 4th, that having learned the result of the assay, the Junta had made a reply to Castillero, asking him what aid he required. Castillero would naturally, therefore, have presented himself to the Junta immediately upon his arrival; for, besides the invitation of the Junta, and his other reasons for expediting the business, he had engaged the master *318 of the "Don Quixote" to remain for him at Acapulco on her return voyage. This Captain Paty testified he did. But after waiting at Acapulco from the 21st of April to the 18th of May he received news that Castillero would meet him at Mazatlan of San Blas. He touched at those places but heard nothing of him. The circumstance, apparently unimportant, that Castillero determined to rejoin the vessel at Mazatlan, and not at Acapulco, as originally intended, is in precise accordance with the arrangement alleged to have been entered into by him with the Junta, viz.: that he was to receive the sum of $5,000 in the form of a draft on Mazatlan.
The importance of this incidental corroboration is perhaps not great. It seemed, however, worthy of mention.
But with regard to the inferences sought to be drawn against the genuineness of the actas, from conjectures as to the probable time of the arrival of the dispatches in Mexico, it seems to me obvious, on any hypothesis, that those dispatches must have been delivered, and Castillero have arrived in Mexico, in time for him to present himself before the Junta on the 6th, as their minutes show.
From the foregoing, it appears that the evidence on the part of the United States is insufficient, not only to disprove, but even to raise a doubt as to the fact of the reception of Castillero's letters and specimens, or of his own appearance before the Junta at the dates mentioned in the actas of that body.
But it is objected that the documents produced from Mexico are not admissible in evidence.
This objection is based on the ground that all muniments of title are incident to the land, and pass with it as if a part of it.
That, therefore, all archives of Mexico relating to the disposition of public lands in California, were included in the treaty and passed to the United States with the cession of the soil. It thus became the duty of the political power to execute the treaty with reference to the muniments, as well as the land, and until that is done, and the political power obtains those muniments and presents them to the Courts, the latter cannot judicially recognize their existence.
*319 No authority directly in point has been cited in support of this position, but a vivid picture has been drawn of the possible evils which might result if adverse claims to the lands of the United States were allowed to be set up, founded on alleged public records existing in a foreign country, and proved by the depositions and certificates of foreign officials.
It will be seen that this objection would apply, although the genuineness and the sufficiency of the documents to convey title were undisputed. If a public and formal grant of a certain tract had been made, to establish which and to show the proceedings which led to it, evidence from the Mexican archives were necessary; if the Congress had by law conveyed a title to an individual, of which the only evidence existed in the reports of committees and the journals of that body, the principle contended for would require the Court to reject all such documentary evidence, no matter in what way proved or authenticated; for they are to be rejected, not because their genuineness is doubtful, but because they are archives and muniments of title to land.
It is admitted that, as a general rule, the right to muniments of title passes with the land, and he who owns the latter is owner of the evidences of his title to it.
But in the cases submitted to this Court under the Act of 1851, the inquiry always is, who is the owner, the United States or a private individual?
The United States, in consenting to be sued, and in submitting her rights to the determination of Courts, has abdicated, pro tanto, her prerogative as a sovereign, and appears before the Court precisely as any individual who asserts an ownership in land.
To say, then, that all muniments of title belong to the United States as owners of land, and cannot be noticed by the Courts until commended to them by the Political Department of the Government, is to assume the very point the suit was instituted to determine; for the question is  does the United States own the land? The claimant avers that she does not, and never did, and in support of his claim he produces muniments of title which, on the very principle contended for, belong to him and *320 not to the United States, for they are the muniments of title to his own land.
I cannot perceive, therefore, that the familiar doctrine of the common law, which regards title deeds as incident to the land and as passing with it, has any application.
In the argument submitted by the counsel for the United States, the distinction seems to have been lost sight of between the political rights of the United States as a sovereign and her purely proprietary rights as an alleged owner of land, which are alone passed upon in this class of cases.
In defining the boundaries of the Territorial Sovereignty of the United States; in determining whether a particular tract is within the limits of a territory the sovereignty of which has been ceded by treaty to the United States, the Courts must always adopt the construction given to the treaty by the Political Department (Elam vs. Neilson, 11 Peters R. 282). But when the United States consent to appear merely as a suitor in the Courts and to litigate her rights with an adverse private claimant, the rights of both must be determined by the application of the ordinary rules which prevail in actions between private individuals.
It is remarked by the counsel for the United States: "If the Judiciary were authorized to say what land was intended to be transferred, and what papers as muniments of title and incidental to the land, it might designate land and accredit papers which the Political Department did not, and thus conflict might arise within the Government itself."
But this is precisely what the highest authority of the nation has, by the law of 1851, enjoined upon the Courts to do. The very object of that law was, that the Courts should ascertain what lands passed to the United States by the Treaty, and what lands were private and did not pass. The question, by that law, was converted from a political to a judicial one, and no conflict could possibly arise, for the political and all other departments are by law required to be governed by the decision of the Court, which determines what is public land belonging to the United States, and what is private land belonging to individuals.
There is something repugnant to reason and justice in the *321 idea that the United States, after consenting to appear as an ordinary litigant before the Courts, and submit her proprietary rights to their determination, should suddenly, in the midst of the suit, throw off her character as a mere party to a suit respecting the ownership of land, or rather, without ceasing to be such, should resume and assert her sovereign rights, and announce to her antagonist that evidences of title he offers, though genuine and conclusive, shall not be admitted by the Court unless presented to it through and by herself; while, at the same time, she refuses to obtain them from the foreign government, or to receive them, if offered, or to present them to the Court, if received.
Compared with such manifest injustice, the evils which might result from possible impositions practiced on the Courts by means of forged archives, &c., are insignificant.
I think the general objection to the admissibility of the documents, because they are Mexican archives, not recognized as such by the Political Department of the United States Government, cannot be maintained.
Assuming, then, the documents from the archives of Mexico to be genuine and admissible, I proceed to consider their legal effect:
1. As to the alleged ratification of acts of the Alcalde Pico. This ratification is supposed, by the claimants, to be contained in the dispatch of Becerra to the Junta, of May 20, 1846, and in the marginal "acuerdo" on the letter of Vicente Segura, signed with the rubric of the same Minister.
The dispatch of Becerra announces, as we have seen, to the Junta, that "His Excellency [i.e. the President] has been pleased to approve, in all its parts, the agreement made with that individual [viz., Castillero] in order to commence the working of said mine."
The "acuerdo" on the margin of Segura's communication is as follows: "Granted, in the terms which are proposed, and with respect to the land, let the corresponding order issue to the Minister of Relations for the proper measures of his office, with *322 the understanding that the Supreme Government accedes to the petition."
An "acuerdo," or order on the margin of a letter, petition, or communication of any kind, is merely an expression of the determination of the Minister or other functionary to whom it is addressed, in regard to its subject-matter. Its chief use was to direct the clerks or other subordinates in the preparation of the reply, or in taking other action with regard to it. If the proceedings has been interrupted after the "acuerdo" is affixed, but before the dispatch is written or title issued as directed, it may be regarded, not unreasonably, as a species of equitable title, or as sufficient, coupled with other equitable circumstances, to justify the party in asking the completion of the proceeding so initiated. But when the title has issued, or the dispatch been written in pursuance of the "acuerdo," when the latter has been submitted to the Minister, and approved and signed by him, the dispatch so approved and signed is the highest and best evidence, not only of the action of the Government in the premises, but of the true intention of the "acuerdo;" for, surely, no argument is necessary to prove that an official reply, signed by a public officer, is better evidence of his resolution, with regard to a particular application, than a direction to his subordinates as to the form in which the reply is to be drafted.
Dismissing, then the "acuerdo," or rather treating it as intending precisely what the dispatch, prepared in obedience to it, expresses, let us consider the true import and effect of the latter.
It will be observed that the dispatch of Becerra does not, in terms, profess to ratify any mining possession or grant, either of lands or of pertenencias. Nor does it announce that the President has been pleased to make such ratification. It merely informs the Junta that His Excellency has approved an agreement made by the Junta with Castillero.
It is not pretended that any such agreement was, at that time, or afterwards, formally entered into between the parties. The propositions of Castillero are dated May 12th. The communication of the Junta is dated May 14th, and Castillero himself, in *323 the preamble to the statement of his propositions, expresses his persuasion that the Junta will accede to his request "so far as may be within its powers, and that it will send up to the Supreme Government with a recommendation that which may require the decision of the latter."
From the communication of the Junta it is evident that the authorization of the Supreme Government was necessary to enable it to furnish Castillero with the iron retorts and flasks belonging to it, as also to make him the loan he solicited of $5,000, payable in quicksilver at $100 per quintal, and without the five per cent. premium per annum which the law required it to exact.
Until the approval of the Supreme Government of this proposed arrangement could be had, no formal contract could be entered into. It was, therefore, not until May 25th, and after the receipt of Becerra's communication approving the proposed contract, that the Junta resolved "that the proper judicial agreement be drawn up immediately, and that application be made for the draft for the $5,000 on Mazatlan or Guadalajara," as appears by the actas of that day.
That the agreement was never so drawn up and executed is admitted; and on the 29th of May an order was made for the payment of the Notary Calapiz "for proceedings relative to it," its consummation having been prevented by the order suspending all payments out of the quicksilver fund.
The language of the dispatch is, therefore, evidently inaccurate in speaking of the approval of the agreement made or "convenio celebrado" with Castillero. Its evident intention was to signify the approval by the Government of the agreement proposed to be made, and which the Junta had expressed its willingness and even anxiety to enter into.
What the agreement was, which, after the approval of the Government had been obtained, the Junta and Castillero had fixed upon and nearly consummated by a formal act before a Notary, we learn from the Report of the Junta of November 17th, 1846, produced by Señor de Bassoco, and embodied in Mr. Lafragua's report in December of the same year.
*324 In this report, the Junta, after giving an account of the presentation of cinnabar ore, &c., by Señor del Moral, of its assay, and of their inquiry of Castillero what aid he required, proceeds as follows:
"The Señor presented his petition in due form and it having been very attentively examined by the Junta, he made his propositions, to which this Junta agreed, to wit: That there should be delivered to him $5,000 in money, eight iron retorts of those which the Junta ordered to be made for the examinations previously made, and all the quicksilver flasks it had in the negotiation of Tasco; Señor Castillero obligating himself, on his part, to repay said advance in quicksilver at the rate of $100 per quintal, within six months from his leaving the port of Mazatlan. This agreement was approved by the Supreme Government on the 20th of the same month; but on account of the declaration of blockade made by the United States of the North, when he was about to receive the draft on Mazatlan, the Ministry issued the order of September 19th of this year, directing the suspension of all payments of the branch of quicksilver, except those for the support of the College and the expenses of the office."
In this account of the cause, and the date of the abandonment of the agreement with Castillero, the Junta are evidently inaccurate; for their own actas show that the communication informing them of the blockade of Vera Cruz and Tampico, and directing the suspension of all payments for the extraction of quicksilver, was dated on the 27th of May, and received by the Junta on the 28th; and on the 29th, the Notary Calapiz was paid for his proceedings in relation to the intended contract.
The communication of the 19th of September ordered that the assets of the quicksilver fund should continue to be used merely for the support of the College, and it demanded a loan of $25,000 from the Dotal Fund. This was strenuously opposed by some of the members, on the ground that the Dotal Fund was the private property of the creditors of that fund. As these discussions occurred less than two months previous to the date of the report of the Junta, and were no doubt fresh in its recollection, and as the report was prepared in great haste, only eight days *325 being allowed for the purpose, the Junta fell into the error of ascribing the breaking off of the negotiation with Castillero to the order of September 19th, instead of to that of the 28th of May.
But with respect to the agreement made with Castillero, and approved by the Supreme Government, the report is very explicit. It sets forth the terms of that contract with a clearness which leaves no room for doubt as to what it was that the Supreme Government approved.
The agreement thus entered into embraced all the subjects upon which the Junta had authority to act. Nor can it be said that the approval of the Supreme Government was only required as to those propositions of Castillero which related to the ratification of his mining possession and a grant of two leagues, for we learn from the letter of the Junta that that body had no authority, without the approval of the Government, either to sell the retorts and flasks desired by Castillero, or to lend him a large sum without interest, to be repaid in quicksilver. But with the granting of lands, the Junta had nothing to do, and whatever might have been the resolution of the Government on Castillero's seventh and eighth propositions, it would never have been communicated to the Junta in the form of an approval of an agreement into which they were supposed to have already entered.
Some stress has been laid on the use of the word "concedido," or "granted," in the marginal "acuerdo" of Becerra.
Had this word appeared alone, and been written on the margin of Castillero's petition, it might, perhaps, have been considered evidence that the whole prayer of the petition had been granted. But it is written on the margin of the Junta's letter, and clearly imports that its request was granted, viz., that the proposed agreement was approved, as is unequivocally shown by the official dispatch written on the same day, and in pursuance of the marginal order of the Minister.
We shall presently see that the petition of Castillero was for land, and not for additional mining pertenencias.
The acuerdo therefore adds: 
"With respect to the land, let the corresponding order issue *326 to the Minister of Relations, for the proper measures of his office with the understanding that the Supreme Government accedes to the petition."
The corresponding order did issue  we have it in Becerra's dispatch to the Minister of Justice. The proper measures were taken in his office  we have them in his dispatch to the Governor of California: and from it alone can we learn what was done by the Government "with respect to the land" petitioned for by Castillero.
It has already been stated that the Act of Possession of the Alcalde Pico embraced two distinct objects: first, the judicial possession of a mine, with the number of pertenencias allowed by law  but, how many, both the Alcalde and the parties seem to have been uncertain; secondly, a grant of a tract of land extending three thousand varas in every direction, as a "gracia" or gift to Castillero. The distinction between these two acts of the Alcalde is not only admitted but strenuously insisted on by the counsel for claimant, and it was contended that the first was legal and valid, while the second is conceded to be utterly nugatory and void.
When, therefore, Castillero asked that the Junta would recommend the approval by the Supreme Government of the possession which had been given him of the mine, in the same terms as those in which he then held it, he must have intended to ask either for a ratification of the possession of the mine, or for an approval of the grant of three thousand varas of land, or for both.
That he did not ask for three thousand varas to be given him as additional pertenencias, is admitted by one of the able and eminent counsel who argued the cause for the claimant.
In the printed report of his argument, he is asked by Mr. Randolph, of counsel for United States:
You argue, then, that the Junta, misunderstanding this document of Castillero's, supposed it to be for additional pertenencias and as such recommended its confirmation.
Mr. Benjamin.  "Certainly."
But this was not the only error into which the Junta fell; for *327 they not only supposed that Castillero was seeking additional mining pertenencias, and merely a tract of land for his hacienda, &c., as well as two square leagues to supply wood for his burnings, but they supposed the three thousand varas so desired, would only amount to fifteen pertenencias, whereas they would amount to nine hundred. The Junta evidently supposed that Castillero solicited a tract three thousand varas long, and of the width of one pertenencias. As a pertenencias is two hundred varas in length, a tract three thousand varas long would comprise exactly fifteen pertenencias. They overlooked the fact that the tract was to be three thousand varas "in every direction," or six thousand varas square, making nine hundred pertenencias.
If then, the supreme Government had formally and unequivocally signified its assent to this recommendation of the Junta, and ratified the possession as represented by them, it may well be doubted whether in a Court of Equity it could be deemed to have ratified any more than a possession of fifteen pertenencias, which was all that Castillero, speaking through the Junta, demanded.
But the fact, that the Junta thought it necessary to devote so much time, and to suggest so many arguments, to induce the Supreme Government to ratify a supposed mining possession of fifteen pertenencias, justifies the supposition that had they known it to have comprised nine hundred pertenencias, they would probably have withheld their recommendation.
That both the Junta and the Supreme Government were willing to assist the enterprise of Castillero by every means in their power, is evident. Their object in so doing, was not to confer a favor on Castillero personally, but to promote the production of quicksilver in the largest quantities, and at the cheapest rates possible.
The same policy would have forbidden them to give a single miner nine hundred mines, of one pertenencia each, and thereby to exclude from so large a tract all miners who might otherwise have discovered and developed new mines in the vicinity, and increased the production and diminished the price of the metal the Government was so anxious to obtain.
*328 It has appeared to me that the very considerations urged by the counsel of the claimant with regard to the policy and interest of Mexico in promoting the production of quicksilver render it impossible that it could, consistently with that policy, have consented to a monopoly by a single miner of a mining tract of such enormous dimensions.
It is clear, therefore, that the Supreme Government could not have intended to ratify the possession of the three thousand varas as mining pertenencias.
But we have already seen that the approval by the Government of the agreement made by the Junta, is conclusively shown not to import a ratification or grant of any pertenencias or lands whatsoever; for the terms of the agreement so approved are disclosed to us by the Junta itself, and can be ascertained as exactly as if the formal instrument had been executed by the parties, the approval of the Government appended to it, and were now before us.
It does not appear that the Act of Possession of Pico was ever exhibited either to the Junta or the Supreme Government. If it had been, it would have disclosed the fact that the mine had been denounced and possession of it given, as on the lands of José Reyes Berreyesa. It would also have been seen that the Alcalde had assumed to grant a tract three thousand varas in every direction from the mouth of the mine, which must have included a large portion of the land of a private individual, even supposing that the mine itself might not have been within his limits. Adopting the obvious construction of the Act of Possession contended for by the claimants, and regarding that act, and the ratification asked for by Castillero, as referring to a tract of land and not to additional pertenencias, and assuming with the distinguished counsel for the claimants, that the Junta was mistaken in supposing that any number of additional pertenencias, whether fifteen or nine hundred, were asked for, we may well doubt whether the Supreme Government, if informed that this tract would in great part include private property, would have so readily made the grant. We have no reason to suppose that, as between individuals at least, rights of property are not *329 as scrupulously respected and enforced by the Mexican as by other nations.
Again, it is contended that in addition to the grant of three thousand varas in every direction, made by the Alcalde and approved by the Supreme Government, there were also granted to Castillero two square leagues of land, to be measured in like manner from the mouth of the mine.
The mode adopted and the precautions observed by the Supreme Government in signifying its willingness that such a grant should be made, will hereafter be adverted to.
Our only concern with it at present is to observe, that on the claimant's theory, the Supreme Government first ratified a concession of six thousand varas square, or more than a league and a quarter in extent, and then issued orders for a further grant of identically the same land, with three-quarters of a league in addition. Its resolution with regard to the latter is formally and regularly communicated to the Governor of California, who was directed to take the proper steps to carry out the intention of the Government; while with regard to the former, its determination is supposed to be expressed in a declaration that it approves a contract, the terms of which we know, and which has no reference, nor could it have had, to grants of land; and the approval of which, if it could by possibility be construed to mean an approval of all Castillero's propositions would import a grant of the two sitios, as clearly as it would import a ratification of the concession of the six thousand varas square.
But the dispatch of Becerra to the Minister of Relations informs us to what part of Castillero's petition the President thought proper to accede, in language too explicit to be misunderstood.
After transcribing his letter to the Junta, Becerra says: "And I have the honor to transcribe it to your Excellency, to the end that with respect to the petition of Señor Castillero, to which his Excellency the President ad interim has thought proper to accede, that there be granted to him two square leagues as a colonist," &c.
It is insisted by the counsel for the claimants, that the words *330 "that there be granted to him two square leagues as a colonist," are descriptive of the petition of Castillero to which the President acceded. The observation is just. Such is no doubt the true construction of the dispatch, and it establishes beyond doubt, that in acceding to the petition the president meant only to accede to that part of it which asked for a grant of two leagues as a colonist, without expressing any resolution as to the application for a ratification of the concession of three thousand varas.
As, then, the supposed ratification is not contained in the approval of the contract of the Junta, nor in the acceding by the President to the petition for two leagues in colonization, it must be found, if at all, in the word "concedido" or "granted" in the acuerdo. But for the reasons given above, I am satisfied that no such signification can be attached to that word in the face of the dispatches written in pursuance of the acuerdo, and which embody and explain its meaning.
But if any doubt could remain as to the true intention and effect of the approval of the Junta's contract, it would be dissipated by the evidence afforded by the acts of the parties, of the construction placed upon it by themselves.
Throughout the whole negotiation for the purchase of barras or shares in the mine, conducted by Mr. Negrete on behalf of Mr. Forbes with Castillero in person, the latter, though urged to exhibit his documents of title, produces only the dispatch of Castillo Lanzas for two leagues. In the instrument of ratification the mine is spoken of as of three pertenencias in extent, and Castillero "cedes in favor of the contractors of supply (aviadores), and for the sixteen years of his contract, the two square leagues of land of which the Government has made him a concession, as shown by the official document which he presents, that it may be inserted at the end of the present instrument."
The Lanzas dispatch is accordingly copied in the instrument, but not the slightest allusion is made to any other grant of three thousand varas in every direction made by an Alcalde, and approved by the Supreme Government.
*331 In all the transactions between the parties, the idea is but once suggested, that the approval of the Junta's contract with Castillero imported a ratification of the Alcalde's concession of three thousand varas.
It occurs in Alexander Forbes' letter to James Alexander Forbes of February 3, 1850. In that letter Mr. Forbes says:
"We think at present it may be the best plan to get an authenticated copy of the approval by the Mexican Government of the three thousand varas given by the Alcalde on giving possession of the mine. As a doubt may be started as to whether the Alcalde, acting as the Juez de Mineria, had a right to make this grant, yet, if approved by the Mexican Government before the possession of the country by the Americans, there could be no doubt on the subject. This takes in our hacienda, and unless opposed by the Berreyesas, would, I should think, settle the question. Castillero says such an approval was given, and that on his arrival in Mexico he will procure a judicial copy of it. This is the plan we shall adopt, if we hear nothing from you to alter this resolution.
"Since writing the foregoing, I have looked over your private letter to William Forbes, dated 18th October, in which you state the limits or boundaries as follows: `The boundaries must be expressed as joining on the north and northwest by lands of the ranchos de San Vicento and de los Capitancillos, and the east, south and west, by Serrania or Tierras baldias'
"Castillero is not certain of accomplishing this latter plan, but thinks the first, that is the three thousand varas, the best."
It will be observed that this letter unmistakably discloses the "plan," which James Alexander Forbes had suggested, and Alexander Forbes adopted, of obtaining fraudulent and antedated documents from Mexico expressing the boundaries of the two sitios, &c. No reliance can therefore be placed on the statement that Castillero said the approval was given.
But whatever he may have told Mr. Forbes, the approval and the agreement approved are before us, and we have already seen that they contain no allusion to any concession of land by an Alcalde.
*332 The silence of Castillero during his negotiations with Mr. Negrete, is far more significant than any statement made four years afterward to Mr. Forbes, nor can it be said that at the time of those negotiations he was ignorant of the action of Government; for the Castillo Lanzas dispatch, then in his possession, and inserted at the end of the contract of ratification, recites the Becerra dispatch, which contains the approval of the contract. the parties were in Mexico; the public offices were accessible, and it would have been easy to ascertain what was the contract approved. That Castillero knew what that contract was cannot be doubted; and yet he and all the other parties, through a series of years, treat the dispatch as a concession of two leagues, but never suspect it to contain evidence of, or to be in itself, a ratification of the Alcalde's gracia, or gratification. Even so late as the date of Mr. Halleck's affidavit, James Alexander Forbes, with the notarial copy of the Lanzas dispatch in his possession, never seems to have imagined that the dispatch of Becerra inserted in it, and announcing the approval of the Junta's contract, constituted the ratification he so much desired of the Alcalde's grant of three thousand varas.
I think it clear, therefore, that the dispatch of Becerra cannot be construed to import a ratification of the action of the Alcalde, either in respect to the possession of the mine, or to the grant by him of three thousand varas.
As to the alleged grant of two leagues. It cannot be denied, that if the documents produced by the claimants be genuine, they show that Castillero presented a petition for two square leagues of land; that this petition was by the Junta de Fomento submitted to the Supreme Government; that the Junta was formally apprised by the Minister of Justice that the proper communication had been sent to the Minister of Relations, that suitable orders might be issued by him with respect to that part of Castillero's petition; that a communication was accordingly sent to that Minister, informing him that the President had acceded to Castillero's petition and requiring him to issue the corresponding orders; and that the Minister of Relations, in pursuance of these instructions transcribed the communication to *333 the Governor of California, in order that in conformity with what the laws and dispositions on colonization provided, be might put Señor Castillero in possession of the said two leagues.
It is manifest that this dispatch of Castillo Lanzas does not by its terms grant the land solicited. It contains no words translative of title; it is not addressed to the supposed grantee, but to the Governor of California; it cannot have been intended to serve as a muniment of title to Castillero, for otherwise it would have contained formal words sufficient to vest the estate in him. It is merely an official communication addressed by one executive officer to another, which, for aught that appears, might as well have been sent to the Governor of California by a courier as by the hands of Castillero. It contains, however, an unequivocal official declaration that the President of the Republic had thought proper to accede to Castillero's petition, and an order to put him in possession conformably to the laws on colonization.
The case thus resembles in some respects that of United States vs. Lecompte, (11 How. 124,) where the claimant had obtained an order from the Lieutenant-Governor directing the Procurador del Comun to put him in possession, if in so doing no prejudice would result to third persons.
The petition solicited two leagues at the place called Llanacoco, to be located so as to include the entire prairie of that name. The Supreme Court held that the order of the Lieutenant-Governor could not be construed to signify an absolute unconditional grant of any specific land; and, as it was never presented to the Procurador, and the land had never been severed from the public domain by that officer, and no occupation was shown which could supply the deficiency by giving certainty and definiteness to the claim, it was rejected.
If the reasoning of the Supreme Court be attentively considered, it will be seen that they refused to treat the order of the Lieutenant-Governor as an absolute grant, for two reasons: 1st. Because it directed the petitioner to be put in possession, "if in so doing no prejudice could result to third persons," and the matter was referred to an officer, to whom the duty was *334 confided of ascertaining the means, &c., of the petitioner and "judging of the propriety of the grant." And 2d. Because the land was not severed from the public domain by the description in the concession, or by authorized survey, or by any definite occupation.
It may, I think, be inferred from the whole opinion, that if the concession had described any tract which could be identified and the petitioner had occupied it, the claim would have been confirmed, notwithstanding the omission to present the order to the Procurador. In the case at bar, the Governor is ordered to put the petitioner in possession "in conformity with what is prescribed in the laws and dispositions on colonization."
The 2d article of the law of 1824, declares that "those lands of the nation, which are not the property of any individual, corporation or town, are the subject of this law, and may be colonized."
The first step to be taken by the Governor, in execution of the order, would have been to ascertain whether the land was within the colonization law  that is, whether it was the land of the nation, or belonged to any private individual; precisely as the Procurador was to ascertain whether by putting the petitioner in possession, any injury would result to third parties.
To construe this dispatch as an absolute grant of a specific tract, we must suppose Castillero to have practiced on the Government a gross fraud, either by concealing or misstating the facts. For, even admitting that he had reason to believe that the mine itself was not within the limits of Berreyesa, he must have known that a tract of two leagues measured in all directions from the mouth of the mine, would certainly have included a portion of his land.
The counsel for the claimants, feeling, no doubt, the force of this objection, suggested that it was intended that inquiry should be made by the Governor, and the two leagues were to be located in such a way as not to include private land. But this admission proves that the duties to be performed by the Governor were exactly those assigned to the Procurador del Comun, in *335 the case referred to; and if the order to put in possession was not a grant in that case, neither can it be so considered in this.
The case at bar is, in some respects, stronger than that reported; for here, the order was addressed to the Executive of a Department to whom, by the laws, in conformity to which the order was to be executed, it belonged to issue the formal title for the land, while the functions of the Procurador were merely to inquire into and report the circumstances of the petitioner, and to mark off and sever from the public domain the land granted.
Had the Governor and Departmental Assembly, in ignorance of the application of Castillero, and the action of the Supreme Government upon it, regularly granted the same land to another person, in strict conformity with the colonization laws, I cannot doubt that his title, though subsequent in date to the dispatch of Lanzas, would have prevailed; and on the reception of that dispatch the Governor would either have refrained from executing it at all, or would, more probably, have allowed Castillero to take his two leagues out of the nearest body of ungranted land.
In the very ingenious brief filed by the counsel for the United States, it is observed:
"The theory of government for the Mexican Territories or Departments was, that all the powers of government were exercised immediately by the local Political Chief or Governor, through whom the will of the Supreme Central Authority at the City of Mexico was transmitted, and by the action of which functionary, and not otherwise, it became operative on persons and things. It was a government of governments  the plan which Spain established in the beginning for the government of the Indies, and which Mexico continued to this extent without a change. Its model was the organization of an army. It was the same whether the Sovereign's will was expressed in the form of a general law, or some particular disposition like a grant; all were alike instructions to an inferior officer. They were not binding on him until known, nor effective until obeyed  until he had done or suffered another to do that which was required.
"The Local Representative of the National Sovereignty was *336 invested with all the active powers of Government in this Department. He alone could manifest the grantor's will, and from Mexico no more could come than the impulse which should move him to act. In these titles, nothing was done here, even the mining title being an original grant in Mexico. The Local Representative has never acted, and therefore there has been no expression of the grantor's will."
In this lucid exposition of the general theory on which the vast governmental machinery of the ancient Spanish Monarchy, and measurably that of Mexico, were constructed, I entirely concur. But if it be argued that because the will of the Sovereign was ordinarily communicated to and executed by subordinate agents, he had no power himself directly to act upon person and things without intervention of the local authority, I cannot assent to the conclusion; for the will of an absolute Sovereign can be manifested in whatever form he may choose to adopt; and had the King of Spain seen fit to make, under his own hand and seal, a grant to a subject in a remote province, I cannot suppose that the royal patent in the subject's hands would not have been respected by the subordinate authorities, notwithstanding that the title had been transferred, and the grant consummated without their intervention.
Nor is it certain that the order of the Sovereign to a subordinate to make a grant to a subject, or do any other act in the performance in which he is interested, is a mere nullity, until known to and obeyed by the inferior officer.
If, as is admitted, the impulse which moves the subordinate to act, rightfully proceeds from the central authority  if the subordinate has no discretion in the premises, but must obey, and his duties are purely ministerial and executive, it would seem that the sovereign disposition which required him to act, cannot be regarded as a mere nullity, even though never in fact obeyed.
Such, I understand to have been the ruling of the Supreme Court in a recent case, where an order to the Governor that a particular island should be assigned to an individual was held itself "to adjudicate the title;" the formal issuing of the title-papers *337 being a merely ministerial act to be performed by the Governor.
It is true, that, in that case, the order was received and obeyed and the title issued. But, the language of the Supreme Court is explicit, that the dispatch "operated of itself to adjudicate the title to the claimants." This case will be more fully considered hereafter.
But whether a notice of the superior will must have been given to the local representative of the Government, and that will must have been obeyed before it could affect the rights of persons, or the condition of things; or whether, as seems to be considered by the Supreme Court, the sovereign disposition, though unknown to, and unobeyed by, the local authority, had an immediate and independent operation, it is clear that by the uniform practice of the Spanish and Mexican Governments, the dispositions of the sovereign authority always contemplated the instrumentality of the local subordinate.
If, therefore, in this case the Government had known that the tract solicited was public land, and that no objection whatever existed to making the grant, it would have been a signal departure from its ancient and established practice to issue the grant directly to the applicant.
In treating, then, this dispatch as an order to make a grant, we suppose the Government to have conformed to its immemorial and traditional usages. While to consider the dispatch as itself conveying the title, and containing merely an order to the Governor to put the claimant in possession of land already granted to him by the direct act of the Supreme Government, is to suppose the latter to have adopted an exceptional mode of proceeding, inconsistent with that pursued in the island's case, and with the theory on which the whole system of government was organized.
For these reasons I cannot regard the dispatch of Lanzas as a direct grant of the two leagues referred to.
Taking this view of the dispatch, we cannot account for the very explicit declarations of the Mexican Commissioners, that *338 no grants had been made of land in California subsequent to May 13, 1846.
For, even if their researches had extended to the official correspondence of Ministers of Relations who had held office from the date of the declaration, and they had discovered the dispatch of Lanzas, they regarded it but as an order to the Governor to make a grant, which they knew could never have been acted on. The truth of their declarations, therefore, to the American Commissioner, is thus entirely consistent with the genuineness of the documents, while, if the dispatch be considered to import an absolute and present grant, we are driven to choose between two alternatives  one, that the Commissioners were guilty of a deliberate falsehood  the other, that the dispatch itself is a forgery.
But the dispatch, though not itself a grant, is, nevertheless, evidence that the Supreme Government acceded to Castillero's petition; and it is, at least, an order that a grant should be made to him by the Government of California, in conformity with the colonization laws, i.e. if the land were vacant and no other insuperable objection existed.
Giving then this construction to the dispatch, let us consider its legal effect  and here we are fortunately not without authority to guide us.
In the case of Andres Castillero vs. The United States, for the Island of Santa Cruz (23 How. 464), the claimant relied on a dispatch of the Minister of Interior, in many respects resembling that of Castillo Lanzas.
In that dispatch the Minister informs the Governor, that in consideration of the services and merits of Castillero, the President directs him (the Minister) "to recommend Castillero very efficaciously to your Excellency and the Departmental Junta, in order that before proceeding to the distribution which should be made conformably to the laws, and as is directed in the order of this date, of the lands of the islands adjacent to that peninsula, there be assigned to that individual the one which he may select of those nearest to the place where he should reside with the troops under his orders."
*339 It will be noticed that the terms of this dispatch are not in some respects so strong as those of the dispatch of Lanzas.
It is not said that the President has acceded to a petition for any particular island or tract of land. Castillero is merely "recommended very efficaciously to the Governor and Departmental Junta," and this recommendation is made in order that there be "assigned" to him the island he may select, &c.; contemplating, evidently the execution and delivery by the Governor of the formal title for the island so selected. In the Lanzas dispatch, the President's assent to the petition is communicated to the Governor, "in order that he may put Castillero in possession of the land"  an expression which has afforded room for the construction that no further title-paper was designed to be issued.
In the Santa Cruz Island case, the Supreme Court held that "the dispatch of the Government operated to adjudicate the title." Its language is:
"They (the Governor and the Junta) were accordingly directed not to proceed to make adjudications under the previous order until the assignment of the title to this claimant was perfected, but they were not required to make the assignment or to cause it to be made.
"To accomplish that purpose, and to carry into effect the command of the President, two things only were necessary to be done; one was to be performed by the claimant, and the other was a ministerial act. It was the claimant who was to make the selection, and if it was a proper one, near the place where he was stationed with his troops, nothing remained but to make the assignment as described in the dispatch. Emanating as the dispatch did from the supreme power of the nation, it operated of itself to adjudicate the title to the claimant, leaving no discretion to be exercised by the authorities of the Department. Neither the Governor nor the Assembly nor both combined, could withhold the grant after a proper selection, without disobeying the express command of the Supreme Government. Nothing therefore, remained to be done, but to issue the title-papers, and that was *340 the proper duty of the Governor as the Executive organ of the Department.
This language would seem too clear for misconstruction. It seems to me an express decision, that an order of the Supreme Government directing the Governor of a Department to make a grant, operates to adjudicate the title to the land specified. It could not, however, have been meant that the order itself was an absolute grant; for it was evident that the formal grant was to be made by the Governor, and besides it did not refer to any particular island, but to such island as Castillero might select; and it was only after the selection was made and found to be a proper one, that the title attached to any particular piece of land.
If such were the effect of the order of Pesada, I am unable to perceive why the Castillo Lanzas dispatch must not be considered to have had a like operation. The direction in that dispatch to the Governor to put Castillero in possession in conformity with the laws and dispositions on colonization, confided no more discretion to him than the duty of seeing that the island selected was a proper one, confided to the Governor in the case before the Supreme Court; and if the issuing of the title-papers in that case was a "merely ministerial act," to be done in respect of land, the title of which had already been adjudicated to the claimant, the same view must be taken of the action, which construing the Lanzas dispatch least favorably for the claimants, Governor Pico was in this case ordered to take.
It is contended that the President of Mexico had no authority to make the order for a grant contained in the Lanzas dispatch.
But, 1st. It is apparent, both from the action of the Supreme Government in this case, as well as in that of the islands on the coast, that it exercised the power.
The presumption, therefore, arises, that it had the authority it exercised. "The public acts of public officers purporting to be exercised in an official capacity, and by public authority, are not to be presumed to be usurped, but a legitimate authority previously given or subsequently ratified, which is equivalent." The United States vs. Arredondo, (6 Pet. 728.)
*341 2. The Colonization Law of 1824, while it enjoined upon the States of the Confederation the duty of making laws or regulations for colonizing within their respective limits, committed the whole subject of colonization in the Territories to the Supreme Executive.
The 16th article of that law provides, that `the Executive shall proceed in conformity with the principles established to the colonization of the Territories."
In pursuance of this authority the Supreme Executive, in 1828, framed the regulations which prescribed the mode in which the colonization of the Territories should be effected.
It was from the dispositions thus made by the Supreme Executive, that the Governor and Junta in the Territory of California derived all their powers with respect to the granting of land.
Had the President seen fit to confide the authority to grant, either to the Governor alone, to the Prefects of the Partidas, or to local Commissioners, he might have done so, or he might have retained it exclusively to himself.
The regulations, in fact, provided that concessions made by the Governor should not be definitely valid unless approved by the Departmental Assembly; and, in case its approval was not obtained, the Governor was to report to the Supreme Government for its decision.
Grants made to "empresarios" were, by the 7th regulation, not to be held as definitely valid until the approval of the Supreme Government was obtained.
It thus appears, not only that the authority of the Governors with respect to colonization was not immediately conferred by any law of Congress, and owed its existence to discretionary regulations of the Supreme Executive, but that by those very regulations the Executive reserved to itself an important part of the granting power. After the adoption of the Central System, and the division of the whole Republic into Departments, the right to dispose of all the lands belonging to the nation seems to have been confided to the Supreme Executive. The Law of 1837 gave to the President authority to sell or pledge *342 them, and by his decree of 11th of March, 1842, other important and fundamental changes in the colonization laws with regard to foreigners were made by General Santa Anna.
It is said by making a grant directly to an individual, or in directing the Governor of a Department to make one, the President violated an existing law, which even an absolute monarch cannot do; for he may abrogate or modify the law, yet while it remains unrepealed he cannot violate it.
The general principle is admitted, but its application to this case is not perceived.
That the President, by the law of 1824, could have reserved to himself the whole right of making grants in the Territories, has already been shown. Such a disposition, though not in accordance with the ordinary policy of the Spanish and Mexican Governments, which intrusted the administration of local affairs to local subordinates by whom the orders of the Supreme Government were carried into effect, would, nevertheless, have been legal and within the limits of the discretion confided to the Executive by the law of 1824.
This power he still retained, notwithstanding that he had framed general regulations on the subject for the guidance of the Governments of the Territories; for those regulations were the mere creature of the President, and could not deprive him or his successors of the general powers given him by law, or of the right to act directly in special cases by making the grant himself, or by ordering the Governor to do so.
The Governor of a Department had no power to grant lands by virtue of his office, or conferred on him as such by law.
All his authority to grant was derived from the regulations of the Executive, of whom he was but the agent and the instrument. He was at all times subject to Executive instructions, and the President might at his discretion withdraw any lands from colonization, prescribe new qualifications for grantees, or in any other manner modify the Governor's authority with respect to grants, or direct him as to its exercise.
That he did so interpose with regard to certain Mission lands which the Governor and Assembly were about to grant is well *343 known, and this Court has decided grants in violation of the order of the Executive to be invalid. The islands cases and the case at bar furnish additional instances of the exercise of the same power.
I confess myself unable to understand how a grant by the President, still less an order to his local subordinate to make a grant can be deemed such a violation of the law as no absolute monarch could commit, or indeed any violation of law whatsoever.
3d. The question is decided by the Supreme Court in the case which has been referred to.
If the Supreme Government had power to direct the title-papers to be issued, and the dispatch operated to adjudicate the title in that case, it must be deemed to have possessed the same authority, and a similar operation must be attributed to the dispatch in the case at bar.
But it is urged that a distinction should be drawn between the cases, on the ground that islands on the coast were not within the Colonization Law of 1824, and therefore might be granted directly by the Supreme Executive, but that he had no authority to act in relation to lands embraced within the provisions of that law, except in obedience to it, and in conformity with the regulations of 1828.
It has already been shown that under the Colonization Law the President had authority either directly to grant, or to order the Governor to grant, public lands in the territories. But his power to grant islands was also derived from the same law, and in making the grant of the island of Santa Cruz, the validity of which has been affirmed by the Supreme Court, he acted in strict obedience to it.
It will also be seen that the judgment of the Supreme Court is not based on the supposed existence of any authority in the Executive not derived from the law of 1824; and also that his right to repeal or modify at his will, in a particular case, his own general regulations which imposed rules on the subordinate local authorities, is impliedly recognized in the decisions referred to.
*344 The 4th article of the law of 1824 provides, that "the lands embraced within the twenty leagues bordering on any foreign nation, or within ten leagues of the seacoast, cannot be colonized without the previous approbation of the Supreme Executive power."
As by the previous section of the law, the Congresses of the various States were directed to enact laws and regulations for colonization within their respective territories, while by Art. 16 a similar duty was enjoined upon the Supreme Executive with respect to lands within the territories, it is obvious that the 4th article was intended chiefly to restrict the power of the States rather than that of the Executive, whose assent to the grant was all that was required.
In the case of The United States vs. Arguello, (18 How., 548,) it was held by the Supreme Court that the "colonization" spoken of in the 4th article must be construed to mean colonization by foreigners, and not the distribution of lands to individuals and families.
The power of the Governors of California to grant lands within the ten littoral leagues might perhaps have been sustained, even if the 4th article be construed to apply to grants to individuals, on the ground that the absence of any express prohibition in the regulations, and the constant exercise of the power with the full knowledge of the Supreme Government, authorize the presumption that the approval required by the 4th article was in act given.
However this may be, it is clear that the Governors of California did not assume to grant the islands on the coast without the previous permission of the Supreme Government. Application for such permission was accordingly made, and it was finally communicated to the Departmental authorities in the dispatch of Pesada of July 20, 1838.
When, therefore, the President ordered a grant of an island to be made, which order the Governor obeyed by issuing the title-papers the grant was in strict conformity with the colonization laws.
For that law confided to the Supreme Executive, as has been *345 observed, the whole subject of colonization within the territories, nor did it impose any limits on the exercise of his discretion, except that the colonization was to be conducted according to the principles established by the law.
Those principles were of a general character, and fixed nothing as to the particular agencies or mode to be adopted in conferring the title upon the colonist.
In the case of lands within the ten littoral leagues, the law itself forbade their colonization without the previous approbation of the Supreme Executive power. The general regulations therefore, by which the Supreme Executive authorized the Governors and Juntas of the Departments to grant public lands, were never construed to authorize them to grant the islands on the coast, and as observed by the Supreme Court, the power to make such grants was neither claimed nor exercised by the Departmental authorities prior to the 20th day of July, 1838, when the "previous approbation of the Supreme Executive" required by the law was communicated to them.
That approbation having been thus obtained, the Departmental authorities proceeded to grant; and in so doing acted in precise conformity with the colonization laws.
It had appeared to this Court, that the effect of that dispatch was simply to communicate to the Departmental authorities the assent of the Supreme Executive that the islands should be granted, and thus to bring them within the general regulations which prescribed the mode in which all grants should be made.
Those regulations required the concurrence of the Departmental Assembly to give definitive validity to the grant by the Governor; but inasmuch as the Supreme Court had decided that even without the concurrence the grant was valid, unless the grantee's right had been forfeited by abandonment, it seemed to me that a similar rule should be observed with respect to the grants of islands, which, by the previous assent of the Supreme Executive, had been brought within the general regulations.
This view, however, the Supreme Court decided to be erroneous, and held that the dispatch prescribed a new rule on the subject, and that the general regulations did not apply to it. *346 The mode of granting indicated in the dispatch of Pesada was therefore, to be strictly followed, and inasmuch as the Departmental Assembly had not concurred, the grant to Osio was adjudged to be void.
But the reversal of the decision of the District Court on this point, in no way shows that the Supreme Court did not consider grants of islands, when made in pursuance of either the general or special regulations of the Executive, as not made under the colonization law.
On the contrary, it appears to me manifest, that neither in the case of Osio, nor in that of Castillero, do the Supreme Court base their decision on the idea that grants of islands were not within the colonization law of 1824; but that they reject the first claim, because in their opinion the grant was not made in the manner prescribed by the Executive, to whom that law committed the whole power over the subject, and they confirm the second claim because the Executive instructions were followed. It is explicitly stated in the opinion, "that it is immaterial whether or not the power to grant the islands on the coast was vested in the Governor," (i.e. by the General Executive regulations of 1828), for the effect of the dispatch "was to repeal the previous regulations on the subject, and to substitute a new one in their place."
As this power of making regulations, with respect to colonization in the territories, was conferred, in terms, on the Supreme Executive, by the Colonization law, and was precisely that which it exercised when the General Executive regulations of 1828 were framed, I confess myself unable to perceive how a grant of an island on the coast, made in obedience to Executive instructions, was not, in every respect, a grant under the Colonization laws, nor can I discover any foundation for the distinction attempted to be drawn between the case at bar and that of the island of Santa Cruz. The lands, in both cases, were open to grant under the general law; and even, if the granting of the islands on the coast to individuals be considered to be embraced within the provisions of the 4th article, and that grants of lands within the littoral leagues were not, the only distinction between *347 the cases would be, that in one the previous assent of the Executive was necessary, while in the other it was not. Each, when regularly granted, must be held to have been granted under the colonization laws. When, therefore, in the Santa Cruz Island case, the Supreme Court held that the dispatch of the Minister, ordering one of the islands to be assigned to Castillero, "operated to adjudicate the title," the same construction must be given to the dispatch in this case, which states that the President has acceded to a petition for two leagues, and orders the Governor to put the petitioner in possession.
As, then, the Lanzas dispatch "operated to adjudicate the title" to the claimant, he must be held to have acquired an inchoate title, which, if founded on such equitable considerations as would have bound the former Government to complete it by issuing the formal title-papers, this Government is equally bound to respect.
Had the claimant been an ordinary colonist, and relying on the action of the Supreme Government on his petition, settled upon and occupied the land, building a house upon and cultivating it, and had the United States found him in the enjoyment of an undisputed possession, it cannot, I think, be doubted that his possession would have been undisturbed and his title confirmed, even though he had neglected to obtain from the Governor the formal grant.
But no such possession was taken in this case, nor was the concession received in California or even known to have been made, until after the subversion of the Mexican authority.
The question therefore arises: Were there any antecedent equitable considerations on which the concession was founded, such as would have bound the conscience of the Mexican Government to perfect it?
That an antecedent consideration, such as the patriotic and public services of the grantee, is one which a Court of Equity cannot disregard, has been expressly decided by the Supreme Court.
In the case of Fremont vs. the United States, the Court says:
"The grant was not made merely to carry out the policy of *348 the colonization laws, but in consideration of the previous public and patriotic services of the grantee; and although this cannot be regarded as a money consideration, making the transaction a purchase from the Government, yet it is the acknowledgment of a just and equitable claim, and when the grant was made on that consideration, the title in a Court of Equity ought to be as firm and valid as if it had been purchased with money on the same conditions." 17 How. 558.
If, then, antecedent considerations of this nature are to be looked to, in determining whether the former Government was under any equitable obligation to perfect the title of the claimant, it is perhaps not easy to imagine a case where the merits of the petitioner and the consideration rendered by him for a small tract of land in a remote Department could be greater.
The immense value of the discovery he had made to the great mining interests of Mexico, need not be dwelt upon. Our own experience in California enables us at once to appreciate how indispensable is an ample and cheap supply of quicksilver to the development of mines of the precious metals. But to Mexico the discovery was, as justly observed by one of the counsel for the claimants, "the unsealing of a hidden fountain of wealth, as precious to her as the rains and dews and living streams are to the nations that live by tillage."
For years it had been the policy of Mexico to stimulate explorations for and to encourage the working of quicksilver mines. By the laws of February 20, 1822, and 7th October, 1823, which imposed duties on gold and silver, quicksilver was expressly exempted from contribution.
In 1842, the Junta de Fomento was established, and empowered "to fix the mode in which the working of quicksilver mines was to be supplied, rewarded, stimulated and protected."
By the decree of May 24, 1843, rewards of $35,000, and of $5 per quintal, were promised to successful miners; and by the decrees of July 5th and September 25th of the same year, the Junta was empowered to work, to supply and protect quick silver mines, and to cause researches for them to be made throughout the Republic.
*349 When, therefore, Castillero announced the discovery of a mine surpassing in richness that of Almaden in Spain, upon which Mexico had so long been dependent, and desired a grant of two leagues in a Department where land was commonly distributed gratuitously in tracts five times as large, he had equitable claims upon the Government far surpassing "the public and patriotic services of Alvarado," which the Supreme Court declares to have been an equitable consideration, as strong as if the grant had been purchased with money.
Compared with the service rendered and about to be rendered to the Mexican nation by Castillero, the consideration on which the ordinary colonization grants were founded was insignificant; for that consideration merely consisted in building a house, cultivating a few acres of an immense tract, and suffering wild cattle to roam at will over the remainder.
The fact that he was working the mine showed that Castillero had already effected a settlement upon the land, and its further development insured an accession to the population of the country far greater than could have been obtained by any other disposition of the public domain.
The purpose for which he sought the land, apprised the Government that it was of a kind not usually fit for cultivation, for it was required to supply wood for his burnings. In thus assisting his enterprise, the nation had as great an interest as Castillero himself, for it was the attainment of an object to which their attention, their efforts, and no inconsiderable portion of their revenues had long been devoted.
It has appeared to me that all these circumstances constitute an equitable consideration for the inchoate title or concession obtained by Castillero, and that they were sufficient to create an equitable obligation on the former Government, and therefore, on this, to complete and make good the inceptive rights he had acquired.
It is urged by the counsel for the United States, that even if the Castillo Lanzas dispatch be considered a grant, it nevertheless is void, because no possession of the land was given before the 7th of July, 1846, when the Mexican authority in California was *350 subverted, and the United States acquired the land by the adverse title of conquest.
It is not denied that, as maintained in the brief of the counsel for the United States, in questions of prize or no prize, the liability of the property captured to condemnation depends upon the fact whether the possession and actual control of it have passed from the hands of the enemy to those of a neutral.
Nor is it questioned that, where the territory is ceded by one Sovereign to another, the nationality of the inhabitants of the ceded territory is not changed until the stipulations of the treaty are executed by a formal delivery given, and by possession taken.
It is also admitted that, by the Roman law, and by most systems of jurisprudence, the property in a thing cannot be transferred without a delivery of the possession of the thing, either actual, or feigned and constructive; and that ordinarily, he who first obtains possession shall hold the thing even as against a prior purchaser, to whom it has not been delivered. In the transfer of land the same principle prevailed at the common law, and a symbolical delivery of the land, or livery of seizin, was indispensable to render a feoffment operative.
This, however, is now unnecessary in conveyances under the Statute of Uses.
In the grants made by the Governors of California, we accordingly find that "the judicial delivery of possession by the corresponding Judge" was always contemplated. This proceeding would seem to have been designed for a double purpose: 1st. To complete the transfer of the property, by a formal delivery or tradition of the thing, thus adding the jus in re to the jus ad rem; and, 2d. To designate and sever from the public domain the tract granted by measuring its extent and establishing its boundaries.
Whether, if the boundaries are distinctly designated in the grant, the judicial delivery of possession was in strictness necessary to complete the right of property in the grantee, may be doubted; for at common law the King's grant was held to import *351 livery of seizin, and the same principle is said to prevail at civil law.
But whether technically necessary or not, it is settled by the decisions of the Supreme Court, that the want of a judicial delivery of possession is no obstacle to the confirmation of a grant of lands in California.
The occupation and settlement which, in the Louisiana and Florida cases, were considered to constitute the true grounds of the claimant's equity, were required by the Supreme Court to be shown, not because the technical rule required a formal delivery of possession to complete the transfer of the right of property, but, because the petitioner, by occupying and cultivating his land under an inchoate title, and an implied promise of a grant, had rendered to the former Government a consideration which bound its conscience and that of its successors to perfect the title.
The question then, in this and other cases, is not whether a formal and technical delivery of possession has been made, but whether a consideration has been given for the grant, either antecedent by public services, the payment of money and the like, or subsequent, by occupation, settlement, &c., which in equity required the former Government to convert the inchoate title actually obtained into a perfect title. If, at the acquisition of the country, the conscience of the former Government was bound by this obligation it is equally binding upon us; and the claimant, whether a resident or a foreign Mexican, has a right of property which the United States have agreed by the treaty to respect.
Whether the consideration rendered, and the equitable claims on the bounty of the Mexican Government possessed by Castillero, are sufficient to create such an obligation, is a question which, perhaps, depends rather on the spirit in which his claims are looked upon, than upon any definite rule of law. It has appeared to me, as before stated, that the consideration rendered by him to the Mexican Government did not merely constitute a claim upon its bounty; but that when he had obtained the assent of the Supreme authority to a grant of a specific tract *352 of land, when orders had been issued to make him a grant and to put him in possession, the execution of which was prevented solely by the outbreak of war, the inchoate title so obtained ought to be respected by the United States.
But if the fact of possession and occupation be insisted on as indispensable, it is to be remembered that the land solicited and ordered to be granted to Castillero, was two leagues "on the land of his mining possession."
It is not disputed that early in December, 1845, he had occupied and worked the mine.
Possession of it had been given to him by the Alcalde, in a loose and informal manner, it is true, but still sufficient to give an official sanction to his occupation, more than six months before the conquest of the country; and from December, 1845, he and his assigns have continued to hold it. As, then, the mine was within the two leagues solicited, and as he had already taken possession of, and was working it, he may, perhaps, be considered, after the order of Lanzas was issued, to have been in possession of the lands referred to in that order.
In no cases was any other possession taken by the California rancheros of the large tracts  sometimes eleven square leagues in extent  granted to them, than by building a rude house of abode, cultivating a small portion of the land, and stocking the remainder with a greater or less number of wild cattle or horses.
I am aware that in this view of the claimant's equities, I have the misfortune to differ from the Circuit Judge.
But on the best consideration I have been able to give to the subject, it has appeared to me not only warranted by the decisions of the Supreme Court, but in accordance with the dictates of the enlarged, and, so to speak, generous justice, which should animate a great and a conquering nation in dealing with the rights of the vanquished.
But it is said that if Castillero obtained from the Supreme Government a grant of two leagues on his mining possession, it proves one of two propositions,  either that he was guilty of a gross fraud in suppressing the fact, that such a grant would include private land, or that the Supreme Government committed *353 a violation of law equally gross, in attempting to grant the lands of private individuals.
Had the title set up been a formal and absolute grant of two leagues, to be measured in every direction from the mouth of the mine, the observation would have possessed much force. But such is not the import of the Lanzas dispatch; on the contrary, it directs the Governor to put the petitioner in possession of the land solicited, "in conformity with the laws and dispositions on colonization," a direction which rendered it certain that, in the location of the grant, private rights would be respected. Had the Supreme Government known that a tract of two leagues, measured in every direction from the mouth of the mine, would include private land, the precautions used in framing the order to the Governor would have sufficed for the protection of the owner; and the dispatch is, in effect, but the expression of the President's assent to a grant of two leagues on land of the petitioner's mining possession, and an order to the Governor to execute the grant; provided, and so far as it could be done, without injury to third persons.
It cannot, therefore, be inferred from this dispatch, either that Castillero practiced a fraud on the Government, or that the latter committed, or intended to commit, a violation of any private rights whatever.
The last objection to the validity of the Lanzas dispatch which I shall notice, is that contained in the seventh division of the printed argument filed by the counsel for the United States.
The same point had been raised and fully considered by the Court in the case of Palmer vs. The United States. As the decisions of this Court have not been reported, it has been thought most convenient to append that opinion to this, adding to it such further observations as may seem appropriate:
"Before proceeding to an examination of the merits of this case, a general objection to the validity of the grant must be considered. The grant purports to have been executed on the 25th of June, 1856, subsequently to the declaration of war between the United States and Mexico.
*354 It is contended, on the part of the United States, that on general principles of public law, grants made flagrante bello when conquest has been set on foot, and actual occupation is imminent and inevitable, have no validity against the subsequent conqueror. The question has not heretofore been presented to this Court. It has been discussed with much ingenuity and ability.
It is urged that in the conduct of war, and the determination of its objects, the political department is supreme; and that the judiciary are bound by the view taken by the political branch of the Government; that, although Congress has alone power to declare war, to the Executive is given the right of shaping it to its ends, or of declaring its objects.
To ascertain its objects, resort must, therefore, be had to Executive acts, and as the Executive acts in this case unequivocally indicate that a principal object of the war was to acquire California, that acquisition was thus brought within the scope of the war, and must be so regarded by the Courts.
To this point, the case of Harcourt vs. Gaillard, (12 Wheat.,) is cited.
Such being the object or scope of the war, it is urged that the intended conquest of California embraced not only the establishment of sovereign rights in the Territory, but also the acquisition of the public property within it.
That the proprietary rights to be acquired by the conquest are as essential, though not as important a part of the fruits of conquest, as the political, the commercial, and other advantages proposed to be obtained, and that no part of these objects of the conquest is to be ignored.
The conquest of California, including the acquisition of the public domain, having been thus shown to have been the object, or brought within the scope of the war, it was urged that any grants of public land made after the conquest was projected and when it was about to be effected, though before it actually occurred, must be deemed to be in fraud of the rights of the incoming conqueror, and invalid as against him.
The foregoing statement is believed to present the outline of the argument submitted on the part of the United States.
*355 Both the premises and the conclusion must be examined.
If the conquest of California was the object of the war, it must be so considered because that object was avowed by competent authority when war was declared; or because it was made the object of the war, after its commencement, by the political branch of the Government.
It may be admitted that this Government had long regarded California, or the Bay of San Francisco, as an important and desirable acquisition. The instructions of the President to Mr. Slidell indicate the wish of the Executive to obtain it by purchase and cession, as Louisiana and Florida have been acquired.
It by no means follows that the intention to obtain it by force of arms, or conquest, can be attributed to Congress, still less that such was its object or motive in declaring war.
The law by which war was declared, recognizes it as previously existing by the act of Mexico; and it is known that hostilities arose by the invasion by Mexico of a territory claimed by the United States to be within their limits. Such was not, therefore, the object for which war was declared, or its existence recognized  nor could it constitutionally have been.
It is observed by Mr. Chief Justice Taney, in Fleming vs. Page, (9 How., 614,) "The genius and character of our institutions are peaceful, and the power to declare war was not conferred upon Congress for the purpose of aggression or aggrandizement, but to enable the General Government to vindicate by arms, if it should become necessary, its own rights and the rights of its citizens. A war, therefore, declared by Congress, can never be presumed to be waged for the purpose of conquest or the acquisition of territory."
As a limitation upon the power of Congress, this distinction may, practically, be unimportant. As every war in which the country may be engaged must be regarded by all branches of the Government, and even by neutrals, as a just war; and as nations can readily cloak a spirit of rapacity and aggression under professions of justice and moderation, it is at all times easy, should our country be actuated by such a spirit, to declare an aggressive war, to be undertaken in self-defense and an intended *356 conquest to be desired only as a compensation for past or security against future injuries.
But the distinction is important when a Court is asked to presume that conquest was the object of the war.
Under our Government, at least, such a presumption cannot be indulged.
The conquest of California being thus shown not to have been the object for which war was declared, we may next inquire whether, by the acts of the Executive under its power to conduct the war, it became such, or was brought within its scope, in the sense in which the phrase was used at the bar?
In his annual message to Congress, in December, 1846, the President distinctly states that the war originated in the attempt of Mexico to re-conquer Texas to the Sabine. After adverting to the considerations which had induced the Executive to interpose no obstacles to the return of Santa Anna, the latter being more favorably disposed to peace than Paredes, who was then at the head of affairs, the President observed: `The war has not been waged with a view to conquest, but having been commenced by Mexico, it has been carried into the enemy's country, and will be vigorously prosecuted there, with a view to obtain an honorable peace, and thereby secure ample indemnity for the expenses of the war, as well as our much injured citizens, who have large pecuniary demands against Mexico.'
Similar declarations are frequently and emphatically repeated by the President in various communications to Congress, and in the correspondence between the American Commissioner and the Mexican authorities.
The object of the war, therefore, as indicated by executive acts and declarations, was not conquest; or, if conquest, it was that of a safe and honorable peace.
It is true, that after the military occupation of California, and after our arms had been everywhere successful, and perhaps at the commencement of hostilities, the Executive and the nation may have confidently anticipated that by the treaty of peace we would acquire California. As Mexico was known to be impoverished, and distracted by civil dissensions, it was obvious *357 that the only indemnity she could afford us for the expenses of the war was the cession of a portion of her territory.
The instructions of the Secretary of State to Mr. Trist, show that the extension of the boundaries of the United States over New Mexico and Upper California, for a sum not exceeding $20,000,000, was a condition sine qua non of any treaty.
The extraordinary success of our arms, the fact that we already held possession of a great part of the territory of the enemy, and virtually of his capital, our great expenditures of blood and treasure, entitled us to retain a portion, at least, of our conquest as the only indemnity we could obtain. But we were willing to restore a considerable part of our possessions, and to pay for that retained by us a large amount of money.
But such views and intentions on the part of the Executive, as to the condition on which the war should cease, are very different from waging it with a view to conquest. The war cannot, then, in any just sense, be deemed to have been declared by Congress, or conducted by the Executive, with a view to conquest.
The power of the President in the conduct of the war was that of a commander-in-chief of the army and navy. He had authority to direct and control military operations. As part of the treaty-making power, he could determine when and on what conditions a treaty of peace should be made. But he had no power to impress upon the war a purpose different from that with which it was commenced, and which, as Mr. Chief Justice Taney, declares, Congress could not constitutionally entertain. `The law declaring war,' observes the same great authority in the case above cited, `does not imply the authority to the President to enlarge the limits of the United States by subjugating the enemy's country. The United States, it is true, may extend its boundaries by treaty or conquest, and may demand the cessation of territory as the condition of peace, to indemnify its citizens for the injuries they suffered, or to reimburse the Government for the expenses of the war.
`But this can be done only by the treaty-making power, or the legislative authority, and it is not a part of the authority *358 conferred upon the President by the declaration of war. His duty and his power are purely military. As commander-in-chief, he is authorized to direct the military and naval forces placed by law at his command, and to employ them in the manner he may deem most effectual to harass and conquer and subdue the enemy. He may invade the hostile country, and subjugate it to the sovereignty and authority of the United States. But his conquests do not enlarge the boundaries of the United States, nor extend the operations of our institutions and laws beyond the limits before assigned them by the legislative power.'
It is true that in the case in which these observations are made, the point to be determined was, whether enemies' territory, which in the course of hostilities had come into our military possession, became a part of the United States, and subject to our general laws. But they are important to this case as defining the power of the President in war, to be merely that of the military commander-in-chief; that territory can be acquired only by the treaty-making and legislative authority, and, consequently, that the fact that hostilities are by the military authority directed against a particular portion of the enemy's territory, cannot be said to make the acquisition of that territory the object of the war.
It is therefore apparent that the war with Mexico cannot be regarded by the judicial department of this Government as commenced, or conducted, with the object of effecting the conquest of California.
The most that can be said is, that its military occupation was effected as a means of crippling and subduing the enemy, and with the expectation, on the part of the Executive, that we would retain and finally insist upon the cessation of the territory so subjugated by our arms as an indemnity for our injuries and expenses.
The nature and amount of indemnity to be required, the extent of territory to be ceded, depended upon the will of the Senate and the Executive as the treaty-making power, and until that will was expressed in the treaty, the intention to effect the permanent acquisition of all California cannot be attributed to the *359 political power, any more than a similar intention with regard to those conquests which at the close of the war was restored.
If, then, it were a principle of public law that all alienations of public domain by a sovereign are invalid as against an enemy who has commenced or is prosecuting a war, with the object of conquering the territory within which the property is situated, or who has set on foot expeditions for the purpose, with sufficient power to attain the end, as proved by the event, the facts of this case would hardly admit of its application.
But assuming the facts as contended for by the United States, we proceed to inquire whether such a rule of law exists. The right of Mexico to dispose of her public domain in California before the war is admitted. It is not denied that that right ceased, as against the United States, when the latter effected the conquest of the country, and subverted the Mexican authority.
If it ceased before the actual conquest and displacement of the Mexican authority, it must be because the determination of the United States to effect the conquest, and the making preparation to carry out its determination, gave to the latter some inchoate or inceptive right to the territory subsequently conquered, and the title consummated by the conquest relates back by a kind of fiction to the date of its inception.
We have been unable to discover any trace or intimation of such a doctrine in any writer on the laws of war.
The rights derived from conquest are derived from force alone. They are recognized because there is no one to dispute them, not because they are, in a moral sense, rightful and just. The conquest of an enemy's country, admitted to be his, is not, therefore the assertion of an antecedent right.
It is the assertion of the will and the power to wrest it from him.
Even where a conquest is effected to obtain an indemnity justly due, it is not the assertion of any antecedent right to the particular territory conquered, but only of the general right to a compensation for injury.
The right of the conqueror is, therefore, derived from the conquest alone. It originates in the conquest, not in the intention *360 to conquer, though coupled with the ability to effect his purpose, nor even in the right to conquer as means of obtaining satisfaction for injury.
It is the fact of conquest, not the intention or power to conquer, which clothes him with the rights of a conqueror.
The rights acquired by the conquest are temporary and precarious until the jus post liminii is extinguished; and if a reconquest is effected, the rights of the sovereign who has temporarily been displaced revive, and are deemed to have been uninterrupted.
The term `title by conquest' expresses, therefore, a fact and not a right. Until the fact of conquest occurs, the conqueror can have no rights. To affirm that a title acquired by conquest relates back to a period anterior to the conquest, is almost a contradiction in terms.
Until, then, the conquest is effected, the rights of the existing sovereign remain unimpaired. He can, therefore, dispose of the public property at his discretion, nor can that right be effected by the determination of an enemy to conquer the territory, and by his preparations for the purpose, though the event may demonstrate the conquest to have been practicable.
The case of Harcourt vs. Gaillard has been cited by the counsel of the United States in support of the doctrine contended for by them.
The distinction between that case and the case at bar is obvious.
In Harcourt vs. Gaillard the question was as to the validity of a grant by a British Governor of land within a territory claimed to belong to the United States. As our Government had asserted and maintained by arms its title to the disputed tract, the Judicial Department were not at liberty to declare the claim to be wrongful, and to recognize the right of any other Sovereign over the territory in question.
The title of the United States was in no sense acquired by conquest, Her title was antecedent to the war  it was merely maintained by arms and recognized by the treaty of peace.
The question presented was, in the language of the Court *361 `one of disputed boundaries, within which the power that succeeds in war is not obliged to recognize as valid any acts of ownership exercised by his adversary.'
Had the claim been that of conquest alone, the case would have presented, says the Court, more difficulty. `That ground would admit the original right of the Governor of Florida to grant, and if so, his right to grant might have continued until the treaty of peace, and the grant to Harcourt might, in that case, have had extended to it the principles of public law which are applicable to territories acquired by conquest, whereas the right set up by South Carolina and Georgia denies all power in the grantor over the soil.'
The distinction is made still more apparent in a subsequent part of the opinion of the Court: `War is a suit prosecuted by the sword; and where the question to be decided is one of original claim to territory, grants of soil made flagrante bello by the party that fails, can only derive validity from treaty stipulations. It is not necessary here to consider the rights of the conqueror in case of actual conquest.' (P. 528.)
The latter is precisely the question to be considered in the case at bar.
The argument of the counsel for the United States can, therefore, derive no support from the case referred to.
It is proper, however, to observe that the case of Harcourt vs. Gaillard, was not cited by the counsel as directly in point. It was thought to establish that all grants of territory brought within the scope of the war are invalid; that the case of disputed boundaries presents one illustration of the general principle, while the case at bar furnishes another.
It has seemed to me, however, that the principle of that decision relates exclusively to the case of disputed boundaries, and that the distinction is clearly drawn between that case and one like the present; that between them the obvious difference exists that the former is a case of `original claim to territory,' while the other is `one of actual conquest.'
It is said, on the part of the United States, that if a belligerent can, after a declaration of war, grant any portion of his property *362 he can grant the whole, and thus might, by granting himself away escape responsibility. The case supposed is an extreme one. It can rarely occur that a nation will seek safety by self-destruction.
But in such case the adversary might refuse to recognize such a voluntary suicide as affecting his rights. For the purpose of obtaining satisfaction he might justly treat the nationality sought to be extinguished as still existing. But in all Courts his rights would be enforced against the successor or grantee of the extinguished Sovereign.
The question would then be purely political, for the new Sovereign, whether to carry on the war or accede to the demands of the enemy of his grantor, and for the latter whether to prosecute the war against the new Sovereign. Little aid, however, can be derived from the consideration of such extreme and improbable cases.
It is further urged, that the doctrine contended for on behalf of the United States is in the prize law.
It may, perhaps, be admitted that a theory of maritime prize formerly obtained, which assumed that a belligerent has a vested right by the declaration of war in all sea-borne private property of the other belligerent; that no such property can be the subject of lawful sale; that all contracts of sale touching belligerent property of any sort, though valid on land, are invalidated by the mere fact of such property being embarked on the ocean, and that if transferred to a neutral after the declaration of war it is a lawful prize to the other belligerent.
Such is not now the received law of nations. It is now admitted that the bona fide sale of the ships of belligerents to neutrals in time of war is lawful and valid unless made in transitu.
In the Johanna Emilia, 29 Eng. L. & Eq. R., p. 562, Dr. Lushington says: `It is not denied that it is competent for neutrals to purchase the property of enemies in another country, whether consisting of ships or anything else. They have a perfect right to do so, and no belligerent right can override it.'
*363 Such is the doctrine maintained by our Government. See opinion of Mr. Attorney-General Cushing, October 8, 1855.
If a sale to a neutral of a ship in transitu is held invalid as against a belligerent, it is not by reason of any inchoate right or lien acquired by the latter by the mere declaration of war, or because the right of the enemy to dispose of his property is invalidated by the declaration of war, but because a sale of a ship in transitu is taken as proof of collusion and fraud, and as showing that no absolute transfer has, in fact, been made. The soundness of even this rule is doubted by the Attorney-General in the opinion referred to.
A sale of a ship not in transitu by a belligerent to a neutral is valid as against a subsequent captor, no matter how imminent the danger of capture would have been had she remained enemy's property, and no matter what may be the number of hostile fleets fitted out to cruise against her and similar property of the belligerent.
It appears, then, that the law of nations, with regard to prize of war, does not recognize the principle contended for.
It is urged, however, that this principle lies at the foundation of the doctrine of post liminii.
It is argued that a state of war implies the reciprocal denial, by each belligerent, of all rights on the other.
That each relies upon force alone  force to retain or force to take.
They are thus in æquali jure.
The principle, therefore, by which, on a reconquest, the original title revives, and is deemed to have been uninterrupted, is founded on the presumption that the displaced Sovereign intended a reconquest when he was displaced, and his title on a reconquest relates back to the time when he is presumed to have formed such intention. If, then, (it is argued,) the title by reconquest relates back to the time of the formation of the intention to reconquer, the title by conquest must relate back to a similar period; for a state of war implies the negation of all antecedent right on either side. The only difference between the cases being, that in the case of a reconquest, the intention to *364 reconquer is presumed until the jus post liminii is extinguished, while in the case of conquest that intention must be shown by the political acts and declarations of the conqueror.
The argument is ingenious, but the premises are, I think, erroneous.
It is assumed that a new title is acquired by a Sovereign who recovers territories from which he has temporarily been driven.
On the contrary, he holds it by his original title, which could only have been displaced by a permanent conquest. But the fact that he recovers the territory, proves that what seemed a conquest was but a temporary dispossession. The invader, therefore, acquired no rights, nor did the original sovereign lose any. He continues to rule, not by a newly-acquired title which relates back to any former period, but by his ancient title, which, in contemplation of law, has never been divested.
Nor is it true that war is the reciprocal denial of all rights by the belligerents, with respect to the territories of either.
A conqueror does not deny that the territory seized was, at the time of the conquest, the territory of his enemy, any more than the attaching creditor denies the property attached to be that of his debtor.
On the contrary, he asserts it to be his. He seizes it as the property of his enemy, and because it is his. He asserts no antecedent title in himself. He declares, not that the territory was his, but that he will make it his by conquest.
The title or right acquired by a conquest is not the same as that of the original possessor.
It is temporary and precarious, and ceases the moment the conqueror is expelled. If, indeed, a title by conquest can be said ever to have existed when the event has proved that the attempted conquest could not be maintained.
The title of the original owner is wholly unaffected by the temporary dispossession; and even during his dispossession, it is treated as valid and subsisting, until the jus post liminii has been extinguished.
The extinction of the post liminii is necessary to ripen the *365 temporary and merely possessary right of the conqueror into such an ownership of the territory as neutrals can recognize.
If these views be correct, the case of a reconquest does not present the instance supposed of a title relating back to the period of the formation of the intention to reconquer.
But the further discussion of this subject would require more time and space than can be devoted to it.
It might, I think, be demonstrated, that a rule which supposes all rights of a Sovereign, with respect to territory subsequently conquered, to cease as against the conqueror, not when war is declared, but when the war is prosecuted with the object of conquest, when expeditions are fitted out for the purpose, and when the conquest is `imminent and inevitable,' is not susceptible of practical application as a rule of international law.
That those rights must continue until the date of actual conquest, or of the treaty of cession, or else must cease at the declaration of war, and that an attempt to estimate the `imminency' of the conquest at any intermediate period, or to try the validity of the exercise of sovereign rights, by calculating the chances of war at a particular moment, would be impracticable and illusory.
On the whole, I am of opinion that the right of Mexico to grant her public domain in California, continued until the conquest of the country by the United States.
It is further urged, on the part of the United States, that grants made after the 13th May are not protected by the treaty of peace, because such was not the intention of the parties.
That the Mexican Commissioners who negotiated the peace, and who represented the claimants as well as the Mexican Government, solemnly, and after special inquiry, declared that none such existed; and that the treaty was negotiated on the faith of this declaration.
It is admitted that such a declaration was made, and embodied in the project of the treaty submitted to the Senate.
Had this declaration been contained in the treaty as adopted and ratified, it might very possibly have been regarded as a *366 covenant or stipulation that no such grants should be deemed valid by the United States.
But the clause containing it was struck out by the Senate, not by the general vote which struck out the whole of the 10th article, of which this declaration formed a part, but by a distinct vote upon the question whether this particular clause should stand as a part of the treaty.
The Court cannot assume, therefore, that a treaty was assented to by the United States on the faith of this declaration by Mexico, else why strike it out? It may, not unreasonably, be supposed that the Senate refused to allow the declaration to remain, because they were wiling that grants made after the 13th May, if any such there were, should be submitted to the Courts, and rejected or confirmed, as might be just.
But assuming that the treaty was concluded on the faith of this declaration, the rights of an individual to his property cannot be affected by it.
The stipulation in the treaty by which the property of the inhabitants of the ceded territory was secured, conveyed to them no additional rights. `An Article to secure this object, so deservedly held sacred in the view of policy as well as of justice and humanity, is always required and never refused.' 12 Wheat., 536.
`When such an article is submitted to the Courts, the inquiry is, whether the land in controversy was the property of the claimant before the treaty.' United States vs. Arredondo, (6 Pet., 712.)
If, then, the land in controversy was the private property of the claimant when the country was acquired, it must have remained such, though no treaty had been made. The United States do not claim to have acquired the ownership of any other property than the public property of the enemy, nor could they justly have demanded that Mexico should assent by the treaty to the confiscation of any property the right to which was vested in private individuals.
If, then, the United States have been wilfully or accidentally deceived, as to the amount of property held in private ownership *367 in the ceded territory, they may have a right to demand a return of some portion of the pecuniary equivalent paid by them.
The fraud or mistake of the Mexican Commissioners can have no effect upon a private right held sacred by the laws and usages of all civilized nations, which was not derived from the treaty, and which, had it been known to exist, the United States would have been bound to respect.
These observations are made with reference to the general proposition maintained at the bar, viz., that the declaration by Mexico that no grants had been made subsequent to May 13, 1846, invalidated all such grants to the same extent as if a stipulation to that effect had been embodied in the treaty."
In the brief filed in the case at bar, the Court is invited to review the grounds of the foregoing opinion; and the question is discussed by the counsel of the United States with characteristic ingenuity and ability.
The authority chiefly relied on in support of the position taken by the counsel for the United States, is Bynkershoek.
"We make war," says the author, "because we think that our enemy, by the injury he has done us, has merited the destruction of himself and all his adherents; as this is the object of our warfare, it is immaterial what means we embrace to accomplish it." * * * "A nation which has injured another, is considered, with everything that belongs to it, as confiscated to the nation that has received the injury. To carry that confiscation into effect, may certainly be the object of the war, if the injured nation thinks proper."
The doctrine here maintained, that in war, poison and every species of fraud may rightfully be used, has received the general condemnation of mankind. It may be the censure on Bynkershoek is not wholly deserved, inasmuch as he expresses no approval of those practices, but differs from other writers mainly in distinguishing between the absolute rights of war and those voluntary relinquishments of them which are dictated by humanity and generosity.
*368 But if it be admitted that humanity, Christianity, and the usages and rules observed by all civilized nations (which constitute public law), forbid even in war the use of certain means, the discussion whether such rights abstractly exist, would seem to be a disputation savoring rather of the subtlety of the schools than of that practical sense which seeks to discover and establish the actual rules by which nations in a state of war are governed.
That the rights of war, as deduced by Bynkershoek, from a consideration of its abstract nature, are mitigated by the laws of war as established by the general consent of nations, with respect to the effects of conquest, as well as to the mode of warfare, is proved by the general recognition of the principle that, on the conquest of an enemy's territory, private rights of property are to be protected.
But if "a nation which has injured another is to be considered as confiscated, with all that belongs to it, to the nation that has received the injury," this confiscation must extend to private as well as public property.
A declaration of war undoubtedly involves the assertion of the right to measure and forcibly to exact an indemnity for the wrong which has occasioned the war.
To seize, to conquer, or to destroy an enemy's goods, his territory or his armed adherents, are but the means of exacting this indemnity.
As a matter of theoretical speculation, we may consider the seizure, the conquest, or the destroying, as done by virtue of a previous fictitious or hypothetical confiscation of property, or forfeiture of life, incurred at the date of the declaration of war. But the necessity of such a theory is not very apparent. For the right to subdue the enemy being admitted, as a means of obtaining an indemnity for previous wrongs, the supposed constructive confiscation can add nothing to the rightfulness of those acts. It is for this reason said, in the opinion above cited, that "the conquest of an enemy's country, admitted to be his, is not the assertion of an antecedent right. It is the assertion of the will and power to wrest it from him." On which the counsel for he United States observes: "Then all governments are highwaymen! *369 Forcibly to take without antecedent right is a very good definition of robbery."
The inference is not just. Conquest is, undoubtedly, the assertion of a right, but it is the right to conquer which results from a state of war.
It is not the assertion of a previous right or title to the territories conquered.
Whether in so doing the belligerent is acting like a highwayman, depends upon the moral justification for the war, an inquiry into which neither neutrals nor the Courts of the belligerent can enter.
The hypothesis of an antecedent confiscation, to enforce which the seizure is effected, in no way affects the question. The moral justification of the supposed confiscation has still to be considered  in other words, the justice and rightfulness of the war.
But whatever be the reasonableness or necessity of supposing this theoretic confiscation by belligerents, of everything belonging to the enemy, it is manifest that by the laws of nations the confiscation is waived where territory is conquered, so far as respects private property; and especially where the conqueror, by the terms of the treaty of cession, has bound himself to respect all rights of private property existing at the date of the conquest.
To repudiate that obligation with respect to any property held in private ownership on the ground that, though private property when the conquest was effected, it was public property ten or twenty or thirty years before, when the war commenced, and that a writer on public law has said, that the declaration of war is a confiscation of all the property of the enemy, and that the conquest was merely carrying into effect the confiscation, would seem an attempt to justify the breach of a plain and positive obligation, which needs but to be stated to be condemned.
The obvious and natural construction of the treaty is, I think, manifestly the true one, viz., that all private property bona fide acquired, and held as such by a legal or equitable title obtained under the former Government, is to be respected by the bellige *370 rent, to whom by conquest and treaty the rights of sovereignty have been transferred.
I do not think it necessary further to discuss this question. It is enough to say that I have attentively considered all that is urged by way of argument or illustration in the brief filed by the counsel for the United States. I have found nothing to which the answer did not appear to me easy, or which has shaken my confidence in the justness of the views previously entertained by the Court.
The question might well have been dismissed without argument; for we have an authoritative decision of the Supreme Court on the point. In the case of The United States vs. Pico, (23 How. R. 326,) the Court says: "In the Act of Congress of 1851, and the decisions of this Court that day (viz., July 7th 1846, the date of the capture of Monterey and constructively, of the conquest of California,) is referred to as the epoch at which the power of the Governor of California, under the authority of Mexico, to alienate the public domain, ceased."
As, however, the point then before the Court was the determination of the precise date of subversion of the former Government, and to decide upon the validity of acts done under Mexican authority after that event  while the validity of acts done previous to it was not questioned, nor does the point raised in this case appear to have been presented to the Court  I have thought it not improper to examine at some length the acute and ingenious argument submitted by the counsel for the United States.
I have given to this case much and anxious consideration. The preparation of this opinion has required more labor than even its great length would indicate.
Voluminous as it is, I am nevertheless aware that it is in many respects incomplete.
To have treated at length every point in the case would have extended it far beyond all reasonable limits.
I cannot conclude my labors on this most important case, without acknowledging the great assistance which the Court *371 has derived from the very able and eminent counsel engaged in it.
Their indefatigable and exhaustive industry has presented to the Court every argument, authority and illustration which profound and patient study, not only of the American and English, but of the Mexican and Spanish laws, could suggest; together with every view of the complicated facts in the case, and of their relations to each other, which could assist the Court in its study of the mass of depositions which have been taken.
To the Court has been left merely the duty of considering the suggestions, and collecting and combining the abundant materials contained in the briefs of counsel.
On the whole case my opinion is:
That the claimants are entitled to seven pertenencias, to be measured in the manner, of the form, and of the dimensions prescribed in the Ordenanzas de Mineria of 1783.
And, also, that they are entitled to two square leagues of land, to be located on the land of their mining possession, but in such a way as not to include any land granted in private ownership, by competent authority, previously to July 7th 1846."